**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States District Court
Southern District of Texas
FILED

APR 2 1 2009

Michael N. Milby, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| EX REL. **KENNETH W. ABBOTT**, | § |
| | § |
| Plaintiff | § |
| | § |
| v. | § |
| | § |
| BP EXPLORATION AND | § |
| PRODUCTION INC., BP AMERICA | § |
| INC. and BP p.l.c., | § |
| | § |
| Defendants | § |

**H-09-1193**

CIVIL ACTION NO. _____
**JURY**

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

**FILED *IN CAMERA* AND UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

**I.**
**PARTIES**

1.      The Plaintiff is the United States of America *ex relatione* Kenneth W.

Abbott under the provisions of 31 U.S.C. § 3730(b).  Kenneth W. Abbott ("Relator") is

an individual residing in Houston, Texas.

2.      Defendant BP Exploration and Production Inc., also known under its com-

mon or assumed name, "BP," is a foreign corporation doing business in Texas.  Defen-

dant BP Exploration and Production Inc. is incorporated under the laws of Delaware, with its home office at Post Office Box 1036, Warrenville, Illinois 60555-1036.

Pursuant to 31 U.S.C. § 3730(b)(2), service of process on this Defendant shall be deferred until ordered by the Court.  When ordered by the Court, Defendant BP Exploration and Production Inc. may be served with process through its registered agent for service, C T Corporation System, at 350 North St. Paul Street, Dallas, Texas 75201.

3.     Defendant BP America Inc., also known under its common or assumed name, "BP," is a foreign corporation doing business in Texas.  Defendant BP America Inc. is incorporated under the laws of Delaware, with its home office at P.O. Box 1036, Warrenville, Illinois 60555-1036.

Pursuant to 31 U.S.C. § 3730(b)(2), service of process on this Defendant shall be deferred until ordered by the Court.  When ordered by the Court, Defendant BP America Inc. may be served with process through its registered agent for service, C T Corporation System, at 350 N. St. Paul Street, Dallas, Texas 75201.

4.     Defendant BP p.l.c., also known under its common or assumed name, "BP," and also known as "BP Global," is a foreign corporation doing business in Texas. Defendant BP p.l.c. is incorporated under the laws of England, with its principal executive offices at 1 St. James's Square, London SW1Y 4PD, England.

Pursuant to 31 U.S.C. § 3730(b)(2), service of process on this Defendant shall be deferred until ordered by the Court.  When ordered by the Court, service of proc-

ess on Defendant BP p.l.c. may be had by serving the Texas Secretary of State pursuant

to Tex. Civ. Prac. & Rem. Code. Ann. § 17.044, by certified U.S. mail, return receipt re-

quested, addressed to the Office of the Secretary of State, Statutory Documents Section -

Citations Unit, Post Office Box 12079, Austin, Texas 78711-2079.

## II.
## JURISDICTION AND VENUE

5.      This Court has jurisdiction and venue of this action pursuant to 28 U.S.C. §

1331 and the False Claims Act, 31 U.S.C. § 3732(a).

## III.
## SERVICE OF PROCESS

6.      Pursuant to the provisions of 31 U.S.C. § 3730(b)(2), process shall be

served upon the Government in accordance with Rule 4(i) of the Federal Rules of Civil

Procedure, as follows:

      a.      By sending a copy of the Summons and of the Complaint by Certi-

fied Mail addressed to the Civil Process Clerk at the Office of the United States

Attorney for the Southern District of Texas, Houston Division, at 919 Milam

Street, Suite 1500, Houston, Texas 77002, and

      b.      By serving the Summons and Complaint by Certified Mail to Eric H.

Holder, Jr., Attorney General of the United States, at the United States Department

of Justice, 950 Pennsylvania Avenue, NW, Washington, DC  20530-0001.

7.     Pursuant to the provisions of 31 U.S.C. § 3730, this Complaint is filed *in camera*, and no service of process shall be had upon the Defendants until further order of the Court, pursuant to 31 U.S.C. § 3730(b)(2).

## IV.
## CONDITION PRECEDENT

8.     Relator has direct and independent knowledge of information upon which this suit is based.  Relator has heretofore complied with the provisions of 31 U.S.C. § 3730(b)(2) by providing a written disclosure of substantially all material evidence and information possessed by Relator to the Inspector General of the Department of the Interior and to representatives of the United States Department of Justice.

## V.
## IDENTIFICATION OF PARTIES

9.     Relator is an individual residing in Houston, Harris County, Texas.

10.     Defendant BP Exploration and Production Inc., also known under its common or assumed name, "BP," is a corporation which is the operator of the oil and gas production project in question known as the BP Atlantis Project.  Relator believes that said Defendant is the 55% owner of said project as well as the operator thereof.

11.     Defendant BP America Inc., also known under its common or assumed name, "BP," is believed to be the direct or indirect owner of all or a majority interest in BP Exploration and Production Inc.

12.      BP p.l.c. (also known under its common or assumed name, "BP," and also known as "BP Global," and hereinafter so referred to) is the ultimate corporate parent of both BP Exploration and Production Inc. and BP America Inc.

13.      Upon information and belief, BP Global exercises substantial detailed control over the financing and operations of both BP Exploration and Production Inc. and BP America Inc. and derives the ultimate profit from the fraud alleged herein; likewise, BP America Inc. exercises substantial control over BP Exploration and Production Inc. and profits from its fraud.  Such parents should be required to disgorge the profit which they have obtained from the fraud.

## VI.
## SUMMARY OF ALLEGATIONS

14.      The BP Atlantis Project is an oil and gas production project operated by the Defendants on submerged federal lands on the Outer Continental Shelf pursuant to leases under 43 U.S.C. Ch. 29 and regulations enacted thereunder.  The lease grants to BP the right to acquire additional property rights from the Government, including to-wit: production rights to produce oil and gas.  To acquire production rights, BP was required to meet certain conditions -- including to certify and verify the design and construction of its production platform and related equipment (facility) as meeting federal requirements for human and environment safety.  In summary, BP had to certify and verify that:

      a.   The facility had an approved engineering design meeting specific safety engineering requirements;

      b.   The fabrication/construction of the facility conformed to the approved engineering design which plan was then approved by the Government;

      c.   The installation of the facility conformed to approved installation plans;

      d.   The design plans and specifications and "as-built" engineering documents were maintained by BP at a specified location for the life of the facility;

      e.   The facility met safety hazard analysis (HAZOP) provisions of specified American Petroleum Institute (API) recommended practices for such installations.

15.     For each of these requirements, BP submitted documentation, certifications and verifications for Government approval.  After all approvals, BP was granted the "production rights" and began production in November, 2007.

16.     Defendants' certifications were false.  At least as to the Subsea Project portion of the project, there are no "approved for design" engineering documents, "approved for construction" engineering documents or "as-built" engineering documents for large portions of the work; without a complete set of such documents, all these certifications and verifications are false.  Without these documents, critical safety requirements, such as the required HAZOPs, cannot be met and oil and gas cannot be safely produced through the platform and its equipment.

17.    The false certifications and records were presented to the Government by BP in support of its false claim of entitlement to production rights; by the use of such false documents, BP obtained government property, namely, production rights to Government owned oil and gas, through the Project Atlantis platform and related subsea equipment.  BP has now commenced producing through such equipment.  BP has taken federally-owned oil and gas in amounts likely exceeding $5 billion in value.

18.    BP has presented for approval to the Government false accountings (predicated upon the false claim of rightful production) falsely representing that BP is entitled to retain the substantial portion of the value of the product while remitting only a small fraction in royalties to the Government.

19.    BP's conduct makes a mockery of the statutory requirement of 43 U.S.C. § 1347:

> (b)    Use of best available and safest economically feasible technologies
> [T]he Secretary . . . shall require, on all new drilling and production operations and, wherever practicable, on existing operations, the use of the best available and safest technologies . . . wherever failure of equipment would have a significant effect on safety, health, or the environment  . . . .

43 U.S.C. § 1347.

# VII.
# PUBLICLY AVAILABLE BACKGROUND

20.    BP Exploration and Production Inc. is the operator of an oil and gas production development project known as the BP Atlantis Project which is a joint venture of

BP (56%) and BHP Billiton (44%).  The project is located upon leases obtained from the United States Department of the Interior pursuant to 43 U.S.C. § 1334 et seq. on the Outer Continental Shelf along the Sigsbee Escarpment of Green Canyon Blocks 699, 700, 742, 743 and 744, approximately 190 miles south of New Orleans, Louisiana.  The project is located in water depths ranging from approximately 4400 to 7200 feet.

21.    The BP Atlantis Project is subject to the provisions of 43 U.S.C. § 1334 et seq., and 30 C.F.R. § 250.101, et. seq.  These provisions authorize the leasing of federal lands for oil and gas development and prescribe the terms upon which the Government will sell its production to development companies such as BP.

22.    Before it could obtain permission from the Government to install equipment to extract and take possession of the Government's hydrocarbons from beneath the sea, BP was required to obtain approval from the Department of the Interior, through the Minerals Management Service (MMS).  Compliance with specific health, safety and environmental requirements is required by the statutes and regulations; these requirements are incorporated by law into the leases and compliance is a condition of the continuation of a lease once granted.  43 U.S.C. § 1334(b). Certification of compliance with specific requirements is required and approval of certain requirements is a prerequisite to beginning production (*i.e.*, taking oil and gas from Government lands). 30 C.F.R. § 250.293; 30 C.F.R. § 250.800.

23.     The BP Atlantis project is newly constructed.  Its production system includes a moored, semi-submersible platform connected to a Subsea System which, in turn, is connected to and receives oil and gas production from under sea oil and gas wells. The first project phase, known as Drill Center 1 (DC-1/SS1) has been completed and began production in the latter months of 2007.  DC-3 is scheduled to begin production in mid 2009.

24.     According to the BP America Inc. website, BP Atlantis began production in October, 2007.  Atlantis is rated to produce 200,000 barrels per day of oil and 180 million cubic feet per day of gas.

## III.
## RELATOR'S KNOWLEDGE AND INFORMATION

25.     On August 18, 2008, Relator was employed to work (through a third-party employment company) in the administrative offices of the BP Atlantis Project located on IH-10 at Kirkwood in Houston, Harris County, Texas.  Relator's office was located at Energy Tower 1, 11700 Katy Freeway.  Other offices of the Project were located at 501 Westlake Park Blvd., Houston, Texas.

26.     Relator was not involved with any of the certifications or verifications described above.  All such certifications and verification would have been filed before Relator's employment with BP began.  Upon information and belief, Relator asserts that BP

filed the requisite certifications and verifications needed to obtain approval for the Project Atlantis platform and related equipment required to begin production, that BP's certifications and verifications were false for the reasons set forth herein, and that the Government's approval for development and production was thus obtained by fraud and is invalid.

27.     Relator worked as a project control supervisor on the subsea portions of the Project with the title of Project Services Lead.  Part of Relator's responsibility was to supervise the databases which maintain critical project documentation.  One of Relator's immediate subordinates was Tinikka Curtis, who was the direct administrator of the documentation databases.

28.     Relator has worked in administration of project control for engineering projects for over 20 years and is familiar with normal procedures in the industry for such projects.

29.     During an engineering project such as Atlantis, design and construction engineering documents normally go through multiple phases, beginning as design concepts and ending with "as-built" engineering documents.  Although nomenclature may vary from project to project or company to company, the general process is the same.  The process generally expected as per BP-specific procedures included:

     a.     Engineering documents "Issued for Approval" (IFA) by the contractor for BP comments;

      b.      Engineering documents "Issued for Design" (IFD) by the contractor after BP comments or concerns are incorporated;

      c.      Engineering documents "Issued for Construction" (IFC) with BP's approval as correct for actual fabrication and construction of the project;

      d.      "As-Built" engineering documents which are the latest revision of construction engineering documents altered as necessary to reflect the actual, "as-built" condition.

30.     In any phase, there may be several engineering analyses and reviews referenced on the document. At various phases, the final result is signed by the responsible engineer. The final engineering document contains the complete history of changes, including the engineering approval and signatures from the earlier phases.

31.     The phase of any particular engineering document as it exists at a given time is shown by a type of lettering designation (for example, IFA, IFC, IFD, as shown above) which is shown on the document and carried forward onto the database listing of documents.

32.     In Relator's ordinary administrative work for BP, he had access to and made use of databases containing the Atlantis engineering documents and gained personal knowledge of the contents of the databases. The BP Atlantis databases containing the documents were exact copies of similar databases maintained by the prime engineering contractor for the project, so that BP Atlantis had copies of all documents. It is Rela-

tor's understanding, based on the system as he learned it while working at BP, that there are no engineering documents in existence other than those in BP's databases.

33.     Soon after beginning work on the Project, Relator learned that BP Exploration and Production Operations did not have complete "as-built" engineering documents for the subsea aspects of the BP Atlantis Project, including such critical systems as Piping and Instrument Diagrams (P&IDs), mechanical, controls, and installation engineering documents.

34.     "As-built" documents are critically necessary to the safe operation of an installation of this nature.

    a.   The platform and related structures are a complex of piping, manifolds, valves, pressure control, safety and safety shutdown, electrical, electronic, data, mechanical, hydraulic and other equipment controlled by a network of wiring operated through multiple, inter-related operating stations, many of which are automated to respond to instruments which electrically measure temperatures, pressures, flow rates and other inputs.  The facility includes a semi-submersible floating structure at the surface connected to producing wells thousands of feet below at the seabed, delivering oil and gas at high pressures to the surface facility.

    b.   "As-built" documents are routinely consulted by operating personnel as part of normal and emergency operations.  Development of safe operating procedures, training, conducting hazards analyses (HAZOPs) and "management of

change" (MOCs) are a few of the needs requiring availability of as-built documen-

tation.  Change is a constant to most such installation due to routine needs to re-

pair, replace or upgrade equipment, or to update or enlarge the facility.  Project

Atlantis is changing moment by moment as construction continues on additional

drill centers.  Change requires orderly, procedural MOCs and HAZOPs to assure

that change is safety integrated into the existing facility, both in terms of the

physical connections of equipment and in terms of operating procedures and train-

ing.  All of this is critical to safe operations, and all of it rests on a foundation of

available "as-built" documents.

35.     The lack of "as-built" engineering documents was well-known to the man-

agement of Project Atlantis, including William H. (Bill) Broman, Atlantis Subsea Direc-

tor, who reported to Simon Todd, the Vice President of Atlantis.  Mr. Broman sent and

received emails and participated in meetings on this subject.

36.     Shortly after beginning work, Relator was sent by Barry Duff (his immedi-

ate predecessor in Relator's job) a copy of an email memo written by Duff to other man-

agement personnel on the subject of lacking "as-built" documents on August 15, 2008

(prior to Relator's beginning work).   The Duff email went to various management per-

sonnel including Bill Broman and Bill Naseman, Atlantis Project Controls Supervisor.  In

his email, Duff reported that Tinikka Curtis, Document Control Administrator, had been

asked by the Operations Document Control person (Christy), to provide all the Subsea

P&IDs regardless of their status (e.g, complete or not complete, handed over or not handed over).  Christy would not say who made the request, but Duff believed it was coming from Nita Oza to support an IM (Information Management) Evaluation she was leading.  (It was not surprising that Operations would ask for the documents since it is generally known that Operations should have "as-built" P&IDs available to work with. Note this lack of P&IDs discussion occurred about 10 months after production through the platform had commenced.)

37.     Duff's email advised his management, including Broman, that he had re-fused to provide the P&IDs because they were substantially incomplete; Duff's email conveyed the information that:

a.     "hundreds, if not thousands" of critical documents have never been finalized;

b.     "this could lead to catastrophic Operator errors;"

c.     categories of critical documents which are not complete in-clude such critical documents as Piping and Instrument Dia-grams (P&IDs), mechanical, controls, and installation engi-neering documents;

d.     due to incompleteness, such critical documents cannot be turned over to Operations which is, thus, forced to conduct operations of the Project without access to such documents;

this is well-known in the industry to be a fundamental viola-

tion of safe practice;

e.    "the document numbering scheme is so fundamentally

flawed" that document numbering frequently does not distin-

guish between mechanical, electrical, P&ID, etc.;

f.    the document database system frequently does not allow di-

rect association of a given document with the equipment or

geographic subsea location to which it relates; for example,

documents are not categorized by drill center.

38.    Attached to the Duff email was another from Malcom Vass, Project Man-

ager of Technip, the outside prime contractor involved, promising to provide completed,

"as-built" P&IDs for BP and its operators within three weeks.  While Relator was work-

ing with BP, Technip did not provide the "as-built" drawings.

39.    On or about August 30, 2008, Relator was one of the recipients of an email

from Duff relating to Duff's efforts to get a decision from upper level management to re-

solve the lack of proper engineering documents and other issues discussed in the August

15, 2008 email.  Duff noted in this email that he had been trying to get management to

approve Duff's plan to fix the engineering documents problem since May 1, 2008; he at-

tached an email from Andrew Gregg advising that Duff's plan would cost $2 million and

was not approved.

40.     Shortly after beginning work, Relator also learned that, in many cases, there was an absence of "approved for construction" engineering documents.

41.     When Relator began his employment with BP, Drill Center 1 (DC-1) was in production and the next drill center, DC-3, was under construction.  (A drill center is equipment that gathers production from a group of wells and passes it through subsea equipment to the platform).  Relator soon learned there was a lack of "Issued for Construction" engineering documents for either DC-1 or DC-3; Relator communicated on this subject and on the subject of the unavailable but promised P&IDs with Malcom Vass at Technip.

42.     By October 20, 2008, Relator emailed Ryan Malone, Project Manager for the DC-3 project and Bill Broman, overall Project Atlantis manager, informing them that:

  a.     Technip had not provided the P&IDs as promised, and

  b.     BP did not have "issued for construction" engineering documents for either DC-1 or DC-3, and there was no apparent schedule for their completion.

Relator expressed concern over having fabrication and installation under way without approved, "issued for construction" engineering documents.

43.     On November 19, 2008, Relator and Tinnika Curtis advised Bill Naseman (their manager) and Bill Broman that the "lead engineers" responsible for various aspects of the project were failing to ensure proper coding of documents by which a particular

document for a particular piece of equipment could be related to the project sector it actually belonged to, and were failing to issue the needed "as-built" engineering documents to Operations for the DC-1 project which was already in production (for about 1 year by that time). It was explained that a large number of the documents in the relevant database were not "as-built" engineering documents. The database itself showed the status of the engineering documents and many had not been issued as being "as-built." In addition, after examining the actual electronic file attachments in the database containing the engineering documents themselves, the engineering documents were not stamped "as-built" as required if they were "as-built." The email informed management that it was critical that Operations be provided with "as-built" engineering documents. The email also included a proposed plan of action to remedy the situation.

44.     The lead engineers were extremely resistant to the proposed plan of action. No additional "as-built" engineering documents were completed for the DC-1, but the lead engineers complained to Relator's manager (Bill Naseman) and the Atlantis Project Manager (Bill Broman).

45.     A spreadsheet workbook file entitled "DC-1 n SS-1 Closeout - Sector Report RevA" was prepared in November 2008 which detailed thousands of engineering documents which were incomplete and had never been brought to the "as-built" stage. This extensive spreadsheet itemized thousands of engineering documents including drawings, plans, specifications and related engineering documents and the status of each. It

was prepared in the ordinary course of business of the BP Atlantis Project.  Relator was

entitled to and did have access to it.  Using the spreadsheet, Relator summarized the

completion status of the engineering documents for DC-1 only, grouped by project "sec-

tor" and calculated the number and percentage of incomplete documents for each sector.

Eighty-nine percent (89%) of the documents were not yet approved by BP.  Only 274 out

of over 7,000 documents were "as built," even though DC-1 had been in production for

over a  year.  The results are summarized in the chart which follows on page 19 (remain-

der of this page left blank):

## Subsea Systems (DC-1 Only)

| Sector No. | Total | IFD | IFC | As-Blt | Not Yet App by BP | % Not App by BP |
|---|---|---|---|---|---|---|
| 30<br>Subsea Systems (well-heads, manifolds, flowlines and risers) | 1,266 | 27 | 86 | 101 | 1,052 | **83%** |
| 31<br>Wellheads | 22 | 0 | 0 | 0 | 22 | **100%** |
| 32<br>Trees | 570 | 1 | 9 | 1 | 559 | **98%** |
| 33<br>Manifolds | 161 | 5 | 4 | 0 | 152 | **94%** |
| 34<br>Pipelines/Flowlines | 2,383 | 1 | 108 | 0 | 2,274 | **95%** |
| 35<br>Controls | 1,351 | 14 | 36 | 36 | 1,265 | **94%** |
| 36<br>Umbilical | 454 | 2 | 201 | 56 | 195 | **43%** |
| 37<br>Risers | 750 | 0 | 1 | 80 | 669 | **89%** |
| 38<br>Installation | 219 | 0 | 14 | 0 | 205 | **94%** |
| TOTALS | **7,176** | **50** | **459** | **274** | **6,393** | **89%** |

46.    It is Relator's understanding that virtually all of these items are of critical

importance to the safe and proper functioning of a system which handles oil and gas

flows thousands of feet beneath the surface of the sea under extreme pressures and temperatures.

47.     On November 24, 2008, Bill Broman emailed all Atlantis engineering leads to the effect that there was a "large issue" with the subsea documentation and that it would be necessary to get it cleaned up. He forwarded Relator's emails and urged that everyone cooperate and work together to develop timing and resources to get something done.

48.     On December 2, 2008, Broman held a staff meeting. Some of the lead engineers present at the meeting questioned why the leads needed to check the engineering documents for correctness and for correct number coding when they signed them off, and why did they need to push for final as-built engineering documents. They were argumentative with Relator about this, and they also asked what procedure said they had to do these things. Bill Broman's staff, including the other project managers and lead engineers, were present at the meeting, and witnessed the heated exchange.

49.     Relator responded to the leads that it was BP procedure as outlined in BP's Project Execution Plan to do so and every oil company required their lead engineers to review engineering documents for accuracy and to obtain as-built final engineering documents from all vendors for operations before startup. After the meeting on December 17, 2008, Relator emailed the lead engineers Section 6.2 of the Atlantis Subsea Project Execution Plan which required the Lead Engineer for each discipline area to ensure

that all technical documentation is updated to reflect the as-built condition of the equip-

ment prior to deployment to the field.  Relator emphasized to the leads that before the

DC-1 unit started production one year before, final "as built" engineering documents

should have been turned over to offshore operations, and they had not been, and that must

be remedied as soon as possible.

50.     In a staff meeting with Bill Naseman (Relator's manager) on December 8,

2008, Relator attempted to discuss this issue with Naseman, but Naseman refused to dis-

cuss it.  Witnesses to Relator's efforts to discuss the subject included Eddie Antoine, John

Vernor, and Frank Schoenfeldt.

51.     In a meeting on January 12, 2009, between Atlantis Project Controls Su-

pervisor Bill Naseman and Relator, Naseman informed Relator that Relator had been "too

aggressive" with the lead engineers in attempting to get them to correct their engineering

documents and issue "as-built" engineering documents.

52.     Ron Berger is the Operations Manager for the Atlantis Project.  Relator

and Tinnika Curtis met with him in early January 2009 to discuss his concern that Opera-

tions still had not received "as-built" engineering documents.  Relator advised him of the

difficulty with the lead engineers and of Relator's plan to solve the problem, and sent

him, by email dated January 17, 2009, copies of the Subsea Project Execution Plan re-

quirement and Relator's plan to get the "as built" documents.

53.    Relator was discharged allegedly due to a "reduction in force" on February 3, 2009.  To the best of Relator's knowledge and belief, the issues respected the as-built documents and other incomplete documents have never been resolved.

54.    As discussed above, a great many of the engineering documents in the databases, although they should be in final, "as-built" status, are only in the very early stages of development.  The spreadsheet file entitled "DC-1 n SS-1 Closeout - Sector Report RevA" lists thousands of engineering documents and design documents which have never been completed to "as-built" status; many are still in the very early stages of development although the drill center to which most relate (DC-1) has been completed and in operation for about 18 months.

a.    As an example, only 459 of over 7,000 documents have been issued for construction.

b.    As another example, in the Controls Sector, there are 33 P&ID documents used for DC-1; of these, only 6 indicate having been approved for design; of the 6, only 2 indicate approval for construction, and none are shown "as-built." This means that, for many critical components of the project, there is no record that the engineering work needed was actually done, or that the item was constructed in accordance with an approved engineering design.

55.    While working on the BP Atlantis Project, Relator devoted many hours in meetings with the project manager and other staff members seeking to develop proce-

dures to obtain the required documents. Although plans were developed and promises made, little progress was made. The "as-built" engineering documents should incorporate the entire engineering history of the item in question; Relator doubts whether it is now possible to create proper engineering documents since their absence means that there is no recorded engineering history.

56.     Much of the equipment is required to be subjected to testing during the design or construction process. The results of such testing are required to be maintained (30 C.F.R. § 250.903(b)). Those testing results are stored in the databases for which Relator was responsible.   Relator learned that the nature of the records kept for the test results did not allow the correlation of a particular test result with the item which had been tested. Thus, one cannot learn from the records in the database whether a particular item was tested or what the results were. Effectively, there was no record of the necessary testing. In November, 2008, Relator was informed that BP personnel and Malcolm Vass had reached an agreement on how to correct this problem, but Relator does not know whether this corrective action was ever actually taken.

## IX.
## APPLICABLE LAW AND REGULATIONS AND CONTENTIONS AS TO FALSE CLAIMS

57.     BP submitted to MMS a series of false records and statements, each of which falsely represented compliance with one or more of the conditions BP had to meet to acquire production rights; as a group, these false records and statements falsely sup-

ported BP's false claim of entitlement to Government-owned production for Government-owned oil and gas from Government-owned submerged land.

58.     Pursuant to the regulations, BP has certified that complete "as built" documents are and will be maintained at a specified location. 30 C.F.R. § 250.903(a)(1); 30 C.F.R. § 250.905(j).  The certification is false.  There is no complete set of "as built" plans and specifications.

59.     As a condition to beginning production, BP submitted and obtained approval of a Deep Water Operations Plan (DWOP) (30 C.F.R. § 250.293), including a purported safety hazard analysis (HAZOP) required by 30 C.F.R. § 250.292(j). Also as a condition of beginning production, BP applied for and obtained approval of its production safety system (30 C.F.R. § 250.800).  This also required the submission of a HAZOP and related piping and flow diagrams.  30 C.F.R. § 250.802(e).

60.     These submissions were false.  Upon information and belief, Relator alleges that the HAZOPs submitted (which must be performed under specified API practices) could not be performed without P&IDs.  Since, for example, only a small fraction (6 of 33) Subsea Controls Sector P&IDs were ever approved for design, performing the required safety analysis would have been impossible.  As a result, the DWOP and any HAZOP within it, and the application for safety system approval and any HAZOP submitted under 30 C.F.R. § 250.802(e) were false documents, falsely representing that a proper HAZOP had been conducted when it had not.

61.    Relator believes that the extensive absence of P&IDs approved for design or construction rendered a proper safety analysis impossible, and rendered any document purportedly containing such analysis a false document submitted to secure an approval to which BP was not properly entitled.

62.    The BP Atlantis Project was required to proceed under the Platform Verification Program.  30 C.F.R. § 250.909(a)(1) and (b).  Under that program, verification is required by a Certified Verification Agent (CVA) nominated by the company at the design, fabrication, and installation stages of the program.

63.    The widespread absence of "approved for design" documents means that it would not have been possible to verify that fabrication (construction) of major portions of the subsea equipment was in accordance with an approved design as required by 30 C.F.R. § 250.917(a).  Again taking the Subsea Controls P&IDs as an example, it would not be possible to verify that they were fabricated or constructed to an approved design when 29 of 33 documents were never approved for design.

64.    Similarly, in the installation phase, the widespread absence of "approved for design" and "approved for construction" documents would make it impossible to verify that the subsea structures had been fabricated and installed according to an approved engineering design. Again taking the Subsea Controls P&IDs as an example, it would not be possible to verify that they were fabricated, constructed and installed to an approved design when 29 of 33 needed design drawings never existed.

65.     The final verification report (30 C.F.R. § 250.918(c)) must address "the adequacy of the entire installation phase" including recordkeeping.  30 C.F.R. § 250.918(b)(5).  One of the primary recordkeeping obligations is to create "as-built" documents by make needed changes to earlier documents to reflect the final, as-built condition of each item and the installation as a whole.  In the case of OCS installations, the obligation includes the obligation to maintain both initial design documents and final "as-built" documents available for MMS examination in accordance with the earlier certification.

66.     The final verification report was false because it did not report the absence of "as-built" documents.

67.     Mr. Abbott believes and alleges that the certifications, verifications, and applications for approval which BP was required by law to provide to the Government before beginning production were false when made, because, at the time of each verification or certification, there was a widespread absence of engineering documents which were essential to that certification or verification.

a.     The design, fabrication, and installation verifications were false misrepresentations because the widespread absence of approved for design or construction documents rendered the verifications false; they were used to obtain approval of BP's false claim to production rights under its lease in violation of 31 U.S.C. § 3729(a)(1), (2), and (7);

b.      The final verification was a false misrepresentation for the reasons set forth in subparagraph (a) immediately above and because there was no set of final, "as-built," engineering documents being maintained by BP anywhere in accordance with its certification and the requirements of 30 C.F.R. § 250.90; it was used to obtain approval of BP's false claim to production rights under its lease in violation of 31 U.S.C. § 3729(a)(1), (2), and (7);

c.      The applications for approval of the DWOP and production safety systems were false misrepresentations because the absence of necessary engineering documentation prevented proper HAZOPs, and required information could not have been submitted; they were used to obtain approval of BP's false claim to production rights under its lease in violation of 31 U.S.C. § 3729(a)(1), (2), and (7);

d.      All of the false applications, certifications, and verifications discussed in subparagraphs (a), (b) and (c) were, in combination, false misrepresentations of facts for the reasons stated above; they were used in combination to obtain approval of BP's false claim to production rights under its lease in violation of 31 U.S.C. § 3729(a)(1), (2), and (7);

e.      By use of its falsely obtained production rights, BP acquired possession of substantial quantities of oil and gas produced through the BP Atlantis project; based on information and belief, it sells such product and periodically ac-

counts to the Government for its sales and for the fraction of monies to be paid to the Government (as royalties); in so doing, BP uses the false applications, certifications and verifications discussed in subparagraphs (a), (b) and(c), in combination with accountings rendered to the Government, to falsely claim that the Government is entitled only to a royalty interest in such proceeds (rather than to the 100% of such proceeds to which the Government is lawfully entitled) and to obtain Government approval of such false claim in violation of 31 U.S.C. § 3729(a)(1), (2), and (7).

68.     The use of the false misrepresentations in question has been undertaken by BP "knowingly," *i.e.*, either with actual knowledge of the true facts, or in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the truth or falsity of the information.

69.     All of BP's applications, certifications, verifications and accountings are essential and vital components of the bargained for exchange as stated by Congress:

> "Operations in the Outer Continental Shelf should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health."

43 U.S.C. § 1332(6).

Congress further established that compliance with this policy and the statute and accompanying regulations are made a part of each and every lease.  43 U.S.C. § 1334(a).

70.     In essence, the Government sells hydrocarbons to the producer  (BP) who is allowed to extract those hydrocarbons from undersea (which advances the Government's interest in increasing domestic oil and gas production and produces revenue for the Government) and to do so in a specific manner which advances the Government's interest in avoiding desecration of the environment and threat to human life.

71.     What the Government pays for, when it grants a producer the right to retain a portion of the proceeds for itself and remit the remaining proceeds (royalties) to the Government, includes compliance with the Government's specifications (designed to protect the environment and human life and health) concerning the manner of extraction of the minerals, as well as the obligation by the operator to truthfully certify and verify compliance.  The statutes make clear that the *only* companies eligible to take federal oil and gas production and receive the benefit of the lease provisions are those who comply with the statutes, regulations and lease requirements.

## X.
## DAMAGES TO THE GOVERNMENT

72.     Under the provisions of 43 U.S.C. § 1334:

> The issuance and continuance in effect of any lease, or of any assignment or other transfer of any lease, under the provisions of this subchapter shall be conditioned upon compliance with regulations issued under this subchapter.

73.     BP's knowingly false statements and records submitted to secure approvals of its false claims and monies to which it is not entitled, and its violations of the lease, render it ineligible to take federally owned minerals under the lease, or to retain its share of the value of those minerals it has taken in reliance on lease provisions.

74.     The Government has been damaged by an amount at least equal to the value of the property taken (estimated to be at least $5.6 billion) less any royalties previously paid, and is entitled to recover treble damages.

75.     Additionally, BP is liable for civil penalties prescribed by 43 U.S.C. § 1350 in the estimated amount of at least $12.8 Million.

76.     Operation of the BP Atlantis Project in its present condition poses an immediate threat of serious, irreparable, or immediate harm or damage to human life and to the marine environment for which reason the Government should take immediate action to halt production.

## XI.
## <u>JURY REQUEST</u>

77.     Relator requests a trial by jury.

## XII.
## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Relator prays that the Defendants be

cited to appear and answer herein, and that this cause be set for jury trial; that upon trial,

that the Government recover three (3) times the amount of its actual damages, as well as

civil penalties, and such other and further relief as the Government may justly show itself

to be entitled, and that Relator recover such monies, including attorney's fees and ex-

penses, as he may be justly authorized to recover pursuant to law, and have such other

and further relief as he may be entitled to receive, and general relief.

Respectfully submitted,

By: _____
      DAVID L. PERRY
      State Bar No. 15800000
      Federal I. D. No. 5685
      DLPerry@perryhaas.com
      ATTORNEY-IN-CHARGE

      RENE HAAS
      State Bar No 21406800
      Federal I.D. No. 5680
      RHaas@perryhaas.com
      ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:
PERRY & HAAS
2100 Frost Bank Plaza
P. O. Box 1500
Corpus Christi, Texas 78403-1500

Abbott: Plaintiff's Original Complaint
2009-04-20 DLP/PAS/sbd

Phone: 512/880-7500
Fax: 512/887-9507

and

Patricia A. Shackelford
State Bar No.  00788393
Federal I.D. No. 18745
SHACKELFORD LAW FIRM
P.O. Box 419
Corpus Christi, TX 78403
pshackelford@Shackelfordlawfirm.com
Telephone: (361) 880-7543
Fax:  (361) 887-9507

and

Gerald M. Birnberg
State Bar No. 02342000
Federal I.D. No. 2120
Williams, Birnberg & Andersen, L.L.P.
2000 Bering Drive, Ste. 909
Houston, Texas  77057-3746
Birnberg@wba-law.com
Telephone: (713) 981-9595
Fax: (713) 981-8670