# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. KENNETH W. ABBOTT; KENNETH W. ABBOTT, INDIVIDUALLY; AND FOOD & WATER WATCH, INC.<br><br>Plaintiffs,<br><br>vs.<br><br>BP P.L.C.; BP AMERICA, INC.; BP EXPLORATION AND PRODUCTION INC.; AND BP PRODUCTS NORTH AMERICA, INC.<br><br>Defendants. | Civil Action No. 4:09-cv-01193 |

EXPERT WITNESS REPORT OF MARC I. STEINBERG

I. BACKGROUND

(A) I am the Rupert and Lillian Radford Professor of Law and Senior Associate Dean for Research at the Southern Methodist University (SMU) Dedman School of Law. I am the Director of the SMU Law School's Corporate Directors' Insititute, the faculty adviser to the SMU Corporate Counsel Symposium, and the former Senior Associate Dean for Academics at the SMU Law School. The courses I have taught since I entered full-time

Steinberg-001

Page Two (Expert Witness Report of Marc I. Steinberg)

teaching in 1982 include Business Enterprises (including Corporation Law) and Securities Regulation.

(B)     Prior to becoming a full-time academician in 1982, I was an attorney at the U.S. Securities and Exchange Commission (SEC), including serving as an attorney in the SEC's Division of Enforcement and as the special projects counsel to the SEC's General Counsel.

(C)     From 1986 to the present, I have served as a consultant to law firms and as an expert witness in scores of matters relating to state corporation law. A number of these engagements have focused on the subjects addressed in this expert witness report (Report): stated generally, under custom and practice, the relationships, activities, and/or corporate governance of parent and subsidiary corporations.

(D)     I have authored over 125 law journal articles as well as approximately 25 books. I have written on the subject of "veil piercing," including, for example, a chapter in my coauthored law school textbook entitled "Business Enterprises: Legal Structures, Governance, and Policy" (LexisNexis 2009).

(E)     I am the editor-in-chief of The Securities Regulation Law Journal, am the co-editor-in-chief of The International Lawyer, serve on the advisory board of The Journal

Page Three (Expert Witness Report of Marc I. Steinberg)

of Corporation Law, and am a member of The American Law Institute. I have received the honor of having an annual securities law scholarship given in my name by the Securities Law Section of the Dallas Bar Association to a SMU law student.

(F) I have lectured abroad in the fields of company and securities law, including, for example, presenting at law schools and/or before the practicing bar in Argentina, Australia, China, England, Germany, Israel, Italy, Japan, Russia, South Africa, and Sweden.

(G) I am a member of the Texas Bar, Maryland Bar, California Bar (inactive status), and District of Columbia Bar (inactive status).

(H) A complete copy of my curriculum vita (CV) accompanies this Report in Annex A hereto.

(I) A list of my expert witness court and deposition testimony during at least the prior four years is set forth in Annex B hereto. I am being compensated for all time incurred at the rate of $750 per hour in this matter, with a minimum payment of $10,000.

## II. MATERIALS REVIEWED

The documents, transcripts of testimony, and other materials that I considered in connection with this Report are set forth in Annex C hereto. This list (set forth in Annex C) was prepared at my request by counsel for the plaintiffs. In addition, I reviewed and relied upon pertinent court decisions.

Page Four (Expert Witness Report of Marc I. Steinberg)

### III. ALLEGED FACTS ASSUMED

In this matter, I assume that certain factual allegations set forth in the Plaintiffs' Amended Complaint are accurate. These allegations are that BP Exploration and Oil, Inc. (hereinafter referred to as BP Exploration and Oil) "acquired certain oil and gas leasehold interests from the United States which comprises the oil and gas field currently being produced by the BP Atlantis Project." (Amended Complaint at Paragraph 1.10) It is my understanding that BP Products North America, Inc. is the successor by merger of BP Exploration and Oil. (Id.) Throughout this Report, the predecessor company's name will be used – BP Exploration and Oil.

In this Report, I assume that, with respect to the Atlantis Project, important documents were critically flawed which could result in catastrophic Operator errors. This failure to conduct operations with the appropriate documentation poses a severe risk to the safety of the environment and public health (see Amended Complaint at Paragraphs 4.13 - 4.19). This misconduct violates federal law (see Amended Complaint at Paragraphs 5.1 - 8.3). I also assume that the parent corporation BP P.L.C. (hereinafter BP or BP Global) did not provide adequate funds and resources to its subsidiary BP Exploration and Oil in order for that subsidiary to meet its legal obligations that are at issue in this matter (see Amended Complaint at Paragraph 5.6).

### IV. OPINIONS RENDERED

Under custom and practice, in ascertaining whether BP Global exercised undue

Page Five (Expert Witness Report of Marc I. Steinberg)

domination and control over BP Exploration and Oil, the totality of the facts and circumstances should be assessed. Likewise, when focusing on whether BP Global under custom and practice represented that it was responsible for activities of BP Exploration and Oil or engaged in unfair treatment of this subsidiary, the totality of the facts and circumstances should be taken into account.

(A) Under custom and practice, BP Global dominated and controlled BP Exploration and Oil to such a degree that BP Exploration and Oil was serving as a conduit for BP Global's business. This opinion is based on the following:

(1) BP Exploration and Oil acquired a majority interest in the Atlantis oil and gas field in the Gulf of Mexico. In fact, however, BP Exploration and Oil does not operate the Atlantis oil and gas field. Rather, through the control and domination exercised by BP Global, the operation was conducted in part by a non-incorporated strategic business unit (SPU) of BP Global functioning in the Gulf of Mexico. The BP Gulf of Mexico SPU was one of around thirty SPUs within the BP organizational framework.

Page Six (Expert Witness Report of Marc I. Steinberg)

See Testimony of William Ellis Armstrong dated July 13, 2011 at volume 1, pages 26-28; Testimony of Anthony Hayward dated June 8, 2011 at volume 2, at page 583. As then BP Global CEO Mr. Anthony Hayward testified, the applicable SPU "ran a business." Id. at page 583. Other BP-affiliated employees likewise testified that the day-to-day working relationships with respect to the Atlantis field were focused on BP's Gulf of Mexico SPU – not BP Exploration and Oil. See Testimony of Kenneth DeJohn dated September 14, 2011 at pages 26-27 (testifying that Gulf of Mexico SPU provided engineering services to Atlantis and that the day-to-day reporting relationship was to a non-corporate organization – a structure that involved many different BP corporations); Testimony of Neil Cramond dated April 25, 2011, at page 22 (testifying that BPs Gulf of Mexico SPU and its designees had "oversight of engineering standards and practices for BP's Gulf of Mexico operations" – which includes the Atlantis field).

(2) From my review of the documents and testimony I thus far have received in this matter, BP Exploration and Oil -- the owner of a majority interest in the Atlantis field and the ostensible operator of that field -- did not in fact exert its control. Rather, the Atlantis field was operated and overseen at the everyday level by an strategic (unincorporated) business unit (SPU) of BP Global. See discussion and sources cited in Paragraph (A)(1) above. Moreover, significant financial and operational decisions were made not by the Gulf of Mexico SPU but rather by other groups within BP Global, including at times by executives of BP Global itself. See Armstrong Testimony at volume 1, pages 45-46 (testifying that the SPU leader, depending upon materiality, had a certain

Page Seven (Expert Witness Report of Marc I. Steinberg)

amount of authority as to dollars to be allocated for drilling and completions in the Gulf of Mexico, the next level was the chief executive officer of exploration and production and then the last level was the chief executive officer of BP Global); Testimony of Anthony Hayward dated June 8, 2011 at volume 2, page 561 (stating that Exploration and Production which oversees BP's SPU in the Gulf of Mexico is "not a legal subsidiary. It's an internal organizational unit."); Testimony of Simon Peter Todd dated May 9, 2011, at page 143 (testifying that BP Exploration and Production did not make its own investment decision on a major product but rather went through a subcommittee of BP Global's board of directors); Testimony of Daniel Ehmer dated September 14, 2011 at pages 54-55 (testifying that expenditures under $100 million were approved by BP's Gulf of Mexico SPU and that expenditures greater than $100 million for BP's Gulf of Mexico operations (including the Atlantis field) must be approved by the BP Resource Management Committee (RCM) in London); Armstrong Testimony at pages 175-177 (testifying that the Group Operation Risk Committee (GORC) comprised of BP high level executives as well as the CEO of BP Global determines which BP facilities will be audited by S & O (Safety and Operations))..

(3) My understanding is that after April 2010, SPUs within the BP operational structure no longer exist. See Testimony of James Dupree dated June 17, 2011 at volume 2, page 429. Today, it appears that BP "consolidated the development and production drilling completions team into a centralized organization and created drilling engineering, completions engineering, and operations." Testimony of Jonathan

Page Eight (Expert Witness Report of Marc I. Steinberg)

Sprague dated March 22, 2011 at volume 2, page 405. Nothing that I have seen in the record indicates that this reorganization signifies that BP Exploration and Oil has greater autonomy. Indeed, with greater centralization of BP's operations, this reorganization suggests otherwise.

(4) Indeed, the testimony given by witnesses in this matter indicate that many of the BP-affiliated employees working on the Atlantis project either are employed by a BP affiliate other than BP Exploration and Oil or do not know the identity of their employer. This fact evidences that BP Global has exerted control and domination to such a degree over BP Exploration and Oil that not only are employees of other BP-affiliated companies assigned to the Atlantis project but that several employees have no idea to whom they are directly accountable. See, e.g., Testimony of Ronald Berger dated September 15, 2011 at pages 10-11 (acting as consultant, "can't recall the exact legal name" of entity he consults with but "think[s]" it is BP America); Testimony of William Broman, Jr. dated September 16, 2011 at page 11 (does not know "exactly" which BP entity is his employer); Testimony of Kenneth DeJohn dated September 14, 2011 at page 26 (testifying that he does not know which legal entity he works for); Testimony of Daniel Elmer dated September 14, 2011 at page 14 (not sure but "believe[s]" he is "part of BP E&P, BP Exploration and Production"); Testimony of Linda Gilmer dated September 14, 2011 at page 18 (testifying that she is employed by BP America, Inc.); Testimony of Robert Peloubet dated September 9, 2011 at page 13 (has continuously been an employee of BP America, Inc. since 1999); Testimony of Frank X. Ragan IV dated September 8, 2011 at

Page Nine (Expert Witness Report of Marc I. Steinberg)

pages 13-14, 34, 42 (testifying that his employer while working on the Atlantis project since March 2007 is BP America, Inc.); Testimony of Doug Suttles dated May 19-20, 2011 at volume 1, page 35, volume 2, page 803 (testifying that he served as chief operating officer of BP Exploration & Production and does not know whether BP Exploration & Production is a legal entity).

        (5)    Significantly BP's internal communications reflect that the Atlantis project was not operated and overseen by its direct owner, BP Exploration and Oil. Rather, these communications set forth that BP is the operator of the Atlantis field and project. These communications thus evidence that BP dominated and controlled its subsidiary, BP Exploration and Oil, to such a degree that this subsidiary served as a conduit for BP Global's business.

        (a)    In a document entitled "Atlantis Project FLOATING SYSTEMS TEAM PROJECT EXECUTION PLAN" (BPEP_ABB_00111486-1604), the following is set forth as the purpose of the Project Execution Plan (PEP):

> "This Project Execution Plan (PEP) documents the philosophies, strategies and plans for executing the Design, Procurement, Fabrication, Integration and Commissioning activities of the Floating Systems for the Atlantis Project. The PEP provides the strategic base of how the delivery team will conduct its business to ensure that the project is executed within the boundaries of the project scope of work, schedule and budget. It is used as a guiding document to resolve issues, control cost and schedule, and as a road map for planning. It is also used to

Page Ten (Expert Witness Report of Marc I. Steinberg)

communicate execution plans to management, clients and other project stakeholders." (at BPEP_ABB_00111490)

References to BP throughout this document evidence that BP is in active control of the Atlantis project. For example:

(i) "The organization charts illustrate the administrative and technical reporting relationships applicable to the project teams and identify BP and Contractor key project personnel associated with the Atlantis project." (BPEP_ABB_00111501)

(ii) "The Floating Systems Team will utilize the BP philosophy of cost control and forecasting." (BPEP_ABB_00111513)

(iii) "This section addresses work carried out by Daewoo Shipbuilding and Marine Engineering (DSME) .... BP will hold and administer the Prime Contract with DSME...." (BPEP_ABB_00111523)

(iv) "DSME will be responsible for the preservation of hull equipment and the hulls internal condition. This will include packing, seafastenings, dehumidification, storage, lashing, and sealing of any compartment or area of the hull to ensure that all equipment, systems, and structure arrive in the GoM [Gulf of Mexico] in a condition acceptable to BP." (BPEP_ABB_00111527-528)

(v) Under the subject matter of "Mooring Pre-Installation",

Page Eleven (Expert Witness Report of Marc I. Steinberg)

stating that "BP will provide a CMT to manage and direct this work scope...." (BPEP_ABB_00111536-537) With respect to other functions, identical language is used setting forth that "BP will provide a CMT to manage and direct this work scope." See, e.g., BPEP_ABB_00111538, 539.

      (vi) "The BP Regulatory Coordinator, a member of the Atlantis Project HSER [Health, Safety, Environmental and Regulatory] Team, provides the primary communication link to regulatory agencies. All regulatory submittals and inquiries should be channeled through the BP Regulatory Coordinator." (BPEP_ABB_00111547) See id. at BPEP_ABB_00111547, 549 (setting forth activities and responsibilities of the BP Regulatory Coordinator).

    (b) In the above document, BP knew how to identify one of its subsidiary enterprises when it so desired. With respect to "Invoicing", the document provides that "two complete copies of the invoice with all back up documentation shall be submitted to: BP Americas, Inc. [address set forth] ...." (BPEP_ABB_00111514) Notably, when BP opted to identify a subsidiary with respect to the Atlantis project in this document, a subsidiary other than BP Exploration and Oil was named.

    (c) Another BP document is entitled "Atlantis Gulf of Mexico Field Development Project PROJECT MANAGEMENT PLAN" (BPEP_ABB_00115768-802). That document states: (I) "Atlantis is one of five Deepwater Gulf of Mexico projects operated by BP to develop four oil and gas fields ...."; (ii) BP is the General Contractor for all of the

Page Twelve (Expert Witness Report of Marc I. Steinberg)

... Projects and has engaged several contractors to provide services to all the Projects as a Program."; and (iii) "BP and BHP Billiton are joint venture partners in the Atlantis field development." (BPEP_ABB_00115772)

Other statements in this document likewise evidence that BP Global controls the Atlantis project. These statements, for example, include: (i) following the caption entitled "BP Assurance Process", stating "The BP Assurance activities for the Atlantis Project have been divided into four areas, Global Project, Facilities, Wells and Subsurface, and planned as shown below." (BPEP_ABB_00115779); (ii) following the caption entitled "Approach to Sanction", stating "The owners of Atlantis Project have chosen to sanction the Project early in order to shorten the schedule to first oil. BP sanctioned the Atlantis Project 15 April 2002 ...." (BPEP_ABB_00115781); (iii) following the caption entitled "Integrated Project Team", stating "BP has assigned Greg Sills as the Project General Manager (PGM) to lead an Integrated Project Team (IPT) made up of people from the Owners, BP and BHP Billiton and the employed Contractors." (BPEP_ABB_00115782); (iv) following the caption entitled "Facilities", stating "The Facilities work is managed by BP ...." Similar statements are made for other aspects of the "Atlantis Leadership Team", including with respect to Subsurface, Wells Delivery, Project Services, Commercial, Operations and HSE&R. (BPEP_ABB_00115782-783); and (v) following the caption entitled "Project Management", stating "The Owners, BP and BHP, are the general contractors for Atlantis and are managing all aspects of the Project development." (BPEP_ABB_00115792)

Page Thirteen (Expert Witness Report of Marc I. Steinberg)

(d) Another document is entitled "Gulf of Mexico Deepwater Development Atlantis Project TOPSIDES ENGINEERING PROJECT EXECUTION PLAN" (BPEP_ABB_00112168-202). Under the caption "Contracting Plan", the following is set forth: "BP will hold and administer the Prime Contracts (Fabrication, Transportation, Installation, & Integration). Subcontracts may be held by BP or assigned to one or more of the Prime Contractors as the work progresses between prime contractor sites." (BPEP_ABB_00112182) Similarly, under the caption "Commissioning", it is stated that "The commissioning resources and management contract will be administered by BP and held by the Topsides Delivery Manager." (BPEP_ABB_00112183) See BPEP_ABB_00112184 (stating that "BP will develop a commissioning team for the project"). This document likewise evidences that BP Global controlled and administered the Atlantis Project.

(e) Numerous emails and other communications also evidence that BP Exploration and Oil did not administer, control and/or manage the Atlantis project. See, e.g., email from Barry C. Duff of the "Atlantis Subseas Team" dated January 16, 2008 to William H. Broman regarding "Risk and Opportunities for DC-1 and SS-2 (BPEP_ABB_00092415); email from Lynnda Pekel from Engineering Services ABS Americas dated January 11, 2002 to Dennis R. Sustala regarding "PM hours" (stating, inter alia, "assume nothing at BP") (BPEP_ABB_01623728); email from Barry C. Duff of the BP Global Projects Organization dated January 31, 2011 to Chris Pickrell (with copy to Dirk Smit, Rob Marshall, William H. Broman, and Katherine M. Krafft) regarding "High Consequence Risks Program" (BPEP_ABB_01453975); Memorandum entitled "Atlantis Management of Change"

Page Fourteen (Expert Witness Report of Marc I. Steinberg)

dated August 7, 2007 regarding "Relocate BJ Services Air Test Cabin to the Main Deck" with Hazard Analysis from Chris Savvides, identified as Senior Safety Engineer (Fire & Explosions) of BP Exploration Operating Company Limited, a company located in the United Kingdom (BPEP_ABB_03388235); and Document entitled "Audit Finding Form" for the period 30 November 2009 to 11 December 2009 identifying Janet Warren as Auditor (making findings of deficiency of Atlantis platform to comply with certain requirements of BP Group defined specifications) (BPEP_ABB_01453572).

(6) Based on the foregoing discussion (Paragraphs (A)(1)-(A)(5) of this Report, it is my opinion that, under custom and practice, BP Global dominated and controlled BP Exploration and Oil to such a degree that BP Exploration and Oil was serving as a conduit for BP Global's business.

(B) In my opinion, applying standards of custom and practice, BP Global represented that it was responsible for the activities and operations of the Atlantis field, a majority ownership interest which is held by its subsidiary BP Exploration and Oil. Also, applying standards of custom and practice, there is evidence that BP Global has failed to adequately capitalize its subsidiary, BP Exploration and Oil, so as to significantly impede that subsidiary from complying with its legal obligations. This opinion is based on the following:

(1) BP Global's communications to the public represented that BP Global was the majority owner and operator of the Atlantis project. Examples of public

Page Fifteen (Expert Witness Report of Marc I. Steinberg)

statements made by BP Global with respect to the Atlantis project include:

        (a)    In a press release entitled "BP Commissions Atlantis Platform, Begins Oil and Gas Production", dated December 18, 2007, the following is set forth: "BP today announced that it has completed commissioning of the Atlantis semi-submersible platform in the deepwater Gulf of Mexico and commenced the export of oil and gas from the deepest moored floating oil and gas facility in the world."

        (b)    On its web site (www.bp.com/us), there is set forth an "Atlantis Field Fact Sheet" which states that "BP operates the development (56% interest), with co-owner BHP Billiton owning the balance." In an accompanying chart entitled "Atlantis Facts", the "Operator" is identified as "BP (56%)". The reader is advised to contact the "BP Press Office [at] (281) 366-8346" "[f]or further information." Another portion of the "Atlantis Field Fact Sheet" which is entitled "BP in the Deepwater Gulf of Mexico" states that "[t]oday, BP produced in excess of 400,000 boe/d (barrels of oil equivalent per day) net from two dozen fields, includomg BP operated facilities at ... Atlantis ...."

        (c)    In an article entitled "Deepwater Gulf of Mexico" from the BP web site, it is stated that "BP operates eight deepwater projects in the Gulf of Mexico" and that "BP's list of discoveries in this region is lengthy: Atlantis, Thunder Horse, and Mad Dog are all world-class fields ...." The Atlantis project thereafter is further identified and described in the article as one of those deepwater projects in the Gulf of Mexico.

Page Sixteen (Expert Witness Report of Marc I. Steinberg)

      (d)    In view of these public statements made by BP, it is not surprising that third parties likewise identify BP as the majority owner and operator of the Atlantis project. For example, an article entitled "Atlantis Platform, Gulf of Mexico, USA" (located at http://www.offshore-technology.com/projects/atlantisplatform/) states that Atlantis is "[considered] one of BP's most technically challenging projects ever ... [and] one of the largest. BP is operator of Atlantis with 56% ownership with its partner in the venture, BHP Billiton, having a 44% working interest."

      (e)    In view of the foregoing representations, applying standards of custom and practice, BP Global represented to the public that it was the operator and majority owner of the Atlantis project and was responsible for that project.

      (2)    Under custom and practice, a subsidiary corporation should be adequately capitalized to meet its obligations. There is evidence that BP Global provided its subsidiary, BP Exploration and Oil, with inadequate funding, personnel, and other resources so as to render it reasonably likely that BP Exploration and Oil would be unable to adhere to its legal obligations. Although I have declined at this time to render an opinion whether BP Exploration and Oil was inadequately capitalized (see Paragraph III of this Report), there exists evidence in the record to support that opinion. See, e.g., Testimony of Kevin Lacy dated June 1-2, 2011 at volume 1, page 33, volume 2, page 813 (had been employed as vice president of drilling and completions for the BP Gulf of Mexico business and testifying that "during my time there ... there was ... in my personal

Page Seventeen (Expert Witness Report of Marc I. Steinberg)

opinion, incredible pressure on reducing costs"); Testimony of Barry Duff dated September 12, 2011 at pages 34-35 (testifying that cost-cutting directives "sometimes" comes from London); Testimony of William Ellis Armstrong dated July 13, 2011, at volume 2, pages 306, 315, 327, 331 (testifying with respect to reducing planned SPU operating costs).

## V.    RESERVING OPTION TO UPDATE OR MODIFY THIS REPORT

I reserve the option to update or otherwise modify this Report upon my receipt of documents, testimony, and/or other materials that become known to me after the date of this Report.

October 13, 2011

_____
MARC I. STEINBERG