1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION

3

4    KENNETH W. ABBOTT              *      09-CV-1193
                                    *      Houston, Texas
5    VS.                            *
                                    *      March 19, 2012
6    BP EXPLORATION AND             *      9:32 a.m.
     PRODUCTION, INC., ET AL
7

8                     PRETRIAL CONFERENCE

9

           BEFORE THE HONORABLE LYNN N. HUGHES
10              UNITED STATES DISTRICT JUDGE

11

     **APPEARANCES:**
12
     **FOR THE PLAINTIFF:**
13   David L. Perry
     **PERRY & HAAS**
14   P.O. Box 1500
     Corpus Christi, Texas 78403-1500
15   361.880.7500

16   Christopher V. Goodpastor
     **WATTS, GUERRA & CRAFT**
17   811 Barton Springs Road, Steph 725
     Austin, Texas 78704
18   512.479.0500

19
     Edward A. Mallett and Tom Berg
20   **MALLETT & SAPER, L.L.P.**
     600 Travis, Steph 1900
21   Houston, Texas 77002-2911
     713.236.1900
22
     Mary Whittle
23   3930 Argyle Terrace, N.W.
     Washington, D.C. 20011
24   202.320.1612

25

**FOR BP EXPLORATION AND PRODUCTION, INC.:**
Otway B. Denny, Jr., Daniel M. McClure and Anne M. Rodgers
Fulbright & Jaworski
1301 McKinney St., Steph 5100
Houston, Texas 77010
713.651.5588


Damond R. Mace
**SQUIRE & SANDERS (US) LLP**
127 Public Square
4900 Key Tower
Cleveland, Ohio 44114
216.279.8500


Jonathan Andrew Hunter
**LISKOW & LEWIS**
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
504.556.4131


**FOR HEARST CORPORATION:**
Ravi V. Sitwala and Heather L. Dietrick
300 West 57th Street
New York, New York 10019-3792
212.649.2039

Court Reporter:
Johnny C. Sanchez, RPR, RMR, CRR
515 Rusk, #8016
Houston, Texas 77002
713.250.5581

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-assisted transcription.

1          THE COURT:  Thank you.  Please be seated.

2 Who's here for the United States?

3          MR. PERRY:  Your Honor, the plaintiff, of

4 course, Qui Tam, represent the United States' interest, as

09:32:00 5 you know.  But there is no one present observing for the

6 United States itself, to my knowledge.

7          THE COURT:  Did it not opt to take the case?

8          MR. PERRY:  They did not intervene.  They have

9 been actively observing the case, and we're actively in

09:32:17 10 communication with them, but they are not party to the

11 case.

12          THE COURT:  All right.  The United States did

13 not use its opportunity to take over the case?

14          MR. PERRY:  That's correct.

09:32:27 15          THE COURT:  Okay.  I'm sorry.  So is there

16 anybody watching from the United States?  Well, that's a

17 good sign.  They're not going to be working.

18               Mr. Perry, I'm new to this.  Give me a

19 three-minute summary of your client's position.

09:33:06 20          MR. PERRY:  We have two cases pending, Your

21 Honor:  One is a citizen's action arising under the Outer

22 Continental Shelf Lands Act, in which we are suing to

23 compel compliance with the statute.

24               The other is a False Claims Act Qui Tam

09:33:26 25 case, in which we are suing to recover damages on behalf of

1 the United States because Defendant BP filed two false

2 certifications, which were necessary prerequisites for

3 their obtaining oil and gas out of the Outer Continental

4 Shelf.  As Your Honor knows, the Outer Continental Shelf

09:33:54   5 Act provides that the oil and gas located there is property

6 of the American people that is being held by the federal

7 government effectively in trust.  So that is sort of --

8             THE COURT:  Or ineffectively in trust.

9             MR. PERRY:  Yes, sir.  That is essentially it.

09:34:10  10 In terms of the Outer Continental Shelf Lands Act case, we

11 claim that the Atlantis Production platform, which is the

12 mechanical device at issue in this case, is presently not

13 fit for service under normal engineering standards.  And we

14 ask this Court to take action, to cause it to be remediated

09:34:34  15 so that it will be safe and fit for service under the Qui

16 Tam case.

17             THE COURT:  And where is the Atlantis?

18             MR. PERRY:  The Atlantis is located about

19 150 miles south of New Orleans.  It is anchored or moored

09:34:48  20 in about 7,000 feet of water.  It is, I believe, the second

21 or third largest production platform in the world, and it

22 is the deepest moored in the world, working in the deepest

23 water.

24             THE COURT:  It's a production platform?

09:35:04  25             MR. PERRY:  It's a production platform rather

1  than a drilling rig.

2          THE COURT:  And with a couple of specifics,

3  what's wrong with it?

4          MR. PERRY:  The most specific thing is that

09:35:20  5  there is a pressure relief valve I can point to -- there

6  are a lot of others -- but most specifically, there is one

7  particular pressure relief valve that is protecting a

8  16-inch pipeline that is used under 250 pounds of pressure

9  to send production off of the rig shoreward.

09:35:47  10          That particular pressure relief valve is

11  undersize by a factor of 20 to one.  I have a chart made

12  just to illustrate.  The green section shows the size of

13  the actual relief that is provided, and the red section,

14  the amount that is deficient.

09:36:13  15          This is something that specifically could

16  cause a catastrophe at almost anytime.

17          The engineers hired --

18          THE COURT:  A leak?

19          MR. PERRY:  It would be a release from the

09:36:32  20  pipeline, but the release from the pipeline of that size

21  might very well cause an almost immediate explosion because

22  the effect of it would be to put a cloud of highly volatile

23  hydrocarbons in the atmosphere.

24          THE COURT:  Is it a gas or oil?

09:36:51  25          MR. PERRY:  It is primarily oil, but there is

1  gas on it.  But what happens with -- what happens with any

2  kind of hydrocarbon, either gaseous or liquid.  If the

3  liquid is sprayed into the atmosphere under pressure, it

4  tends to atomize, forms very small droplets that are

09:37:22   5  highly, highly ignitable, and because they're diesel

6  engines that provide power, there is a very great danger

7  that there will be an ignition source.  And if there is an

8  ignition source, you have an explosive fire in that vapor

9  cloud, and it's an immediate catastrophe.

09:37:40   10            THE COURT:  Where on the platform is the valve

11  located?

12            MR. PERRY:  The valve is located near -- I

13  don't know precisely, but I know in a general way that the

14  valve is located near where the discharge line leaves the

09:37:58   15  platform and goes shoreward.  And the valve is set to -- if

16  it relieves, it is set to discharge its contents into a

17  flare header.

18            THE COURT:  Into where?

19            MR. PERRY:  A flare header.  The contents

09:38:14   20  ordinarily would depressurize, vaporize and be burned in

21  the flare.

22            Unfortunately, this valve has a tremendously

23  small capacity and amount of content that might have to be

24  relieved would be on the order of 26,000 gallons per

09:38:35   25  minute.  Much, much larger than can be relieved through

1  this valve.

2          Another situation, another piece of

3  information that makes this much more critical is that the

4  event that could trigger this is a power failure on the

09:38:57  5  platform that would cause the pumps associated with the

6  discharge line, to fail, to go down because of lack of

7  electrical power.  Atlantis has a history of having such

8  power failures.

9          THE COURT:  How does the stopping of the pumps

09:39:24  10  require the safety valves to open?

11          MR. PERRY:  We're getting pretty close to the

12  limit of my ability to explain it.  But what I understand,

13  from reading the engineering documents, is that if you have

14  the product moving through the pipeline -- and I gather

09:39:45  15  this is -- the pipeline is rather long, I think many miles

16  long.  That if the --

17          THE COURT:  We're hoping it's at least hundred

18  miles, don't we?

19          MR. PERRY:  I think it may connect to some

09:39:58  20  other pipelines before it actually reaches shore.  But

21  apparently, if the pumps suddenly stop, there can be a

22  backflow that will come back towards the rig.

23          The back flow is restrained only by some

24  check valves, the check valves, according to the

09:40:18  25  engineering documents we've seen, are considered

1  notoriously unreliable.

2            And, so, when the backflow would come back,

3  that is what would overpressurize that part of the pipeline

4  and would require the large relief.  All of these facts

09:40:39  5  were gathered and documented by a very prominent

6  engineering firm that was hired by BP to review these

7  issues.

8            The reason BP hired them is that BP had done

9  what they call a S&O audit, and the audit found --

09:41:02  10            THE COURT:  Say that -- what kind of audit?

11            MR. PERRY:  I believe it stands for service and

12  operations audit.  But it is an audit of a particular type

13  that the large corporate entity began to do after Texas

14  City in order to try to keep track of the safety at its

09:41:27  15  various facilities.

16            This audit found that out of 500 and

17  some-odd pressure relief valves on the platform, there were

18  no sizing calculations for about 150 of them.  Sizing

19  calculations are necessary engineering work that has to be

09:41:51  20  done during the design process to determine -- and they

21  have to be done individually for each pressure relief valve

22  to determine the size that is needed at that particular

23  location.

24            BP then hired this Worley, Parsons firm to

09:42:11  25  come in and either find or reconstruct, recalculate sizing

1  calculations for those valves.  This is one of a number of

2  valves that when Worley, Parsons did that, they found that

3  the valves were undersized by -- some of them by very large

4  amounts.

09:42:35  5          THE COURT:  There are no pulsation dampers on

6  these lines?

7          MR. PERRY:  That is not something that I'm

8  familiar with, Judge, and I have not heard -- you said

9  pulsation dampers?

09:42:46  10         THE COURT:  Surge absorber, pulsation damper.

11         MR. PERRY:  I am not familiar with how those

12  would be used on the platform, and I have not heard that

13  discussed, so I cannot answer that.

14         THE COURT:  Ms. Liberato?

09:43:01  15         MS. LIBERATO:  Your Honor, I don't know the

16  answer to that question, but there are things that I would

17  like to address that Mr. Perry says.  But I don't know the

18  answer.

19         THE COURT:  Of this specific factual question.

09:43:16  20         MR. PERRY:  We have -- we know --

21         THE COURT:  So this doesn't go on too long,

22  tell me about Mr. Abbott.

23         MR. PERRY:  Mr. Abbott is seated right back

24  here, Your Honor.  Mr. Abbott works in the oil and gas

09:43:34  25  industry and the part of the industry that designs and

1 builds large facilities like this.  His job is to be a --
2 tell him, Ken, I always forget the words.

3           MR. ABBOTT:  Project controls manager.

4           MR. PERRY:  A project controls manager.  Not an
09:43:54 5 engineer, but one of the people who administer the
6 engineering of the facilities.

7             He was hired to go to work for BP to do that
8 kind of work in August -- either late August or early
9 September of 2008.  And when he arrived there, he
09:44:13 10 immediately found himself -- and his job put him in charge
11 of a situation where although the rig had been in
12 production for about a year at that time, not quite a year,
13 there were a large body of documents.

14           THE COURT:  When you say "rig," you mean --
09:44:31 15           MR. PERRY:  The Atlantis.

16           THE COURT:  -- the platform?

17           MR. PERRY:  The platform, yes, sir.  I think I
18 have learned that the platform -- the word "platform"
19 refers only to the big thing that floats.  And the proper
09:44:48 20 word for the whole thing is "facility."  And that --
21 including the subsea.  I tend to call it a rig.

22           THE COURT:  Except the rig implies it's
23 drilling a hole.

24           MR. PERRY:  And it's not a drilling rig.
09:45:01 25 That's exactly right.

1           THE COURT:  It's a production platform, so

2 we're going to call it a platform.

3           MR. PERRY:  So, at any rate, the platform at

4 that point had been in service for -- had been producing

09:45:13   5 for not quite a year.  Your Honor is probably familiar with

6 P and IDs, piping and instrument diagrams.  They are

7 diagrams that chart how the flow of product goes through

8 the system.

9           Mr. Abbott's experience and the engineering

09:45:35  10 fact, as we understand it, and BP's documents, require that

11 all of those kinds of drawings be fully engineeringly

12 completed to an as-built status and turned over to the

13 operations department before production begins.

14           When Mr. Abbott arrived, the operations

09:46:00  15 department was calling and demanding to have their P and

16 IDs, which they did not have.  Mr. --

17           THE COURT:  You can just call them piping

18 diagrams.

19           MR. PERRY:  Okay.  The -- Mr. Abbott's

09:46:14  20 immediate predecessor was refusing to turn them over on the

21 ground that they were not complete, he did not know what

22 the nearest complete versions were.  There were hundreds,

23 if not thousands, that were incomplete.  And Mr. Abbott

24 came into a situation where it was his job to try to remedy

09:46:36  25 that situation.

1                THE COURT:  What does he do now?

2                MR. PERRY:  He is now working as a project

3    controls manager in that type of work for a company called

4    Technip.

09:46:51     5                THE COURT:  Spell that for the reporter,

6    please.

7                MR. PERRY:  T-E-C-H-N-I-P.  Technip, that name

8    comes up in two different ways in this case:  One that it

9    is now Mr. Abbott's present employer; the other is they

09:47:12    10    were doing work on the Atlantis platform when he was

11    working for BP.  And after he left BP, was fired, he had

12    gone through several different employers, one of them was

13    bought up by Technip.  So he is now with Technip.

14                THE COURT:  You may want to take a sip of water

09:47:32    15    and read your memos.

16                MR. PERRY:  Thank you, sir.

17                THE COURT:  Let's see what Ms. Whittle --

18    you're missing your boat.

19                MR. PERRY:  I'm sorry.  This is her job, Judge,

09:47:49    20    is to give me memos.  And...

21                THE COURT:  I have a very ample staff whose job

22    it is to keep me out of trouble and they're not very good

23    at it.

24                MR. PERRY:  Her memos remind my to make clear

09:48:13    25    that there were about 150 valves that did not have the

1  sizing calculations, not only one, and that the kind of

2  event that could happen would be similar to but perhaps

3  worse than what happened on the Deepwater Horizon or what

4  happened at Texas City.  And that this whole situation

09:48:46   5  relates to two other factual threads that are important in

6  the case.

7            One, BP's primary factual defense to this

8  case is that they have done everything right, nothing is

9  wrong, everything is safe, and the world can stand assured

09:49:09   10  that that is true because the government agency that used

11  to be named the MMS has investigated and given this

12  production platform a clean bill of health.

13            THE COURT:  It was better when it was the

14  General Land Office.  That's what, four names back?

09:49:30   15            MR. PERRY:  I know that there had been three

16  names since this lawsuit was filed, and I think --

17            THE COURT:  I'm sorry.  The General Land Office

18  in Texas, the Public Land Office was the federal act.

19  Anyway.

09:49:44   20            MR. PERRY:  Yes.  And I don't know what the

21  name is that you're thinking of -- I'm not -- but at any

22  rate, I think most of us in this case still call it the

23  MMS.

24            The MMS, when they did their investigation,

09:49:59   25  was assured by BP that there were no problems like this one

1  with the pressure relief valves.  They did not find during

2  their many inspections about the pressure relief valves.

3  There are also other major problems related

4  to the controls system, which controls all the processes on

09:50:20  5  the rig, it controls the opening and closing and all the

6  valves 7,000 feet below the surface.

7  And there have been problems such as valves

8  open and close unexpectedly without any human being or any

9  machine that anybody knows of intending to give a command

09:50:39  10  for that.  Wells shut in unexpectedly, power on the

11  platform failed and the platform loses power.  None of that

12  was discovered by MMS.  And MMS, in effect, when they did

13  their investigation, took BP's word for the fact that there

14  were no problems on the platform.

09:51:08  15  THE COURT:  Mr. Abbott is not an engineer?

16  MR. PERRY:  That is correct, he is not.

17  THE COURT:  Is there anything in his background

18  that I ought to know about, of resumé data?

19  MR. PERRY:  We have -- he has worked for I

09:51:26  20  guess about 30 years, for a number of large companies that,

21  Your Honor would recognize, Shell, GTE, various other

22  companies like that, doing the same sort of work his whole

23  life.

24  This is his career employment.  He's not

09:51:46  25  an engineer, but what I have learned is that he is in a

1 profession where, in effect, it's part of his job to

2 monitor whether the engineering work is getting properly

3 done or not.

4          THE COURT:  I once met a dentist who was the

09:52:04  5 project manager building a hydroelectric dam, and he said

6 he didn't need to be an engineer.  He had a whole staff of

7 engineers.  He needed somebody to manage the thing.

8          MR. PERRY:  Well, and I've learned that there's

9 a whole industry that in effect manages the engineering,

09:52:19  10 and that the people that run it apparently by and large are

11 not engineers.  They are, in effect, professional managers,

12 may have degrees of that nature or may not.  But

13 Mr. Abbott's been doing this a long time and is still doing

14 it.

09:52:35  15          THE COURT:  All right.  Thank you.

16          MR. PERRY:  Thank you, sir.

17          THE COURT:  Ms. Liberato, do you want to go, or

18 does someone else want to take the lead?

19          MS. LIBERATO:  I can start by answering

09:52:48  20 questions.  Mr. Ottway is the lead counsel in this case.

21          THE COURT:  Who wants to do it?  He always want

22 to be the king.

23          MS. LIBERATO:  It's hard for me to turn down

24 the offer.

09:53:01  25          MR. DENNY:  Go ahead.

1           MS. LIBERATO:  So if I may start and call on

2    others if necessary.

3           THE COURT:  Please, ma'am.  Briefly.

4           MS. LIBERATO:  Yes, Your Honor.  Well, our

09:53:12   5    position, of course, is that the facility is safe, that the

6    DOI, Department of Interior has determined it saved an

7    extensive investigation.  They investigated Mr. Abbott's

8    specific allegations in this case.  They are aware, as the

9    Court asked whenever he first started of the accusations,

09:53:41   10   and the evidence that's been produced in the case.

11          There are ongoing inspections by both the

12   Department of Interior and the Coast Guard, which

13   determined that there's no risk or danger in the

14   facility -- in the Atlantis facility.

09:54:04   15          And, so, this new request to shut it down,

16   this urgency, is something that has only been used by the

17   plaintiffs whenever it served their litigation hence.

18          At the very beginning of the case they

19   asked -- they sued the Department of Interior, requested a

09:54:34   20   preliminary injunction to shut down the Atlantis,

21   voluntarily dismissed that case and then since that time,

22   even though they pursued these claims, there has not been

23   any urgency to it.

24          The allegations that he made, the factual

09:54:46   25   allegations that Mr. Perry discussed, are either not

1  supported by the evidence or they are explainable.  It's a

2  cherry picked document that is an old document that can be

3  explained, and that has -- there's been action taken

4  relating to it.

09:55:05    5           And, so, bottom line is our position is

6  that there's no urgency on this, that, yes, definitely

7  Atlantis is safe.

8           THE COURT:  The good thing there's no urgency.

9           MS. LIBERATO:  That's right.

09:55:21   10           THE COURT:  When I got this, I might have been

11  tempted to go buy BP stock and I think three judges left.

12  I think we ought to share.

13           MS. LIBERATO:  Well, Judge, as recently as

14  Friday we were joking about whether you would actually be

09:55:37   15  here on Monday, given our history that the most likely

16  action you would take would be to recuse yourself.  Not for

17  any specific reason, it's just that's kind of been our

18  track history in all of this.

19           THE COURT:  Just follow precedence, that's all

09:55:56   20  I have to do; right?

21           MS. LIBERATO:  There you go.  It's pretty much

22  become the law of the case for the judges to recuse

23  themselves.

24           We have filed, as the Court is aware, five

09:56:08   25  summary judgments and we challenged jurisdiction, standing,

1  merits and damages.  And what we would ask that the Court

2  do is to evaluate those summary judgments, that we feel

3  confident in them and each of them is a strong summary

4  judgment and that the Court ultimately should grant the

5  summary judgments in this case.

6            THE COURT:  Is there other litigation, besides

7  the original injunctive action, or whatever that was?

8            MS. LIBERATO:  Well, other than what's pending

9  before the Court?

10            THE COURT:  Yes, ma'am.

11            MS. LIBERATO:  Right now, no, Your Honor.  That

12  preliminary action was voluntarily dismissed by the

13  plaintiff.  So the only action is the result of an amended

14  complaint that brought in Food & Water Watch and Mr. Abbott

15  who are plaintiffs in this case.

16            THE COURT:  I forgot them.  Anything else?

17            MS. LIBERATO:  No, Your Honor.  That's it.  Is

18  there someone from Food & Water?

19            MR. PERRY:  Your Honor, we represent Food &

20  Water Watch, but there is a gentleman back here, Zack

21  Corrigan.  He is an attorney in Washington, D.C. and he is

22  inhouse counsel for Food & Water.

23            THE COURT:  Okay.  Don't tell people he's from

24  the he's from the District of Columbia.

25            MR. PERRY:  Yes, sir.  It can be --

1          THE COURT:  I just want to make sure I hadn't

2 overlooked somebody.  All right.  Yes, sir.  That was one

3 of my concerns that you're going to represent the

4 plaintiffs.

09:57:53   5          MR. PERRY:  Yes, sir.  We have all the

6 plaintiffs.

7          THE COURT:  Good.  Thank you.

8              All right.  Someone from *The Chronicle*.

9          MR. SITWALA:  Good morning, Your Honor.  My

09:58:03  10 name is Ravi Sitwala.  I represent *The Chronicle*, as well

11 as *Bloomberg News*.  And we've moved to intervene as

12 indicated, the public's right to know in this case.  We

13 filed a motion to unseal the records.

14          THE COURT:  I read all that stuff.  That's one

09:58:16  15 of the reasons we're here.

16          MR. SITWALA:  Excellent.

17          THE COURT:  Is there a reason that your motion

18 cites only criminal cases?

19          MR. SITWALA:  I can cite civil cases right now,

09:58:33  20 Your Honor.  I could file --

21          THE COURT:  No.  I had to go look at those

22 cases.  I only read the first five, and they are all

23 criminal cases.

24          MR. SITWALA:  I apologize, Your Honor.  There

09:58:42  25 are numerous civil cases, including two cases from this

1 Court, and a case from the Fifth Circuit that I think --

2 the cases from this Court actually apply to the First

3 Amendment right of action.

4          THE COURT:  From me?

09:58:52  5          MR. SITWALA:  Not from you, Your Honor.  I can

6 give you the citations now if you'd like.  I could file

7 it -- if you give me leave, I can file a supplemental

8 brief.

9          THE COURT:  Let's file it.  Did you write the

09:59:03 10 brief?

11          MR. SITWALA:  My colleague, Heather Dietrich,

12 worked on the brief.  I obviously reviewed it as well.

13          THE COURT:  All right.  Well, the phrase "First

14 Amendment and common law right of access" appears 22 times.

09:59:20 15 Couldn't you just say "the law" every once in a while?

16          MR. SITWALA:  We like to say the First

17 Amendment, us press lawyers, Your Honor.

18          THE COURT:  All right.  Then you'll point to me

19 the text in the First Amendment that says anything about

09:59:37 20 right of access.

21          MR. SITWALA:  Your Honor, the First Amendment

22 compels first to -- does not contain specific text.

23          THE COURT:  Okay.  And that's why 220 years ago

24 we wrote this in a little book -- I have one -- is because

09:59:55 25 the Constitution is it.  It's the text, which is the oldest

1 functioning Constitution in the world, and the shortest.

2 There's a lesson there.

3                 The First Amendment is about people's

4 rights to do things, to speak, to write, to print, to pray,

10:00:21   5 not to pray, not to have their taxes support -- you know,

6 all that sort of thing.  And there's nothing in the First

7 Amendment that announces a right of access, is there?

8                 MR. SITWALA:  I would disagree with Your Honor.

9 I think if you read a long line of Supreme Court cases --

10:00:44  10                 THE COURT:  Counsel, there's nothing in the

11 First Amendment that says -- this is the Constitution, not

12 nine grouchy old people on the Potomac.  Is there anything

13 in the First Amendment?

14                 MR. SITWALA:  The text of the First Amendment I

10:01:07  15 think is interpreted by the Supreme Court to --

16                 THE COURT:  Counsel --

17                 MR. SITWALA:  -- right of access, Your Honor.

18 I can't say anything more than that.

19                 THE COURT:  Yes, you can.  You can say:  No,

10:01:16  20 sir.  There's nothing in the text of the First Amendment

21 that talks about the right of access.

22                 MR. SITWALA:  First Amendment text is not

23 specifically --

24                 THE COURT:  In the First Amendment's text is

10:01:26  25 the First Amendment.  You know, that same Supreme Court

1  manages to overlook the fourth word very frequently, "no."

2  Have you noticed that?  They say:  No law unless it's

3  really repugnant, or no law unless we really think it's

4  necessary, or they think no law unless it's highly

10:01:55  5  regulated by an inefficient bureaucracy.

6          My favorite one is the Religious Rights

7  Restoration Act, or whatever it was.  What part of "no" did

8  they misunderstand when they passed that?  It might have a

9  great purpose, but that's not the point.

10:02:12  10          All right.  So there's nothing in the First

11  Amendment itself that says anything about rights of access.

12          MR. SITWALA:  The First Amendment text does not

13  purport it's not to deny right of access.

14          THE COURT:  Now, in Article 3, which deals

10:02:33  15  largely with courts, is there a parallel clause to

16  Article 1, Section 5, Paragraph 3, the records clause for

17  Congress?

18          MR. SITWALA:  Not to my knowledge, Your Honor.

19          THE COURT:  No.  Did anybody find one?

10:02:53  20          All right.  So it's not there.  Then we have

21  in some of those amendments, and there's one about civil

22  cases, and that's the preservation of the jury.  Right?  7?

23          MR. SITWALA:  Correct.

24          THE COURT:  And then 6, says very carefully,

10:03:29  25  "in all criminal prosecutions"; right?

1              MR. SITWALA:  Correct.  That's right, Your

2  Honor.

3              THE COURT:  This is not a criminal prosecution.

4              MR. SITWALA:  Correct.

10:03:49   5              THE COURT:  All right.  So there's no First,

6  Seventh or Sixth Amendment right of access, is there?

7              MR. SITWALA:  Perhaps if you read the text very

8  strictly, you may not -- you may not see it.

9              THE COURT:  How do you not read it strictly,

10:04:05  10  counsel?

11              MR. SITWALA:  I rely on the Supreme Court's

12  decisions on this.  I think they're very clear.

13              THE COURT:  And when did God die and leave them

14  in charge of what words mean?  We went through a lot of

10:04:16  15  trouble to write this, and it served us well.  It served us

16  best when we actually lived up to it.  It's harder to do

17  that than you might think.  It's interpreted by.  All

18  right.  So then we have the common law right of access,

19  what common law?

10:04:48  20              MR. SITWALA:  The federal and state common law.

21              THE COURT:  Explain to me where federal common

22  law comes from.

23              MR. SITWALA:  Comes from the courts recognizing

24  the rights that existed when this country was founded.

10:05:00  25              THE COURT:  No.  There's nothing in Article 3

1   either that says, "And when you think it's necessary, make

2   something up."  There is no federal common law.  Under the

3   Articles of Confederation, was there federal common law?

4             MR. SITWALA:  I believe there's numerous

5   decisions that recognize --

6             THE COURT:  I'm sorry, counsel, you were on Law

7   Review, weren't you?

8             MR. SITWALA:  I was, Your Honor.

9             THE COURT:  You need to take the cure.  This is

10  about the Constitution and about real life and about the

11  growth of Anglo American jurisprudence, and a bunch of

12  other stuff.  It's not about what somebody says about

13  something that somebody says.

14             I'm not sure Chief Justice Rhenquist ever

15  quoted the Constitution.  He would cite a case, cited a

16  case that cited a case, that quoted the Constitution.

17  There's something wrong with that process.

18             So, was there federal common law during the

19  Articles of Confederation?

20             MR. SITWALA:  I'm not sure I understand your

21  question, Your Honor.

22             THE COURT:  Well, from 1783 until 1789, we had

23  a national government under the Articles of the Federation.

24  And after peace with Great Britain and before the adoption

25  of the Constitution, was there federal common law?

1          MR. SITWALA:  I can't answer that question,

2    Your Honor.  I'm not sure.

3          THE COURT:  It might help you to know the

4    national government had no courts.

10:06:51   5          MR. SITWALA:  I have to agree with that.

6          THE COURT:  It's pretty hard for us to be

7    making things up if we don't exist.

8               All right.  So is there another basis for

9    access?

10:07:11   10          MR. SITWALA:  I'm sure you're not going to like

11   this answer, Your Honor, but I believe the basis for access

12   is the First Amendment of the case is that --

13          THE COURT:  No.  We've already killed your two

14   basics:  Federal common law and the First Amendment.

10:07:25   15          MR. SITWALA:  I can't accept that, Your Honor.

16          THE COURT:  I don't care whether you accept it.

17          MR. SITWALA:  I understand.

18          THE COURT:  It's not what do you believe.

19   There is an obdurate reality out there.  There is an

10:07:38   20   explanation, and that is civil cases, Seventh Amendment

21   clearly have the right to trial by jury.

22               And my recollection, even the most

23   obnoxious, to the commonest courts of the rapacious monarch

24   from Germany would have the rule over England, was the vice

10:08:06   25   admiralty courts which sat without juries.  But to my

1 recollection, and I haven't looked this up, you're all free

2 to look it up, is they were not closed proceedings.

3           MR. SITWALA:  I believe that's correct.

4           THE COURT:  Know what a vice admiralty court

5 is.

6           MR. SITWALA:  I believe the history proceeding

7 this country --

8           THE COURT:  It wasn't in this country then.  It

9 was in the other country.  We worked real hard to get rid

10 of that other country.

11           It has been the nature of the Anglo

12 American experience that a civil trial is a public event.

13 It comes from what trials meant in 1789.  They didn't think

14 they had to explain what it meant, what a jury was, did

15 they?

16           The founders I think were slightly over

17 confident in our ability to understand simple declarative

18 sentences, and the context.  Nothing about the First

19 Amendment, there's nothing about federal common law.  It is

20 in the nature of what a trial in a civil case means that

21 it's a public proceeding.  It's as simple as that.  And

22 there are probably citations for that, there's just -- I

23 didn't look them up.

24           Now, in some of the briefing there was the

25 assertion that the press had this or that right.  The First

1  Amendment does not apply to newspapers; it applies to

2  people.

3          MR. SITWALA:  Correct, Your Honor.

4          THE COURT:  Whether they own a Mervyn's Ultra

10:10:30   5  Press, or they're a obsessive compulsive recluse that blogs

6  only from 2:00 to 4:00 in the morning, or somebody at the

7  hairdressers that wants to say something about something,

8  the government cannot interfere with their expression.

9  Simple as that.

10:10:59  10          I do not read the First Amendment to say

11  that the lady at the hairdressers or in this world -- a man

12  at the hairdressers -- can compel the parties to

13  litigations to divulge documents that they don't want to

14  divulge.  That's a different proposition.

10:11:28  15          Now, this may be slightly off, but the

16  more disclosure of the government's own behavior is

17  salutary for a functioning democracy and a responsible

18  bureaucracy.  That does not apply to private people.

19          So the questions are fairly narrow in

10:12:03  20  here.  If a document in a civil case is filed by the

21  consent of the parties, who has a legal right of access?

22  Isn't that the only question?

23          MR. SITWALA:  And what the standards for that

24  right are.

10:12:30  25          THE COURT:  And what are the standards?

1              MR. SITWALA:  I believe the standards are

2    something once filed under seal the party moves to seal the

3    document --

4              THE COURT:  Wait a minute.

10:12:40   5              MR. SITWALA:  Sure.  We believe that if a party

6    is seeking to file a document under seal, they need to make

7    a motion, and then that motion needs to be on notice, and

8    interested parties should --

9              THE COURT:  Notice to whom?

10:12:59   10             MR. SITWALA:  Notice to the public, on the

11   docket or in any other manner.  We believe, for example, in

12   in re *Hearst Newspaper* last year the Fifth Circuit set

13   forth that procedure.

14             THE COURT:  Wait.  And that panel decided that

10:13:15   15   case on those facts, and I've now forgotten -- wasn't that

16   a criminal case?

17             MR. SITWALA:  It was a criminal case.

18             THE COURT:  Stop it.

19             MR. SITWALA:  If you'd like, I can cite civil

10:13:30   20   cases.

21             THE COURT:  You want a history of the

22   difference between criminal and civil law, now that we've

23   gotten through the First Amendment?

24             MR. SITWALA:  In *Courthouse News Service versus*

10:13:38   25   *Jackson* in 2009, this Court applied the First Amendment

1  right of access in a civil case.  It was not Your Honor.  I

2  understand that.  Judge Kent applied it in *Doe versus Santa*

3  *Fe* in 1996, and *Doe versus De Gaulle*, Fifth Circuit, said

4  that the First Amendment applies in a civil context --

10:13:55   5          THE COURT:  Judge Kent is not the gold standard

6  of jurisprudence.

7          MR. SITWALA:  I will not comment on that.  So,

8  again, the procedure we believe is applicable is that a

9  party files a motion on notice to the public, any

10:14:09  10  interested party is heard, and then the Court would decide

11  if there are interest, higher interests that require

12  sealing and tailor the sealing narrowly to those interests.

13          THE COURT:  You think there's an obligation

14  every time some overactive lawyer files something at

10:14:30  15  1:30 in the morning electronically under seal because it

16  has Social Security numbers or something?  Before they can

17  file that, they must move.

18          MR. SITWALA:  That's right, Your Honor.

19          THE COURT:  And how long do they have to wait?

10:14:51  20          MR. SITWALA:  These proceedings --

21          THE COURT:  How long?

22          MR. SITWALA:  For what, Your Honor?  For --

23          THE COURT:  Before they can file it under seal.

24          MR. SITWALA:  That would be up to the Court's

10:15:01  25  discretion.  If the party makes the motion to seal and

1  nobody objects, then the party --

2            THE COURT:  Nobody objects by when?

3            MR. SITWALA:  Again, I think that's within the

4  discretion of the Court.  If nobody notices --

10:15:13  5            THE COURT:  In the real world, the way it works

6  is you check a box on the computer screen; right?  Anybody

7  here do their own docketing?

8            MS. WHITTLE:  Yes, Your Honor.

9            THE COURT:  Yes, you just check the box.

10:15:37  10           MR. SITWALA:  And I believe, again, even if

11  nobody objects, the Court should and must make the findings

12  that justify sealing when you're sealing the document.  I

13  understand --

14           THE COURT:  If I make findings that are

10:15:48  15  articulate enough to justify the sealing, I would have to

16  disclose enough about it to vitiate the sealing, wouldn't

17  I?

18           MR. SITWALA:  I don't believe that's true for

19  two reasons:  Number one, I think you can identify the

10:16:00  20  interest that is protected without identifying what the

21  substance is; number two, you could file -- I'm sorry.  Go

22  ahead, Your Honor.

23           THE COURT:  No, I didn't mean --

24           MR. SITWALA:  The second reason is because you

10:16:10  25  certainly can file part of the order itself under seal.

1 That's happened in numerous cases that the Court will seal

2 part of it.

3              Now, this is to protect the appellate

4 review, Your Honor.

10:16:22  5              THE COURT:  And that's the joy of my life.

6              MR. SITWALA:  This process certainly, you know,

7 is not --

8              THE COURT:  That's like telling the surgeon to

9 do the operation to make it easy for the pathologist to do

10:16:35  10 the autopsy.

11              All right.  Also, the practice is that

12 frequently the motion and the document are both filed both

13 under seal.

14              MR. SITWALA:  Correct.

10:16:54  15              THE COURT:  And I trust you don't do criminal

16 law?

17              MR. SITWALA:  I do not, in so far as we

18 intervene in criminal cases to attempt to unseal or gain

19 access to those proceedings.

10:17:10  20              THE COURT:  The public defender, who -- and we

21 have a marvelous public defender, but any application,

22 reimbursement request -- merely motions to withdraw are on

23 file -- I mean, apparently the box is permanently checked.

24 And none of that -- not none -- one out of a thousand

10:17:36  25 actually might require being sealed.  It's just sort of

1  prophylactic practice.

2              And I don't like sealed documents in civil

3  cases, and I have never closed a courtroom in a criminal or

4  civil case.  I've never closed a courtroom.  But what *The*

10:18:06  5  *Chronicle* posits is a procedure it is simply, horribly

6  disproportionate to the need to be used in the vast

7  majority of cases.

8              Why is it that the parties cannot agree to

9  keep things secret?

10:18:29  10             MR. SITWALA:  Because we believe once the

11  Courts are involved, once the government is involved, the

12  public has a right to know what the business of its courts.

13  That is the reason.

14             THE COURT:  And the public does not get the

10:18:44  15  sense of what is going on in this case, in the 44-page

16  docket sheet.  And my guess is that out of 326 entries, how

17  many of them -- does anybody know how many are sealed?

18             MR. PERRY:  Not a large number, Your Honor.

19  I'd say perhaps five, 10, maybe as many five or 10.

10:19:20  20             MR. SITWALA:  It's five or 10, Your Honor, that

21  most of the documents relating to the motions for summary

22  are under seal.

23             THE COURT:  Exhibits.

24             MR. SITWALA:  The exhibits.  Which would --

10:19:27  25             THE COURT:  The motion is clear.

1          MR. PERRY:  The motion itself is under seal,

2   Your Honor.

3          THE COURT:  It is?

4          MR. SITWALA:  Yes.

10:19:35  5          THE COURT:  All right.  Other than the parties

6   sealed it, why does the paper think that that's critical to

7   its understanding of what's going on?

8          MR. SITWALA:  Well, we believe -- the summary

9   judgment is basically tried on papers, Your Honor.  And to

10:20:05  10  understand what --

11          THE COURT:  I think I understand it.

12          MR. SITWALA:  So for the papers to understand

13  what is being argued --

14          THE COURT:  Except Liberato's papers are trial

10:20:15  15  to the Judge.

16          MR. SITWALA:  For us and for the paper to

17  understand why BP is seeking for this case to be dismissed

18  or why the plaintiffs are seeking summary judgment on their

19  end, to see the papers is necessary to understand the

10:20:27  20  argument.

21          THE COURT:  Is the response to the motion for

22  summary judgment sealed?

23          MR. PERRY:  No, sir.  And that's a very strange

24  situation, because under the agreed protective order, it

10:20:41  25  was required to be sealed, but when BP found it in its

1   interest not to seal it, it didn't, nor did it seal --

2              THE COURT:  No.  But yours.

3              MR. SITWALA:  Your opposition.

4              THE COURT:  Your response to its motion.

10:20:57   5              MR. PERRY:  We've got them going both ways.

6   Our motion for summary judgment was filed under seal

7   because the agreement required it, order required it, BP's

8   response to us was not -- and I think it -- I don't

9   remember which ones of the others are under seal.  Some are

10:21:17  10  and some aren't.

11              MS. LIBERATO:  Your Honor, may I address that?

12  None of the defendant's motions for summary judgment are

13  under seal and none of their responses are under seal, the

14  pleadings themselves.

10:21:29  15              MR. PERRY:  If we could have agreement right

16  now that we don't have to file anything else under seal,

17  the documents itself, that would do something we haven't

18  been able to obtain that agreement from BP up until now.

19              THE COURT:  I'm not going to do that.  We have

10:21:49  20  gone some time here on an understanding, and I'm not just

21  going to change the understanding.  So other than exhibits

22  to motions, is there anything else sealed?

23              MR. SITWALA:  The plaintiff's motion, Your

24  Honor, is under seal.

10:22:23  25              THE COURT:  Is that because the contents of it

1 refer that they remain in the attachments?

2                    MR. PERRY:  Yes, sir.  Motion for summary

3 judgment refers to the elements.

4                    THE COURT:  That's a novel approach.

10:22:45   5                    MR. PERRY:  I've never filed a summary judgment

6 in my practice before, which is nearly 50 years, and maybe

7 I'll just learn to not do that anymore.

8                    THE COURT:  Usually it's some of these cases

9 have very few facts.  Lawyers love the law a lot better

10:23:07   10 than they love their facts, and in most cases there's a

11 reason for that, I guess.

12                        This is another technical thing.  The paper

13 doesn't have standing to intervene because it doesn't meet

14 the criteria for intervention.  I don't really want you to

10:23:37   15 go sue me, so I thought I'd sue.  So you can't be a party.

16                    MR. SITWALA:  Your Honor, I disagree.  I think

17 if you see the Fifth Circuit's decision in *Ford versus City*

18 *of Huntsville*, its 242 F3d 235, in that case, I believe

19 it's a newspaper challenging a sealed settlement agreement

10:23:57   20 in a case, and the Fifth Circuit did go through the

21 standing test and find that the newspaper had standing as a

22 matter of practice.

23                    THE COURT:  But they're wrong.  If that panel

24 said that, that's wrong.  That you want to read other

10:24:09   25 people's business doesn't make you a party to the dispute.

1              MR. SITWALA:  I believe that the law is clear

2 that we have standing.

3              THE COURT:  You've got one case.  What do you

4 mean the law?

10:24:17    5              MR. SITWALA:  I think there's numerous other

6 cases that site cite that case, that I'll be happy to

7 submit.

8              THE COURT:  Let's try this:  Have you read the

9 rule on intervention?

10:24:28   10              MR. SITWALA:  Yes.

11              THE COURT:  And you don't share common factual

12 basis, you don't have a platform, or you don't have

13 knowledge about valves and relief valves and pressure, do

14 you?

10:24:37   15              MR. SITWALA:  We have an interest in the

16 documents that were filed.  We do not have an interest --

17              THE COURT:  That's a separate and distinct

18 interest.

19              MR. SITWALA:  From the underlying proceeding,

10:24:45   20 correct.

21              THE COURT:  That's like having a plaintiff's

22 mortgagee intervene because if the plaintiff wins, the

23 mortgage will get paid.

24              MR. SITWALA:  Your Honor, if in fact --

10:24:55   25              THE COURT:  Not even that close.

1          MR. SITWALA:  If you recognize the right of the

2     public to see the documents that is the right that would

3     support the intervention.  Obviously, if you don't agree --

4          THE COURT:  No, that's not what the rule says.

10:25:09   5     As I recall, of all the cases you cited, that I read at

6     least, five or six of them, all of them were actions

7     against the clerk or somebody else.  They were not

8     interventions into the merits of the case.

9                But I want to solve the problem.  But I'm

10:25:32  10     not willing to change the rule in the middle of the game.

11     So, I think the solution -- and this is a suggestion that

12     with the agreement of the parties and the acquiescence of

13     the Court, we have apparently some sealed documents.  It

14     seems to me the solution is to strike those and allow the

10:26:15  15     parties to refile documents without confidential

16     information in them.

17                If there are data that one or the party

18     genuinely believes is essential, and the other generally

19     believes it is proprietary, then we can have a hearing or

10:26:43  20     somehow discuss it.

21          MR. PERRY:  The situation in which we find

22     ourselves is that BP has produced in this case between five

23     and six million pages of documents.  And they have labeled

24     virtually all of them, not quite all of them, but they've

10:27:05  25     labeled virtually all of them as confidential.

1                 And under the protective order and parts

2  of it that we agreed to at their request, all of those, if

3  they are referred to in a document are filed are supposed

4  to be filed under seal, and the document itself is supposed

10:27:23  5  to be filed under seal.

6                 Our remedy is to file a pleading.  We

7  believe that essentially all of those designations are not

8  meritorious.

9                 THE COURT:  But I don't want to read two and a

10:27:44  10  half million pages of much of anything.

11                 MR. PERRY:  Exactly.

12                 THE COURT:  But if Abbott will specify a

13  manageable universe of documents that he believes are

14  significant, give the list to BP and you-all work on

10:28:13  15  what -- and there may be some of the document really is

16  confidential, but the part you want is not, so you can

17  redact it, or some other solution like that.

18                 MR. PERRY:  We've sort of done that.  We asked

19  that if they could discuss with us some document that they

10:28:44  20  thought actually had real confidential material, and they

21  refused to do that.

22                 But I might come back with a suggestion

23  that perhaps at the point where we are now, maybe would let

24  us move ahead, and that is that pretty soon we're all going

10:29:02  25  to be exchanging exhibit lists, and maybe that will be a

1 smaller universe of documents, that they could tell us if
2 there's anything on our exhibit list that they feel like
3 needs to be sealed or confidential.

4          THE COURT:  On the motions.  We've got to get
10:29:19  5 those out of the way.

6          MR. PERRY:  On the motions that are in the
7 past, they have admitted, they have agreed formally, that a
8 large number of them are not confidential, but it is -- we
9 do not yet have permission to refile those unsealed.

10:29:37  10          THE COURT:  All right.

11          MR. PERRY:  That would be the step.

12          THE COURT:  I think that's what we need.  Now,
13 Ms. Liberato.

14          MS. LIBERATO:  Judge, I think what you're
10:29:48  15 suggesting is fine.  If understand it, which would be to
16 look at the motions that have already been filed, see if we
17 can make an agreement on the ones that are filed.  Under
18 seal, redacted appropriate and get a narrower universe.

19                 The reason it was hard not to jump to my
10:30:06  20 feet is because I just want to be sure that the Court
21 understands that the agreement they were trying to seek
22 from us and that we weren't cooperating with, is where they
23 wanted us to go through the entire universe of documents
24 and identify the documents, again, that were highly
10:30:21  25 confidential, to review all those when, in fact, they would

1  not tell us except for Deep Water Horizon documents, they

2  would not submit --

3          THE COURT:  But Mr. Perry has them all.

4          MS. LIBERATO:  He has all the documents, that's

10:30:32  5  right.  I'm just --

6          THE COURT:  But my -- my sense after some

7  modest experience at this is that the usefulness of

8  discovery material is several decimal points of a

9  percentage point.

10:30:54  10         And, so, Mr. Perry has made Ms. Whittle

11  read all that stuff, but Post-its on the good ones, and so

12  he can decide which ones he really needs.  And then tell

13  you what those are, and then you tell him which parts of it

14  you think should be redacted, or if there's something -- if

10:31:23  15  it's redacted it destroys the reason he wants to have it,

16  why exactly it is that that is directly harmful to the

17  company.  And you ought to be able to narrow it down to a

18  dozen disputes.

19         MR. PERRY:  No, sir.  I don't think it probably

10:31:46  20  serves the Court's purpose for us for try to discuss our

21  past disagreements, but maybe with the direction of the

22  Court's --

23         THE COURT:  I've got some sense that there's

24  some disagreement.

10:31:58  25         MR. PERRY:  Maybe with the direction that the

1  Court has given us, we might be able to reach agreements on

2  how to proceed from here.

3          THE COURT:  Well, the first thing I need is a

4  list of the documents that have been filed under seal or

10:32:17   5  with.  And I know I have that, but I can't remember whether

6  it's in this case or one of the cases that I read, where

7  they were just the motion would be "sealed event" was all

8  the docket sheet said, and the next one would say "sealed

9  event," and you could get an order on the motion or the

10:32:47  10  response.  On our electronic system, can you explain the

11  sealed event at all?

12          MS. LIBERATO:  No, Your Honor.  I've got the

13  list, if you'd like to see it.  It's been filed.

14          THE COURT:  That's sort of a computer problem.

10:33:06  15          MS. LIBERATO:  I understand.  I understand.

16  But the short answer to the question is you cannot.  Looks

17  like you got it too.

18          MR. PERRY:  One of the things that --

19          THE COURT:

10:33:22  20          Once again, Mr. Sitwala, we're coming up

21  against the perquisite in bed of modern technology that if

22  your name is more than 12 letters long, change it.

23          You must have a first name, middle initial

24  and last name.  You can't have a first initial, middle name

10:33:50  25  because the computer doesn't like you to do those things.

1              This also might be salutary in that now

2  that you've thought better of some of the things in your

3  motion that could be shorter and clearer, the same with the

4  responses, so I'll start with a fresh round.  And I know

10:34:20  5  it's a cost, but it's the only way I can think out of the

6  dilemma because Mr. Sitwala, in principle, is correct.

7              It's the public -- if I say all the

8  time -- it's the public administration of justice.  Y'all

9  keep all this secret, just go arbitrate in Bermuda

10:34:43  10  someplace, and if you want an arbitrator in Bermuda I'll

11  take the weekend off.  Do you speak any foreign languages,

12  Mr. Sitwala?

13              MR. SITWALA:  I speak with my toddler, but I

14  don't know if that counts.

10:35:00  15              THE COURT:  Do you know how to say "no" in

16  French?

17              MR. SITWALA:  Is this a trick question, Your

18  Honor?

19              THE COURT:  No, of course not.

10:35:11  20              MR. SITWALA:  Sure sounds like one.  I'm going

21  to go with no.

22              THE COURT:  Most people would say "nome," and

23  that's a South Texas version.

24              The way you say no in French is, "en

10:35:26  25  principe, oui."  In principle, yes.

1           I'm not going to let you go through BP's

2    records.  I'm not going to let you go through Mr. Abbott's

3    records.  We are going to see this case progress with the

4    absolute minimum of sealed documents.  And if they are

10:35:52   5    sealed, I'll know why, and I'll tell you.

6                MR. SITWALA:  Thank you, Your Honor.

7                THE COURT:  And you still can't intervene.

8    Tell your client what a great job, you won the case for

9    them without ever being a party.

10:36:12  10                MR. SITWALA:  It's being transcribed, right,

11   Your Honor?

12                THE COURT:  All right.  Anything else for the

13   papers?

14                MR. SITWALA:  Thank you, Your Honor.

10:36:19  15                THE COURT:  Anything else for your people?

16                MR. SITWALA:  No.

17                THE COURT:  Okay.  All right.  Are you ready in

18   Corpus?

19                MR. PERRY:  Sir?  Yes, sir.

10:36:30  20                THE COURT:  You're in Corpus?

21                MR. PERRY:  Yes, sir.

22                THE COURT:  Are those people with you?

23                MR. PERRY:  Well, all of these people --

24                THE COURT:  No, I mean these people to my left

10:36:44  25   Hogan, and Goodpastor.

1          MR. HOGAN:  We drove here this morning, Your

2   Honor.

3          MR. PERRY:  They drove a much shorter distance

4   than I did.

10:36:53   5          THE COURT:  I came twice as far as he did.  I

6   know where he lives.

7               Look, we've got good lawyers on both sides.

8   The first thing I want to do is take the heat out of this

9   and see if we can get some more light.  I'll just assume

10:37:27   10   that both parties are terrible and we'll get down to the

11   facts and the law that under actually undertakes.  And so,

12   I would like for you all to confer.  Make sure, if

13   possible, you agree on what needs to be struck in the

14   sense -- and I'm not going to obliterate it.  It's just

10:37:53   15   going to be ineffectual.  It will be there, just in case of

16   a later dispute and it will still be sealed, that way it

17   won't be operative, as they say in Washington.

18               And, so, we've got a new round of operative

19   documents sometime in the near future, and I'll act on

10:38:16   20   those, and they won't be sealed, unless there's -- I

21   believe it will be minor.  But whatever you need.

22          MR. PERRY:  We will work toward that end, Your

23   Honor, and if it ends up that we cannot agree, hopefully it

24   will be a very, very short list.

10:38:37   25          THE COURT:  And if there's something that just

1  sounds awful the way the memo was written, it's not going

2  to persuade me.  My wife says I'm not only dull, I bring

3  dullness out in other people.

4          MR. PERRY:  One of the things that we are

10:38:56   5  planning to do for trial exhibits, we have many documents

6  that have been produced that are thick documents, several

7  hundred pages and oftentimes the only one, as far as we can

8  tell of interest in the case, might be three or four pages.

9          And, so, our plan -- and we want to talk

10:39:18  10  with counsel about it -- is to try to offer as exhibits

11  only the pages that are relevant and --

12          THE COURT:  Mr. Perry, I don't want anything

13  except a page or two, and if it's a really long document,

14  give me Page 1 side or the other, because I've found when I

10:39:43  15  read lawyer's quotes, I look it up, I read the sentence

16  before and after, because sometimes the next sentence says,

17  "However, in this case, we're not doing that at all."

18          I had an administrative appeal form

19  somewhere, the lawyers said they had to introduce 14,

10:40:04  20  4-inch binders of the administrative record.  And I said

21  something very judicial, like, "You've got to be kidding

22  me?"  And they said, "However, Judge, we have copied 153

23  pages on yellow paper and we agree that all anybody ever

24  needs to read, but we're just not comfortable without

10:40:28  25  having the whole record."  And I was grateful, but don't

1   even do that.  Just give the 153 pages.  And if BP thinks

2   they need one more page to add to it, they'll add the page

3   that elucidates it, like in a contract.

4               Maybe you need the first page with all the

10:40:50   5   parties and then the last page with the signatures and

6   Page 7 skipping the first six pages of defined terms.  So

7   print the documents.

8               Is there anything else we can usefully do

9   this morning?

10:41:11   10              MR. PERRY:  I think there are two issues,

11   Judge, that I know we would like to move on.  One is a kind

12   of a housekeeping matter.  At least from our side, when we

13   read Your Honor's rule, it is not clear to us as to whether

14   in this particular case Your Honor would like us to file a

10:41:32   15   pretrial order, or only the materials that Your Honor's

16   rules call for to be filed separate from the pretrial

17   order.

18              THE COURT:  You didn't read the last of my

19   practices, and it says, "Nothing in here supersedes the

10:41:58   20   rule or common sense," parenthesis.  I don't want you to do

21   anything about the trial, other than having thought through

22   the actual issue you would need to prove at trial.

23              I'm not setting deadlines that I don't

24   know I can meet, because if I say, All right.  The summary

10:42:22   25   judgments are due by whatever date, and the trial will be

1  in October, it could happen I don't get to the summary

2  judgments until November, in which case you would have done

3  a lot of work that's a waste.  So we're going to do it in

4  steps.  My scheduling orders last about 90 days, and then

10:42:43  5  we will have a new one.

6                    And while y'all are conferring about the

7  documents, it's all right with me if you work out when you

8  file your revised motion and call it that, not "First

9  Amended" or something.  And BP responds, as long as it's

10:43:05  10  not more than six weeks.  It's too late to rush this case,

11  but it's got to get decided.

12                    MS. LIBERATO:  When you say revised motion,

13  which motion are you referring to?  Are you saying --

14                    THE COURT:  It's revised motion for summary

10:43:23  15  judgment.

16                    MS. LIBERATO:  Based on the sealing issue?  We

17  filed all our summary judgments.  The time for filing

18  summary judgments is passed, and both sides have filed

19  motion for summary judgments, and all those pleadings are

10:43:44  20  complete and we don't anticipate filing any additional

21  ones.

22                    THE COURT:  All right.

23                    MS. LIBERATO:  Because the deadline's past.

24                    MR. PERRY:  I think we're both ready -- both

10:43:53  25  willing to stand on what we've already filed, but the

1 things that were under seal, we will refile them not under

2 seal.

3                THE COURT:  If that's all you have to do --

4                MR. PERRY:  I think that we can agree to do

10:44:03   5 that.

6                MS. LIBERATO:  Sure.

7                THE COURT:  Just file a new one, the same

8 one --

9                MS. LIBERATO:  Okay.

10:44:08  10                THE COURT:  -- again.

11                MS. LIBERATO:  Okay.

12                MS. WHITTLE:  Your Honor, only the plaintiff's

13 memorandum for summary judgment is under seal.  There are

14 documents for the other motions for summary judgment that

10:44:26  15 have been filed under seal.  And when we filed our motion

16 for summary judgment, we gave BP a redacted version, which

17 took out some of the confidential documents they weren't

18 willing to withdraw the confidentiality designation on it.

19                We asked if we could file that redacted

10:44:46  20 copy as the public copy and they refused.  And I think that

21 might be the best way to solve this is to file that

22 redacted copy, they don't have to withdraw those?

23                THE COURT:  Even if you're happy with them, put

24 a new caption, strike a few extra surplus words, clean it

10:45:04  25 up, put whatever you-all agree or that publicly, the

1  documents you want me to use, and then if there are any

2  disputes, of course, let me know that when you're through

3  narrowing it down, so that I will have the fresh copy filed

4  in April of 2012.  And then -- they may be fine.  I haven't

10:45:33    5  looked at them.

6              But you want to decide it on the public

7  record that the stuff filed after today, that essentially

8  everything that is filed under seal is struck.  And then if

9  you simultaneously cross move before --

10:46:12    10              MS. LIBERATO:  Yes, Your Honor.

11              THE COURT:  And I know the time for deadlines

12  have past, but I want to decide it right, not based on the

13  process.

14              So if there's something Mr. Perry for

10:46:23    15  having wished you'd said whenever it was, go ahead and say

16  it.

17              MR. PERRY:  Okay.

18              THE COURT:  Something you wish you'd said or

19  everybody else wished you'd said for BP, go ahead and add

10:46:37    20  it.  I want to decide the case on whatever it is.

21              MS. LIBERATO:  Yes, sir.

22              THE COURT:  Yes, sir.

23              MR. PERRY:  Notwithstanding what BP said, it

24  has been our feeling from the beginning that the platform

10:46:53    25  is quite dangerous and the more information we get, the

1 more that information supports that belief.  So, we do seek

2 an early trial setting, and I'm quite prepared to discuss

3 the nature of that information if the Court would wish me

4 to.

10:47:12

5           THE COURT:  No.  Because I'll forget it by the

6 time I get to the motions.

7           MR. PERRY:  The other issue is we compressed

8 our discovery period a great deal because we had early

9 trial settings, which haven't happened.

10:47:31

10           There are some very limited issues that we

11 would like to, in effect, update the discovery, and

12 although the normal discovery deadline is past, according

13 to the previous deadlines run forth, and I don't think

14 either side wants to reopen discovery generally.

10:47:50

15           THE COURT:  That makes three of us.

16           MR. PERRY:  There are three issues that I would

17 like to ask permission to reopen.  I gather that we're

18 hearing that the trial date is not going to be day after

19 tomorrow?

10:48:07

20           THE COURT:  It may be a month after I rule on

21 the summary judgments.

22           MR. PERRY:  And, so, what we would request is

23 that the Court give us permission, if we might, to reopen

24 discovery on a very limited basis, on three very narrow

10:48:28

25 issues.

1          One issue is that on this controls issue,

2    controls equipment is supposed to create digital logs that

3    says exactly what happens and exactly when anything goes

4    wrong.  We've been trying to discover those logs and we're

10:48:49    5    told some of them have been destroyed, either not

6    necessarily intentionally but in some way, but that even

7    after they fix the mechanical devices that weren't working,

8    they don't have any to produce.

9          And we'd like to take a very short

10:49:07    10    deposition, 30(b)(6) deposition, to either get that

11    material or find out exactly what happened to it.

12          On the pressure relief valves, we have

13    looked at drawings which all indicate that even though BP

14    has known about these dangers for 18 months, they have done

10:49:26    15    nothing to change the hardware on the rig to make -- on the

16    platform to make it safe.  And we would like to take a

17    30(b)(6) and ask for particular documents.  We asked them

18    if there are documents showing that you have in fact fixed

19    it, would you please give it to us.  They told us, "Well,

10:49:48    20    the discovery deadline has past."

21          THE COURT:  Well, if BP had changed the

22    material part of the plaintiff, it should have updated the

23    information.

24          MR. PERRY:  Yes, sir.  That is exactly correct.

10:50:07    25          THE COURT:  So is it the case that

1  nothing material has changed with the piping in this case?

2       MR. MACE:  I just have a little bit longer of a

3  an explanation, Your Honor.  With regard to these pressure

4  safety valves that Mr. Perry was talking about, the fact is

10:50:27  5  that all the PSPs are in full compliance with all

6  regulations.

7       THE COURT:  I didn't ask you that.  From the

8  information he has about what they are, for all I know a

9  2.9-inch one is perfect.  My question is:  Somebody told

10:50:47  10  Mr. Perry that on one of those lines it's 2.9 inches.  Has

11  that changed?

12       MR. MACE:  I don't believe since the close of

13  discovery there's been any changes.

14       THE COURT:  Double check.

10:51:04  15       MR. PERRY:  And the real question that I'm

16  asking is:  Has it changed since the Worley, Parsons

17  Engineering Company wrote their report?

18       THE COURT:  You should have everything between

19  that and close of discovery.

10:51:16  20       MR. PERRY:  We should have, yes, sir.

21       THE COURT:  The help -- BP will update you.

22       MR. PERRY:  And the third thing, I don't

23  remember whether -- there was a third thing, but I don't

24  remember what it was, so I will take it up with counsel and

10:51:35  25  see if we can agree on it.

1          MS. LIBERATO:  Judge, just one last thing for

2  clarification.  On the joint pretrial order, there is an

3  existing order that says that is due on the 30th of next

4  month.  I know from what you've said you don't intend to

10:51:48   5  enforce that, but it would -- just so we can sleep better.

6          THE COURT:  All deadlines set by the 23

7  previous judges are vacated.

8          MS. LIBERATO:  Thank you, Judge.

9          THE COURT:  We'll do -- we're going to do it in

10:52:04  10  steps.  I don't think I've had you before, have I,

11  Mr. Perry?

12          MR. PERRY:  No, sir.  I'm pretty confident,

13  I --

14          THE COURT:  You've been lucky a long time.

10:52:17  15          MR. PERRY:  I think Your Honor and I might have

16  met on the Supreme Court task force on revision of the

17  discovery rules a number of years ago.

18          THE COURT:  Eighteen months of Saturdays in

19  Dallas, that commission?

10:52:31  20          MR. PERRY:  It got old pretty soon.

21          THE COURT:  I was there, and I'm sorry if I

22  apparently don't remember you.

23          MR. PERRY:  I think a lot of us came and went,

24  Your Honor.

10:52:47  25          THE COURT:  Well, and it was -- it was a great

1  idea, but I don't know.  It was worth trying.

2          MS. LIBERATO:  Judge, we have nothing else.

3  Thank you very much.

4          MR. PERRY:  I believe that's it, Judge.

10:53:07   5          THE COURT:  All right.  The reason I ask that

6  is the way -- I won't give you a trial date until I'm sure

7  that you will be ready for trial on that day.  And a

8  pretrial order can be issued the day the case is filed

9  saying it will be tried in 18 months, I'm willing to bet

10:53:31  10 none has ever been tried on that schedule, and it forces

11 you-all to do things you wouldn't otherwise do because

12 you're adhering to the procedure.

13          So I can have a trial probably within a

14 month of a genuine announcement of ready.  So that's why

10:53:56  15 I'm not setting it off.  I don't know what you-all are

16 going to be doing or I'm going to be doing six months from

17 now or a year.  I hope it doesn't take more than six

18 months.

19          MR. PERRY:  I think, Judge, we have all been

10:54:10  20 working towards the trial setting.  Initially, a few weeks

21 ago, we were working towards the March 5th trial setting,

22 and then we were working towards an April 10th trial

23 setting.  So I think in terms of us being ready for trial,

24 subject to the motions for summary judgment, I think that

10:54:28  25 both sides are virtually ready.

1          THE COURT:  Good.

2          MR. PERRY:  I think we could probably easily

3 try the case in April or May, if the Court -- and I know

4 how your schedule is likely to be -- I think we can easily

10:54:41  5 be ready.

6          THE COURT:  Anything else from anybody?

7          The Constitution has a great number of

8 marvelous provisions, but perhaps the most marvelous is the

9 First Amendment.  When *The Chronicle* asked me on the

10:55:15  10 bicentennial what amendment I would add to the

11 Constitution, I said, "I would add an amendment that said,

12 'We really meant the First Amendment.'"

13          It didn't print my astute observation, but

14 because your right to a speedy trial, your right to vote

10:55:36  15 for your representatives, all of those things are dependent

16 on people being able to talk about them.  And I don't mean

17 giant metropolitan negatives.  And Bloomberg is just a blog

18 now, isn't?  Does it print?

19          MR. SITWALA:  I cannot speak to that.  I'm sure

10:55:58  20 they print it many different ways now.

21          THE COURT:  It means some kid at a junior high

22 school with a mimeograph machine and people on the street

23 corner and all those other places, because unless -- in

24 fact, you know, there's never been a famine in a democracy

10:56:21  25 with a free press.  And that's actually a Amartya Sen, an

1  economist formulation.  But it's hard to believe you have a

2  real democracy without a free press too.  And a democracy

3  without a free press would be, say, Putin.

4              So it's very important that the government

10:56:43    5  stay out of your business and let you talk about whatever

6  you want.  And if that means keeping up with the

7  Kardashians, then there's a easy solution to that.  It's

8  not regulation; it's the channel search.

9              All right.  Thank you, counsel.

10:57:17   10           **(Recessed at 10:57 a.m.)**

11              **COURT REPORTER'S CERTIFICATE**

12

13  I, Johnny C. Sanchez, certify that the foregoing is a

14  correct transcript from the record of proceedings in the

15  above-entitled matter.

16

17                    /s/_____
                      Johnny C. Sanchez, CRR, RMR

18

19

20

21

22

23

24

25