## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. KENNETH W. ABBOTT, ET AL., | § § § | |
| Plaintiffs, | § § | |
| | § | Civil Action No. 4:09-cv-01193 |
| v. | § | |
| | § | Jury Trial Requested |
| BP EXPLORATION AND PRODUCTION INC., ET AL., | § § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' REVISED MOTION FOR SUMMARY JUDGMENT

**PERRY & HAAS**
David L. Perry
René Haas
P.O. Box 1500
Corpus Christi, TX 78403
Tel. (361) 880-7500
Fax. (361) 887-9507

**MALLETT, SAPER, BERG LLP**
Edward A. Mallett
JPMorgan Chase Tower
600 Travis St., Suite 1900
Houston, Texas 77002
Tel. (713) 236-1900
Fax. (713) 228-0321

**HOGAN & HOGAN**
Richard P. Hogan, Jr.
Jennifer Bruch Hogan
909 Fannin, Suite 2700
Houston, TX 77010
Tel. (713) 222-8800
Fax. (713) 222-8810

**WATTS GUERRA CRAFT LLP**
Mikal C. Watts
J. Hunter Craft
Four Dominion Drive
Bldg. 3, Suite 100
San Antonio, TX 78257
Tel. (210) 447-0500
Fax. (210) 447-0501

Christopher V. Goodpastor
811 Barton Springs Road, Suite 725
Austin, TX 78704
Tel. (512) 479-0500
Fax. (512) 479-0502

**Mary M. Whittle**
Attorney at Law
3930 Argyle Terrace, N.W.
Washington, D.C. 20011
Tel. (202) 320-1612

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................v

INTRODUCTION ............................................................................................. 1

SUMMARY OF ARGUMENT ........................................................................... 2

STANDARD OF REVIEW ................................................................................ 6

STATUTORY FRAMEWORK .......................................................................... 6

   A.   OCSLA .........................................................................................7

   B.   THE FALSE CLAIMS ACT ("FCA") ..........................................9

       1.   Introduction ...................................................................9

       2.   False Statement or Fraudulent Course of Conduct.......10

       3.   Scienter .......................................................................12

       4.   Materiality ...................................................................13

       5.   Payment of Claim .......................................................14

ATLANTIS LEASE TERMS ........................................................................... 14

FACTUAL BACKGROUND............................................................................ 15

   A.   ABBOTT IS THE ORIGINAL SOURCE. ...................................15

       1.   Introduction .................................................................15

       2.   Abbott's Direct and Independent Knowledge of BP's Fraud...........................16

       3.   Abbott's Claims Are Not Barred By the FCA Public Disclosure Bar. ..............18

   B.   SAFETY CONCERNS.................................................................20

   C.   ATTEMPTS AT RESOLUTION.................................................21

   D.   ABBOTT'S EFFORTS AFTER TERMINATION.........................22

   E.   MMS INVESTIGATION.............................................................24

ARGUMENT................................................................................................... 25

   A.   BP'S ATLANTIS PLATFORM PERMIT APPLICATION WAS A FALSE CLAIM FOR GOVERNMENT PROPERTY.........................25

       1.   Introduction .................................................................25

       2.   The Atlantis Detailed Structural Plans and Specifications Were Not Certified by Registered Professional Engineers. .................................28

          a.   No Factual Dispute Exists Regarding Which Drawings Are Covered By BP's Platform Certification. ........................................ 28

b.    The Atlantis Hull Was Designed by a Korean Shipbuilding Firm That BP Knew Could Not Certify Engineering Drawings As Registered Professional Engineers. ................................................................. 29

c.    An Engineering Drawing Is "Certified" By Application of a Seal. .......... 33

d.    BP Knew That Seals Were Required. .......................................... 34

e.    BP Knew That Its Platform Certification Regarding Professional Engineering Certification Was False. .......................................... 36

3.    BP Did Not Develop "As-Built" Drawings. ..................................... 39

a.    BP Did Not Perform "As-Builting." ............................................ 39

b.    BP's Failure to Follow Its Own Specifications Requiring "As-Built" Stamps Shows That "As-Builting" Never Occurred. ........................ 41

c.    Atlantis Was Over Budget By Almost $4 Billion. .......................... 44

d.    BP Claims to Rely On Documentum to Find Latest Revision. ........ 45

e.    "As-Built" Drawings Are Critical to Safe Operations. ................... 49

f.    BP Acted in Reckless Disregard of the Falsity of Its Platform Certification Regarding "As-Built" Drawings. ................................ 51

g.    Todd Misled MMS About BP's "As-Built" Standards. ................... 52

4.    BP's False Certifications Were Material to the Platform Permit Approval. .....53

B.    BP'S ATLANTIS PRODUCTION SAFETY SYSTEM APPLICATION WAS A FALSE CLAIM FOR GOVERNMENT PROPERTY. ................................. 55

1.    Introduction .......................................................................... 55

2.    Definition of Production Safety System. ..................................... 56

3.    Production Safety System Permit Application and Approval .......... 57

4.    The Designs for the Atlantis Mechanical and Electrical Systems Were Not Approved By Registered Professional Engineers. ..................... 58

a.    A Texas Registered Professional Engineer Who Approves an Engineering Document Must Seal the Document. ........................ 58

b.    None of the Designs for the Production Safety System Bear the Stamp or Seal of an Individual Registered Professional Engineer. ........................ 61

c.    BP's Contractors Admit No Registered Professional Engineer Approved the Designs For The Mechanical and Electrical Systems of the Atlantis Production Safety System. ........................................................ 63

d.    BP Made No Effort To Verify that Its Certification Was True. ......... 66

e.    MMS Accepted the Certification Submitted Without Further Inquiry... 67

f. An Engineering Firm Cannot Approve Designs As A Registered Professional Engineer. .................................................................... 69

g. BP Acted in Deliberate Ignorance By Submitting Its Production Safety System Certification Without Confirming Its Truthfulness. ................... 71

5. BP's False Certification Was Material to the Production Safety System Permit Approval. ........................................................................72

C. DAMAGES ARE EQUAL TO THE ATLANTIS FIELD RESERVES VALUE. ........73

1. Introduction ...............................................................................73

2. Statutory Basis for Damages ..........................................................74

3. The Government Can Recover As Actual Damages The Value Of The Oil and Gas BP Obtained Because Of The False Permit Applications. ...................74

4. The United States Is Entitled to Treble Damages. .................................78

5. Royalty Payments on Produced Oil and Gas May Be Subtracted From the Trebled Damage Amount. ............................................................79

D. THE ATLANTIS SHOULD UNDERGO AN AGGRESSIVE AUDIT AND REPAIR OR BP'S LEASES SHOULD BE REVOKED. ................................................80

1. Introduction ...............................................................................80

2. Plaintiffs Have Standing to Seek Injunctive Relief Under OCSLA. ..................81

a. Plaintiffs Will Be Injured if BP is Not Enjoined. .......................... 83

b. Plaintiffs' Threatened Injury is Traceable to BP's Conduct. ............... 87

c. Plaintiffs' Claims are Redressable. ........................................ 89

3. BP's Continued Operation of Atlantis Is Dangerous. ............................90

a. BP Has Violated OCSLA and MMS Regulations. ....................................... 91

b. BP's Conduct Poses a Substantial Threat of Irreparable Harm. ............... 91

(1) BP's Failure to Obtain Approval By Registered Professional Engineers of its Designs Increases the Risk of an Oil Spill or Explosion. ......................................................................... 92

(a) Introduction ....................................................................92

(b) Atlantis Pressure Relief Valves Are Not Fit for Service According to BP's Own Criteria. ............................................93

(c) Atlantis Production Safety System Subsea Controls System Has Experienced Repeated Malfunctions Resulting In Loss of Well Control ....................................................................97

(d) The Design of the Atlantis Controls Violated Federal Regulations. ..................................................................101

       (2)   BP's Failure to Develop "As-Built" Drawings Creates a Significant Threat of Harm to Persons, Property, and the Environment. ....... 105

    c.   The Threatened Injury Outweighs Harm to BP ...................................... 107

    d.   The Public Interest Weighs In Favor of Granting Injunction ................. 107

  4.   A Special Master Should Be Appointed To Oversee a Remediation Plan. ..... 108

CONCLUSION ........................................................................................................... 108

CERTIFICATE OF SERVICE ................................................................................... 111

iv

# TABLE OF AUTHORITIES

## CASES

*Abbott v. BP Exploration and Production, Inc.,*
781 F. Supp. 2d 453 (S.D. Tex 2011) .........................................................passim

*Ab-Tech Construction, Inc. v. United States,*
31 Fed. Cl. 429 (Fed. Cl. 1994).................................................................... 76

*Allison Engine. Co. v. United States ex rel. Sanders,*
553 U.S. 662 (2008)...................................................................................... 19

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531 (1987)..................................................................... 88, 105, 106

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)........................................................................................ 6

*Ashwander v. Tennessee Valley Authority,*
297 U.S. 288 (1936)........................................................................................ 7

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979)...................................................................................... 84

*Bangor Water Dist. v. Malcolm Pirnie Eng'rs,*
534 A.2d 1326 (Me. 1988) ........................................................................... 39

*Beck v. Sampson,*
186 A.2d 783 (Me. 1962) ............................................................................. 34

*Bolton v. City of Dallas,*
472 F.3d 261 (5th Cir. 2006) ......................................................................... 6

*Bowsher v. Synar,*
478 U.S. 714 (1986)...................................................................................... 80

*Conservation Law Found. of New England, Inc. v. Secr'y of Interior,*
790 F.2d 965 (1st Cir. 1986)......................................................................... 82

*Cook Cty., Ill. v. United States ex rel. Chandler,*
538 U.S. 119 (2003)...................................................................................... 72

*Ctr. for Biological Diversity v. U.S. Dept. of Interior,*
563 F.3d 466 (D.C. Cir. 2009)...................................................................... 82

*DiBiase Corp. v. Jacobowitz,*
  682 N.E.2d 1382 (Mass. App. Ct. 1997) ............................................................. 39

*Elliott v. Fosdick & Hilmer,*
  460 N.E.2d 257 (Ohio Ct. App. 1983) ................................................................. 39

*Faulk v. United States,*
  198 F.2d 169 (5th Cir. 1952) ............................................................................... 78

*Fort Stewart Schools v. Federal Labor Relations Auth.,*
  495 U.S. 641 (1990) .............................................................................................. 9

*Friends of Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.,*
  528 U.S. 167 (2000) ............................................................................................ 81

*Friends of the Earth, Bluewater Network Div. v. U.S. Dept. of Interior,*
  478 F. Supp. 2d 11 (D.D.C. 2007) ..................................................................... 81

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,*
  204 F.3d 149 (4th Cir. 2000) ............................................................................. 85

*George Thomas Home, Inc. v. Southwest Tension Systems, Inc.,*
  763 S.W.2d 797 (Tex. App.—El Paso 1998, no writ) ........................................ 33

*Gladstone Realtors v. Village of Bellwood,*
  441 U.S. 91 (1979) .............................................................................................. 84

*Glenn v. Nortex Foundation Designs, Inc.,*
  2008 WL 2078510 (Tex. App—Ft. Worth May 15, 2008, pet. denied) ............ 33

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ............................................................................................ 81

*Justheim v. McKay,*
  229 F.2d 29 (D.C. Cir. 1956) ................................................................................ 7

*Lake Charles Diesel, Inc. v. GMC,*
  328 F.3d 192 (5th Cir. 2003) ............................................................................. 89

*Little v. Shell Exploration & Production Co.,*
  2011 WL 1370565 (S.D. Tex. Apr. 8, 2011) ....................................................... 15

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .................................................................................. 80, 86, 87

*Marcus v. Hess,*
  317 U.S. 537 (1943) .............................................................................................. 9

*Massachusetts v. E.P.A.*,
 549 U.S. 497 (2007)........................................................................ 80, 88

*Massachusetts v. EPA*,
 549 U.S. 497 (2007)............................................................................ 84

*McIntosh Land Co. Ltd. P'ship v. Fairfield Fletcher Ltd. P'ship*,
 2005 WL 2656577 (M.D. Fla. Oct. 18, 2005) ....................................... 38

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
 760 F.2d 618 (5th Cir. 1985) ............................................................... 89

*Mobil Oil Exploration and Producing Southeast, Inc. v. United States*,
 530 U.S. 604 (2000).......................................................................... 8, 74

*Mountain States Legal Found. v. Glickman*,
 92 F.3d 1228 (D.C. Cir. 1996) ............................................................. 84

*Nat'l Taxpayers Union, Inc. v. United States*,
 68 F.3d 1428 (D.C. Cir. 1995) ............................................................. 80

*Natural Res. Def. Council ("NRDC") v. EPA*,
 464 F.3d 1 (D.C. Cir. 2006)................................................................. 85

*Natural Res. Def. Council v. E.P.A.*,
 489 F.3d 1364 (D.C. Cir. 2007)............................................................ 88

*Overseas Shipholding Group, Inc. v. Skinner*,
 767 F.Supp. 287 (D.D.C. 1991) ........................................................... 85

*Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.*,
 913 F.2d 64 (3d Cir. 1990) .............................................................. 81, 86

*Riley v. St. Luke's Episcopal Hospital*,
 252 F.3d 749 (5th Cir. 2001) ................................................................. 9

*Royal Indemnity Co. v. U.S.*,
 313 U.S. 289 (1941).............................................................................. 7

*Save Our Comm. v. E.P.A.*,
 971 F.3d 1155 (5th Cir. 1992) ..................................................... 81, 82, 86

*Sec'y of the Interior v. California*,
 464 U.S. 312 (1984)........................................................................... 7, 8

*Septimus v. Univ. of Houston*,
 399 F.3d 601 (5th Cir. 2005) ................................................................. 6

*Sierra Club v. Morton,*
    405 U.S. 727 (1972)............................................................................................ 81

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.,*
    73 F.3d 546 (1996) ............................................................................................. 85

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976).............................................................................................. 80

*South Park Land & Livestock Co., Inc. v. Hamiton Enter., Ltd.,*
    538 P.2d 444 (Co. 1975)..................................................................................... 34

*Springfield Terminal Ry. v. Quinn,*
    14 F.3d 645 (D.C. Cir. 1994).............................................................................. 19

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998).............................................................................................. 80

*UMC Elecs. Co. v. United States,*
    43 Fed. Cl. 776 (Fed. Cl. 1999)............................................................. 13, 67, 70

*United States ex rel. Augustine v. Century Health Services,*
    289 F.3d 409 (6th Cir. 2002) ........................................................................ 12, 51

*United States ex rel. Cantekin v. Univ. of Pittsburgh,*
    192 F.3d 402 (3d Cir. 1999) ............................................................................... 37

*United States ex rel. Compton v. Midwest Specialties, Inc.,*
    142 F.3d 296 (6th Cir. 1998) ........................................................................ 13, 76

*United States ex rel. Farmer v. City of Houston,*
    523 F.3d 333 (5th Cir. 2008) ........................................................................ 12, 70

*United States ex rel. Grubbs v. Kanneganti,*
    565 F.3d 180 (5th Cir. 2009) .................................................................. 16, 18, 19

*United States ex rel. Longhi v. Lithium Power Tech.,*
    513 F. Supp. 2d 866 (S.D. Tex. 2007) ........................................................passim

*United States ex rel. Longhi v. Lithium Power Tech.,*
    575 F.3d 458 (5th Cir. 2009) *cert. denied*, 130 S. Ct. 2092 (2010) ..............passim

*United States ex rel. Marcus v. Hess,*
    317 U.S. 537 (1943)............................................................................................ 73

*United States ex rel. Purcell v. MWI Corp.,*
    520 F. Supp. 2d 158 (D.D.C. 2007).............................................................. 76, 77

*United States ex rel. Reagan v. E. Tex. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168
(5th Cir. 2004) ............................................................................................ 15, 19

*United States ex rel. Rosales v. San Francisco Housing Auth.*,
173 F. Supp. 2d 987 (N.D. Cal. 2001) .......................................................... 75

*United States ex rel. Schwedt v. Planning Research Corp.*,
59 F.3d 196 (D.C. Cir. 1995) ......................................................................... 77

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir. 1997) ..................................................................... 11, 13

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
525 F.3d 370 (4th Cir. 2008) ......................................................................... 10

*United States of America, The State of New York ex rel. Assoc. Against Outlier
Fraud v. Huron Consulting Group*,
2012 WL 506824 (S.D.N.Y. Feb. 16, 2012) ................................................. 18

*United States v. Aerodex*,
469 F.2d 1003 (5th Cir. 1972) ........................................................... 37, 38, 73

*United States v. Bornstein*,
423 U.S. 303 (1976) ...................................................................................... 78

*United States v. Hibbs*,
568 F.2d 347 (3d Cir. 1977) .......................................................................... 77

*United States v. Killough*,
848 F.2d 1523 (11th Cir. 1988) ..................................................................... 73

*United States v. Krizek*,
111 F.3d 934 (D.C. Cir. 1997) ....................................................................... 70

*United States v. Lorenzo*,
768 F. Supp. 1127 (E.D. Pa. 1991) ............................................................... 70

*United States v. Mackby*,
339 F.3d 1013 (9th Cir. 2003) ....................................................................... 75

*United States v. Marine Shale Processors*,
81 F.3d 1329 (5th Cir. 1996) ......................................................................... 89

*United States v. Miller*,
645 F.2d 473 (5th Cir. 1981) ......................................................................... 77

*United States v. Neifert-White Co.,*
  390 U.S. 228 (1968) ............................................................................................. 11

*United States v. Race,*
  632 F.2d 1114 (4th Cir. 1980) ............................................................................. 67

*United States v. Rogan,*
  517 F.3d 449 (7th Cir. 2008) ............................................................................... 75

*United States v. Science Applications Intern. Corp.,*
  626 F.3d 1257 (D.C. Cir. 2010) ........................................................................... 13

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP),*
  412 U.S. 669 (1973) ............................................................................................. 81

*United States v. TDC Management Corp., Inc.,*
  288 F.3d 421 (D.C. Cir. 2002) ....................................................................... 75, 76

*United States v. Thomas,*
  709 F.2d 968 (5th Cir. 1983) ............................................................................... 78

*United States v. Woodbury,*
  359 F.2d 370 (9th Cir. 1966) ............................................................................... 76

*Valley Forge Christian College v. Americans United for Separation of Church
  and State, Inc.,*
  454 U.S. 464 (1982) ............................................................................................. 84

*Vermont Agency of Nat'l Res. v. United States ex rel. Stevens,*
  120 S. Ct. 1858 (2000) ........................................................................................... 9

*Village of Elk Grove Village v. Evans,*
  997 F.2d 328 (7th Cir. 1993) ............................................................................... 85

*W. Va. Highlands Conservancy v. Johnson,*
  540 F. Supp. 2d 125 (D.D.C. 2008) ..................................................................... 88

*Warth v. Seldin,*
  422 U.S. 490 (1975) ............................................................................................. 88

*Watt v. Energy Action Educ. Found.,*
  454 U.S. 151 (1981) ............................................................................................. 80

*Wiley v. State Farm Fire and Cas. Co.,*
  585 F.3d 206 (5th Cir. 2009) ................................................................................. 6

**STATUTES**

30 C.F.R. § 250.905(k) .................................................................................. 25, 28

31 U.S.C. § 3729 .............................................................................................. 1

31 U.S.C. § 3729(a) ........................................................................................ 72

31 U.S.C. § 3729(a)(1) ........................................................................... 6, 12, 19

31 U.S.C. § 3729(a)(1)(A) .............................................................................. 10

31 U.S.C. § 3729(a)(1)(B) .............................................................................. 10

31 U.S.C. § 3729(a)(2) ........................................................................... 10, 12, 19

31 U.S.C. § 3729(b)(1) .................................................................................... 12

31 U.S.C. § 3729(b)(2) ............................................................................... 10, 11

31 U.S.C. § 3730(b)(2) .................................................................................... 22

31 U.S.C. § 3730(e)(4)(B) .............................................................................. 15

43 U.S.C. § 1302 .............................................................................................. 7

43 U.S.C. § 1311 .............................................................................................. 7

43 U.S.C. § 1331 .............................................................................................. 1

43 U.S.C. § 1331(a) .......................................................................................... 7

43 U.S.C. § 1332(3) .......................................................................................... 8

43 U.S.C. § 1332(6) ...................................................................................... 8, 96

43 U.S.C. § 1334(a) ...................................................................................... 7, 79

43 U.S.C. § 1334(b) ...................................................................................... 7, 79

43 U.S.C. § 1334(d) ...................................................................................... 8, 79

43 U.S.C. § 1337(a)(1) ..................................................................................... 7

43 U.S.C. § 1337(a)(1)(A) ............................................................................... 7

43 U.S.C. § 1344 ............................................................................................. 14

43 U.S.C. § 1349(a)(1) .................................................................................. 6, 9

43 U.S.C. § 1349(a)(6) ..................................................................................... 9

43 U.S.C. § 1350(c) ......................................................................................... 9

Act of May 22, 2001, 77th Leg., ch. 1421, § 1, 2001 Tex. Gen. Laws 4570,
    4587 (previously codified as TEX. OCC. CODE § 1001.401(b)) ........................... 58

CAL. BUS. & PROF. CODE § 6701 ...................................................................... 68

CAL. BUS. & PROF. CODE § 6704 ...................................................................... 90

CAL. BUS. & PROF. CODE § 6732 ...................................................................... 68

CAL. BUS. & PROF. CODE § 6735.5 .................................................................... 58

LA. R.S. 37:681 ...................................................................................... 58, 90

LA. R.S. 37:682(10) ......................................................................................... 58

LA. R.S. 37:682(4) ........................................................................................... 68

NEV. REV. STAT. § 625.407 ............................................................................... 68

NEV. REV. STAT. § 625.005 ............................................................................... 90

NEV. REV. STAT. 625.060 ................................................................................. 68

NEV. REV. STAT. 625.520 ................................................................................. 58

TEX. OCC. CODE 1001.002 ............................................................................... 68

TEX. OCC. CODE § 1001.003(b) ........................................................................ 58

TEX. OCC. CODE § 1001.003(c) ........................................................................ 58

TEX. OCC. CODE § 1001.004(b)(3) .................................................................... 59

TEX. OCC. CODE § 1001.004(c) ........................................................................ 58

TEX. OCC. CODE § 1001.301 ............................................................................. 58

TEX. OCC. CODE § 1001.301(a) ........................................................................ 68

TEX. OCC. CODE § 1001.401 .................................................................. 33, 58, 60

TEX. OCC. CODE § 1001.401(a) ................................................................... 68, 90

TEX. OCC. CODE § 1001.401(b) ......................................................... 33, 58, 60, 68

TEX. OCC. CODE § 1001.405(e)(3) .................................................................... 68

Tex. Occ. Code § 1004.405(c) ................................................................ 68

Tex. Occ. Code. § 1001.405(b) ............................................................... 68

Utah Code § 58-22-102 ........................................................................... 68

Utah Code § 58-22-601 ........................................................................... 58

Utah Code § 58-22-603 ........................................................................... 68

**RULES**

Fed. R. Civ. P. 56(c) ................................................................................. 6

Louisiana Rules, 46 LA ADC Pt LXI, § 2701(A)(4)(a)(i) ...................... 68

Nevada Rules, NAC 625.610 .................................................................. 68

Utah Rules, Utah Admin. Code R156-22-302c .................................... 90

**REGULATIONS**

22 Tex. Admin. Code § 131.81(10) ........................................................ 59

22 Tex. Admin. Code § 133.11 ............................................................... 68

22 Tex. Admin. Code § 137.1 ................................................................. 58

22 Tex. Admin. Code § 137.33(a) .......................................................... 58

22 Tex. Admin. Code § 137.33(b) .......................................................... 59

30 C.F.R. § 250.198 ................................................................................. 55

30 C.F.R. § 250.281 ................................................................... 9, 11, 53, 70

30 C.F.R. § 250.800 ................................................................................. 79

30 C.F.R. § 250.800(a) .............................................................. 9, 11, 54, 71

30 C.F.R. § 250.801(i) ........................................................................... 100

30 C.F.R. § 250.802(a) ...................................................................... 74, 79

30 C.F.R. § 250.802(b) ............................................................................ 79

30 C.F.R. § 250.802(e) ..................................................................... passim

30 C.F.R. § 250.802(e)(3) ........................................................................ 55

30 C.F.R. § 250.802(e)(5)..................................................................... 10, 54, 56, 71

30 C.F.R. § 250.803(b)(1) ................................................................. 79, 91, 92, 94

30 C.F.R. § 250.803(B)(1) ............................................................................. 91

30 C.F.R. § 250.803(b)(4) ...................................................................... 100, 102

30 C.F.R. § 250.803(b)(4)(ii) .................................................................. 99, 100

30 C.F.R. § 250.900(a) ........................................................................... 74, 79

30 C.F.R. § 250.900(b) ................................................................................ 79

30 C.F.R. § 250.900(b) (2002) ............................................................ 25, 26, 53

30 C.F.R. § 250.900(b) (2000) ....................................................................... 9

30 C.F.R. § 250.900(c) (2002) ................................................................ 26, 79

30 C.F.R. § 250.901 (2002) .............................................................. 10, 25, 33

30 C.F.R. § 250.901(d) .......................................................................... 31, 32, 37

30 C.F.R. § 250.901(d) (2002) ..................................................... 10, 25, 53, 79

30 C.F.R. § 250.902 (2002) ........................................................................ 31, 37

30 C.F.R. § 250.903 (2006) ......................................................................... 52

30 C.F.R. § 250.905(j) .................................................................................. 19

30 C.F.R. § 250.905(k) ............................................................................. 25, 28

67 Fed. Reg. 51,757 ...................................................................................... 55

70 Fed. Reg. 41556, 41517-72 (July 19, 2005) ......................................... 52

## OTHER AUTHORITIES

BLACK'S LAW DICT. (9th ed. 2009) ....................................................... 33, 66

*House Comm. on Licensing & Admin. Procedures,*
  Bill Analysis, Tex. C.S.H.B. 1817, 79th Leg., R.S. (2005).................... 60

MERRIAM-WEBSTER'S COLLEGIATE DICT., 10th Edition (1999) ............... 66

S. Rep. No. 615, 96th Cong.......................................................................... 73

S. Rep. No. 99-345............................................................................................. 13

Tex. Att'y Gen. Op. GA-0274 (2004),
    2004 WL 2678848 (Tex. A.G.)..................................................................... 69

Tex. Att'y Gen. Op. No. GA-0287 (2004),
    2004 WL 2980275 (Tex. A.G.)............................................................... 59, 66

U.S. CONST. art. IV, §3, cl. 2 ...............................................................................7

## INTRODUCTION

Plaintiffs United States of America *ex rel.* Kenneth W. Abbott, Kenneth W. Abbott, individually ("Abbott"), and Food & Water Watch, Inc. ("FWW"), respectfully move this Court to grant summary judgment in favor of Abbott on his claims under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), and in favor of Abbott and FWW on their claims under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.* ("OCSLA").

Plaintiffs' claims arise from BP's[1] false certifications in permit applications to the Minerals Management Service ("MMS")[2] seeking to install the Atlantis platform in the Gulf of Mexico and the platform's production safety system and to extract publicly owned oil and gas.  BP was required to have designs for the Atlantis approved by registered professional engineers.  BP was required to develop "as-built" plans and specifications for the platform.  BP falsely certified to both and is liable for the full value of the Atlantis field.  Atlantis is unsafe; its continued unsafe operation should be enjoined, and BP should be required to upgrade Atlantis to comply with critical safety and environmental regulations.  In the alternative, BP's leases should be revoked.

---

[1] BP Exploration and Production Inc., BP America Inc., BP p.l.c., and BP Products North America Inc. (collectively, "BP").

[2] On May 19, 2010, MMS was divided into three independent entities and temporarily renamed the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").  On October 1, 2011, the Bureau of Safety and Environmental Enforcement ("BSEE") was created and is the agency currently charged with enforcement of safety and environmental regulations at issue in the instant case.  *See* "The Reorganization of the Former MMS," at http://bsee.gov/About-BSEE/Reorganization/Reorganization.aspx (last visited 11/17/2011).  Because the vast majority of activity giving rise to this suit took place while the agency was named MMS, this memorandum will refer to it as MMS.

## SUMMARY OF ARGUMENT

In permit applications requesting government approval to install the Atlantis platform and production safety system, which are conditions precedent to oil and gas production, BP knowingly and falsely certified compliance with engineering requirements that are essential to the safe functioning of the necessary installations. Based on these false certifications, MMS granted BP the critical permits, allowing BP to produce oil and gas from the five unitized leases that make up the Atlantis field.

First, BP falsely certified in its platform permit application that registered professional engineers would certify the detailed structural plans for the Atlantis as required under OCSLA regulations subpart I.  When BP submitted its application, BP already had contracted with a Korean ship-building firm to perform the detailed design work for the hull, and BP already knew that the Korean designers could not certify their plans because they were not registered professional engineers.  BP deliberately chose not to inform MMS that the detailed structural plans of the weight-bearing hull would not and could not be certified as required by the regulation.  BP also did not seek permission for alternate means of compliance.  After fabrication in Korea, the hull required extensive remediation by BP: entire systems were rebuilt at the integration yard in Ingleside, Texas.  Of the 1154 design drawings for the hull and floating structure of the platform, only 8 drawings (0.7%) are certified with a registered professional engineer's seal.

Second, BP falsely certified in its platform permit application that "as-built" plans and specifications for Atlantis would be developed and kept on file at BP's offices in Houston.  Uncontroverted testimony reveals that neither BP nor its contractors

undertook performing the "as-built" process required for the Atlantis integrated platform structure or developed a full set of "as-built" plans and specifications at commissioning.  BP's records also demonstrate that "as-builting" never occurred; only 3.4% of the drawings are revised "as-built."

Third, BP falsely certified in its production safety system permit application that registered professional engineers had reviewed and approved the designs for the mechanical and electrical systems of the Atlantis production safety system.  BP submitted 522 design drawings in support of its application, but none (0%) bears the stamp or seal of a registered professional engineer.  The controls for the production safety system, along with the SAFE Chart and the safety shutdown logic, were not developed by registered professional engineers.  BP's contractors conceded that no individual registered professional engineer approved the designs for the mechanical and electrical systems of the production safety system–the drawings themselves have no professional engineer seal, no one approved the designs for the systems in writing, and no one approved the designs for the systems orally.  BP subcontracted to engineering companies, but those companies did not bring BP into compliance.  Hiring an engineering firm registered in the State of Texas is not equivalent to approval by an individual licensed and registered professional engineer.

The facts underlying BP's false certifications, including BP's failure to develop and maintain the critical engineering drawings required by OCSLA regulations since before first oil in October 2007, pose a significant and imminent threat to the Gulf of Mexico ecosystem.   The production safety system is required to include pressure relief

safety valves to prevent explosions or loss of containment due to overpressure, and BP lacks the necessary design basis for over one-third of the Atlantis pressure relief safety valves.  One valve in particular is undersized by a factor of 20 to 1, and a release of explosive oil and gas under pressure from that pipeline when ignited could rapidly engulf the platform in explosions and fire.

Another example found in BP's records: The controls of the Atlantis production safety system have experienced repeated failures that have not been remedied – valves open and close without command, oil leaks to the wellhead through the annulus, and communication between the well and operations has been lost repeatedly.  These failures are directly attributable to improper engineering.  BP witnesses have acknowledged that the failures could result in additional release of oil and gas into the Gulf.  The safety shutdown controls were not in compliance with required performance standards from the start of production for more than a year before BP realized major design flaws.  BP's expert testified that the problems may continue through today.

BP's failure to maintain a complete set of "as-built" drawings on which operations personnel can rely is a violation of process safety.  A lack of "as-builts" was one of the reasons BP was unable to stem the Deepwater Horizon spill.  The oil flowed for several hours after the blowout preventer failed while BP employees searched for "as-built" drawings.  BP and others were unable to take appropriate remedial measures because the available drawings were not "as-built" drawings, *i.e.*, they did not depict the facility as it was actually installed.  Further, failures associated with the improper design and construction of the hull of BP's Thunder Horse caused the near sinking of

that platform in 2005.  Thunder Horse was designed and fabricated by the same Korean ship-building firm as Atlantis, a firm BP admits does not employ registered professional engineers.

As a consequence of BP's false certifications, the United States is entitled to damages equalling the full value of the Atlantis field.  The United States awarded the Atlantis field leases to BP through a competitive bidding process, and BP's rights under the leases were conditioned on BP's compliance with all OCSLA regulations.  Through the permit process, the United States received assurances from BP that its Atlantis installations complied with regulations requiring proper engineering and "as-built" plans and specifications for safe operation of the production facility.  In fact, those assurances were untrue and worthless.  The United States is entitled to damages, namely, the value of the people's oil and gas that BP has taken as a result of BP's successful fraud.

Finally, BP's operation of Atlantis should be enjoined until BP develops a full set of "as-built" plans and specifications and registered professional engineers certify both the detailed structural plans for the platform and the designs for the mechanical and safety systems of the production safety system.  In the alternative, BP's leases should be revoked for violations of law.

For these reasons, plaintiffs respectfully request that this Court hold BP liable under the FCA and OCSLA, award damages to the United States, assess statutory penalties for BP's false claims, and enjoin operation of Atlantis or revoke BP's leases.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Bolton v. City of Dallas*, 472 F.3d 261, 263 (5th Cir. 2006). "A fact is material only if its resolution would affect the outcome of the action . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the [nonmovant].'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). "The appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

## STATUTORY FRAMEWORK

Plaintiffs seek to enjoin BP's operation of the Atlantis until BP corrects its lack of compliance with critical federal environmental and safety regulations. BP's current operation of Atlantis is unsafe and poses a substantial threat of long term or irreparable injury to the Gulf of Mexico ecosystem. Plaintiff Abbott also seeks to restore to the United States treasury the value of the federally owned oil and gas illegally obtained because of BP's false certifications of compliance with the regulations. Plaintiffs' claims arise under the OCSLA, 43 U.S.C. § 1349(a)(1), and the FCA, 31 U.S.C. § 3729(a)(1).

A.    OCSLA

The United States owns the submerged lands that lie beyond the territorial sea and constitute the outer continental shelf.  43 U.S.C. §§ 1302, 1311, 1331(a); *Sec'y of the Interior v. California*, 464 U.S. 312, 315-16 (1984).  Only Congress has the power to dispose of property belonging to the United States.  U.S. CONST. art. IV, §3, cl. 2; *see Ashwander v. Tennessee Valley Authority*, 297 U.S. 288 (1936); *Royal Indemnity Co. v. U.S.*, 313 U.S. 289 (1941).  MMS cannot dispose of federal oil and gas, by lease or otherwise, unless Congress has delegated the power to do so.  *See Justheim v. McKay*, 229 F.2d 29 (D.C. Cir. 1956) (affirming decision that Congress did not authorize leases of submerged lands in the Mineral Leasing Act of 1920).  The only authority the Department of the Interior has to dispose of property on the outer continental shelf was delegated to it by Congress in the OCSLA.

The OCSLA authorizes the Secretary of the Interior to grant oil and gas leases on the outer continental shelf to the "highest *responsible* qualified bidder by competitive bidding."  43 U.S.C. § 1337(a)(1) (emphasis added); *see Sec'y of the Interior v. California*, 464 U.S. at 315-16.  A leaseholder pays a cash bonus as its bid for the lease and agrees to pay a fixed royalty rate of 12 ½ percent to the United States on any oil or gas produced from the lease area.  43 U.S.C. § 1337(a)(1)(A).  Pursuant to OCSLA, the Secretary of the Interior may prescribe regulations necessary to prevent waste and conserve the natural resources of the outer continental shelf.  *Id.* at § 1334(a).  The issuance and continuance in effect of any lease is conditioned upon compliance with those regulations.  *Id.* at § 1334(b).  A lessee who fails to comply with OCSLA or its regulations may have his lease

forfeited and cancelled by an appropriate proceeding in any United States district court. *Id.* at § 1334(d).

Congress declared the outer continental shelf "a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.* at § 1332(3). Congress also declared that "operations in the outer Continental Shelf should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, . . . or other occurrences which may cause damage to the environment or to property, or endanger life or health." *Id.* at § 1332(6).

A lessee does not gain an immediate or absolute right to explore for, develop, or produce oil or gas under its lease contract. Those activities require separate authorization through permit applications to the MMS. *See Sec'y of the Interior v. California*, 464 U.S. at 317; *Mobil Oil Exploration and Producing Southeast, Inc. v. United States*, 530 U.S. 604, 609-10, 620-21 (2000); *Abbott v. BP Exploration and Production, Inc.*, 781 F. Supp. 2d 453, 462-63 (S.D. Tex 2011). The permit and approval process is required because the mechanisms used to achieve production, and the structures and components that ensure safe removal of oil and gas, are necessary predicates to the production of oil and gas. *Mobil Oil*, 530 U.S. at 609; *Abbott*, 781 F. Supp. 2d at 462-63. Once the required permit applications are approved by the MMS, the lessee can take

possession of the government owned oil and gas.  Before the permits are approved, a lessee cannot begin oil or gas production or take the government property.  30 C.F.R. §§ 250.281, 250.900(b)(2000)  , 250.800(a); *Abbott*, 781 F. Supp. 2d at 464, 466.  MMS, like all federal agencies, is bound by its regulations.  *See Fort Stewart Schools v. Federal Labor Relations Auth.*, 495 U.S. 641, 654 (1990).  MMS, therefore, cannot grant permits disposing of federal oil and gas where the lessee has not complied with OCSLA regulations.

OCSLA's citizen suit provision allows any person with a valid legal interest, which is or may be adversely affected, to bring an action on his own behalf to compel compliance with the statute or leases.  43 U.S.C. § 1349(a)(1).  A citizen suit plaintiff may also request any appropriate relief under common law.  *Id.* at § 1349(a)(6).  OCSLA also includes criminal sanctions for knowingly and wilfully making false certifications in any permit application.  *Id.* at § 1350(c).

## B.    The False Claims Act ("FCA")

### 1.    Introduction

The *qui tam* provision of the FCA has been described by the Supreme Court as "one of the least expensive and most effective means of preventing frauds on the treasury . . . Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does the slow-going public vessel."  *Marcus v. Hess*, 317 U.S. 537, 541 n. 5 (1943).  Justice Scalia, holding that a *qui tam* relator has Article III standing, relies on "original intent," namely the long tradition of *qui tam* actions in England and the American colonies.  *Vermont Agency of Nat'l Res. v. United*

9

*States ex rel. Stevens*, 120 S. Ct. 1858, 1861-65 (2000); *see also Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749, 752 (5th Cir. 2001).

With this memorandum, Abbott establishes that (1) BP knowingly presented the MMS with a false or fraudulent claim for government payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A); and (2) that BP knowingly made or used a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B). BP committed these FCA violations by making expressly false certifications and by submitting many false engineering documents with permit applications to obtain possession of government oil and gas in violation of 30 C.F.R. § 250.901(d) (2002) and 30 C.F.R. § 250.802(e)(5).

In *United States ex rel. Longhi v. Lithium Power Tech.*, 575 F.3d 458 (5th Cir. 2009), *cert. denied*, 130 S. Ct. 2092 (2010), the Fifth Circuit adopted a four-prong test for section 3729(a) claims.  The Fifth Circuit requires that a plaintiff show: "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys."  *Id.* at 467 (adopting the test stated in *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)).

### 2.     False Statement or Fraudulent Course of Conduct

The FCA broadly imposes liability on any person who submits a false or fraudulent claim to the government and defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property."  31 U.S.C. § 3729(b)(2).[3]

---

[3] Although the term "false or fraudulent" is not expressly defined in the FCA, Judge Miller has recognized that "[i]n the simplest terms a false claim is an assertion or statement that is untrue. So . . . the

10

To effectuate the FCA's remedial purpose, courts have properly construed the concept of a "claim" to encompass all attempts to obtain government money or property.  *See United States v. Neifert-White Co.*, 390 U.S. 228, 223 (1968); *Longhi*, 513 F. Supp. 2d at 873-74.  Permit applications seeking approvals to extract resources under a federal lease may be properly viewed as, "claim[s] . . . for . . . property" under the FCA.  31 U.S.C. § 3729(b)(2).

The permits at issue here are two out of the four that are specifically required to effectuate BP's right to extract oil and gas under its leases.  The OCSLA regulations require that a lessee obtain the following "approvals or permits" before conducting exploration activities:

(1)    Approval of applications for permits to drill (APDs) (see § 250.410);
(2)    **Approval of production safety systems (see § 250.800);**
(3)    **Approval of new platforms and other structures (or major modifications to platforms and other structures) (see § 250.901);**
(4)    Approval of applications to install lease term pipelines (see § 250.1007); and
(5)    Other permits, as required by applicable law.

30 C.F.R. § 250.281 (emphasis added).  The production safety system permit is the final permit; a lessee may commence production upon receiving it.  *See* 30 C.F.R. § 250.800(a).  Without the required approvals, BP could not obtain government oil and gas (*i.e.*, BP would have no production facilities).

"Where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute

---

question becomes whether the claims or statements are literally true."  *United States ex rel. Longhi v. Lithium Power Tech.*, 513 F. Supp. 2d 866, 874 (S.D. Tex. 2007) (internal citations omitted).

or regulation." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997). In line with this principle, Judge Hoyt already recognized here that: "this understanding of a false claim comfortably encompasses misrepresentations in some permits that a lessee submits in seeking the right to drill for or develop oil on a federal OCS lease." *Abbott*, 781 F. Supp. 2d at 462.

In addition, Judge Hoyt held that "if BP made misrepresentations material to the approval of any such permit, then BP's actions violated its lease terms, rendering the leases false for FCA purposes," *id.* at 465, because "BP's rights under its leases to drill for and develop oil were expressly conditioned on it obtaining critical permits designed to ensure the safety and efficacy of any drilling and production activities," *id.* at 463 n.14; *see also United States ex rel. Augustine v. Century Health Services*, 289 F.3d 409, 415 (6th Cir. 2002) ("liability can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned").

### 3.   Scienter

The FCA prohibits a person from "knowingly" presenting or making a false statement in connection with a claim seeking payments from the government. *See* 31 U.S.C. § 3729(a)(1)-(2). The FCA defines "knowingly" to mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). Although proof of specific intent to defraud is not necessary, the FCA requires proof of a culpable mental state that exceeds mere negligence or gross neglect. *See Longhi*, 575 F.3d at 468 (quoting *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008)).

The definition of "knowingly" is intentionally broad "to capture the 'ostrich-like' conduct which can occur in large corporations where 'corporate officers . . . insulate themselves from knowledge of false claims submitted by lower-level subordinates.'" *United States v. Science Applications Intern. Corp.*, 626 F.3d 1257, 1274-75 (D.C. Cir. 2010) (quoting S. Rep. No. 99-345, at 7, 20-21 (which noted that 1986 FCA amendments lowered the scienter threshold to impose "some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek")).  The failure to make a minimal examination of records that support a claim constitutes deliberate ignorance or reckless disregard.  *See UMC Elecs. Co. v. United States*, 43 Fed. Cl. 776, 794 (Fed. Cl. 1999).  Moreover, when a contract or regulations impose a specific requirement and that requirement is not satisfied, an FCA defendant acts in reckless disregard of the truth by representing that he complied with the contract or regulations.  *See United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998).

### 4.      Materiality

A false or fraudulent claim or statement violates the FCA only if it is material. *Longhi*, 575 F.3d at 467 (*citing Thompso*n, 125 F.3d at 899).  The Fifth Circuit applies the "natural tendency" test to determine materiality, which

> requires only that the false or fraudulent statements either (1) make the government prone to a particular impression, thereby producing some sort of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants.  **All that is required under the test for materiality, therefore, is that the false or fraudulent statements have the potential to influence the government's decisions.**

*Longhi*, 575 F.3d at 470 (emphasis added); *see also Abbott*, 781 F. Supp. 2d at 466-67.

Here, Judge Hoyt already applied this test and concluded that "[u]nless and until the

permit process was satisfied, BP did not have the lawful right to drill for, or extract, any oil or gas . . . Accordingly, false statements made during that process could certainly have had a natural tendency to affect the government's decision to allow BP to explore and develop the leases." *Abbott*, 781 F. Supp. 2d at 466.

### 5.      Payment of Claim

BP submitted false applications for two permits.  Without those permits, BP could not produce oil and gas under its leases.  MMS granted the permits – allowing BP to take possession of all the minerals, except helium, that was under the sea.

### ATLANTIS LEASE TERMS

The Atlantis field (Green Canyon Block 743 Unit) is the third largest oil field in the Gulf of Mexico.  It covers a five-block area currently held by unit agreement contract number 754305003, approved April 2005.[4]  The Atlantis field is located at Green Canyon blocks 699, 700, 742, 743, and 744 in United States federal waters in the Gulf of Mexico approximately 190 miles from the coast of Louisiana in water depths ranging from 4400 to 7100 feet.[5]

BP acquired the Atlantis field through leases obtained from the Secretary of the Interior pursuant to authority granted by Congress.[6]  BP Exploration & Oil Inc. and BHP Billiton hold working interests in the five leases under a joint operating agreement (BHP owns 44.0%, and BP E&P owns 56.0%).[7]  BP is the designated operator of the

---

[4]  *See* Atlantis Field Supplemental Conservation Information Document (March 2009) at 4 [BPEP_ABB_01597639 at BPEP_ABB_01597642] (Attach. A, Ex. 1).
[5]  *Id.*; Atlantis Project – Application to Design, Fabricate and Install a Platform (Sept. 2002) ("Platform Application") at 2 [BPEP_ABB_00086577 at BPEP_ABB_00086583] (Attach. A, Ex. 2).
[6]  *See* 43 U.S.C. § 1344.
[7]  Platform Application at 2 [BPEP_ABB_00086583] (Attach. A, Ex. 2); *see, e.g.,* Lease OCS-G 15606 [FWW0008511] (Attach. A, Ex. 3).

Atlantis project.[8]   In each of the five unitized leases, BP paid a cash bonus (*i.e.*, $435,775.00 for Block 742) and agreed to pay a royalty rate of 12 ½ percent to the United States.[9]   Under the leases, the lessee pays a fixed royalty "in amount or value of production saved, removed or sold from the leased area."[10]

Each of the unitized leases grants BP the "exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately 5760.00 acres . . . ."[11] The leases were issued subject to the OCSLA and "all regulations issued pursuant to the Act."[12]   The lessee's rights include: "the right to construct or erect and maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations."[13] The leases state that, "The Lessee shall comply with all regulations and Orders."[14]

**FACTUAL BACKGROUND**

**A.   ABBOTT IS THE ORIGINAL SOURCE.**

**1.   Introduction**

Abbott is prototypical of the qualified FCA relator praised by the U.S. Supreme Court.   He is "an original source with antecedent, direct, and independent knowledge of the facts, who has volunteered the information to the government."   *Little v. Shell*

---

[8] Platform Application at 2 [BPEP_ABB_00086583] (Attach. A, Ex. 2); Dep. of B. Domangue (MMS) at 24:14-22 (Attach. A, Ex. 4).
[9] Lease OCS-G 15606 [FWW0008511] (Attach. A, Ex. 3).
[10] *Id.* at Sec. 6(a). Royalty on Production [FWW0008512].
[11] *Id.* at Sec. 2. Right of Lessee [FWW0008511].
[12] *Id.* at Sec. 1. Statutes and Regulations [FWW0008511].
[13] *Id.* at Sec. 2(c) [FWW0008512].
[14] *Id.* at Sec. 10. Performance [FWW0008512].

*Exploration & Production Co.*, 2011 WL 1370565, *5 (S.D. Tex. Apr. 8, 2011).[15]  Abbott was employed through a third-party employment company at Atlantis's administrative offices in Houston, Texas, during which time he served as the Project Services Leader for the subsea portion of the project.[16]  During his employment, Abbott obtained direct knowledge of the incomplete engineering documents.   After BP fired him, Abbott reported first to BP's internal ombudsman (former federal Judge Stanley Sporkin), then to the Department of Interior Inspector General, then provided substantially all of his information to the Attorney General of the United States and the United States Attorney for the Southern District of Texas, before filing suit.[17]

### 2. Abbott's Direct and Independent Knowledge of BP's Fraud

Abbott alleged in great detail the factual basis for his personal knowledge that: (1) proper design and "as-built" documents required by regulation were never completed; (2) BP violated its own engineering document development procedures; (3) BP Atlantis management was fully aware of the unsafe conditions thus created; and (4) BP Atlantis management, nevertheless, failed to remedy the deficiencies.[18]   BP's fraudulent scheme extended to the engineering documentation for all parts of the

---

[15] *See also* 31 U.S.C. § 3730(e)(4)(B); *United States ex rel. Reagan v. E. Tex. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 177 (5th Cir. 2004). The "direct and independent" standard does not require the relator to have direct and independent knowledge of each false claim alleged. *Reagan*, 384 F.3d at 177. The relator "is simply required to possess direct and independent knowledge of the 'information on which the publicly disclosed allegations are based.'" *Id.*.

[16] *See* Swift Technical Services LLC–Contract for Services [BPEP_ABB_00094892] (Attach. A, Ex. 5); BP Organization Chart Showing Abbott's Position [BPEP_ABB_03455080] (Attach. A, Ex. 6).

[17] Abbott provided the statutorily required government disclosure on April 9, 2009, and Abbott served a copy of his sealed complaint on the Attorney General on April 24, 2009.  *See* Attach. B, Decl. of David L. Perry; April 24, 2009 Letter to Attorney General Eric Holder [AB0015861 to AB0015894]  (Attach. A, Ex. 7).

[18] *See* Plaintiffs' Amended Complaint and Request for Injunctive Relief (Doc. 47); *see also Abbott*, 781 F. Supp. 2d at 467 (holding that Abbott has pled fraud with sufficient particularity).  A relator need not plead the specific details of the false claims (*i.e.*, the who, what, when, where, and how). *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).  Instead, a relator properly can assert a FCA claim by alleging the details of a scheme to submit false claims.  *Id.*

16

Atlantis–the hull and floating structure, its topsides structure, subsea, and the production safety system.[19]

Abbott has worked in the field of project management for over 30 years.[20]  He is not an engineer, but he manages engineering document control systems, database records, financial records, and other types of management records.  He also provides management support for engineers by establishing project schedules and budgets and auditing their performance.   While he worked at the BP Atlantis offices, he was responsible for records management, including engineering documentation.   In this position, he learned directly through emails, conversations, meetings with engineers, and his own review of BP documents that mechanical drawings, electrical drawings, controls systems designs, structural drawings, and piping & instrument drawings ("P&IDs") were not approved by engineers and that only 5% of the drawings were issued "as-built."[21]  Abbott testified that,

> the document control log is the bible for an engineering company.   It shows the status of the drawings.  If those drawings have not been issued, it says that.  And when I came in 90 - - 90 percent were not approved for construction by BP engineers . . . only 5 percent were issued as-built, and that's a fact.[22]

Abbott was not involved in BP's regulatory filings for Atlantis, but he was aware that platforms have to be certified to MMS, and he knew that the drawings that formed

---

[19] Abbott's specific knowledge included the production safety system.  *See* Dep. of K. Abbott at 17:5-9; 66:1-7; 306:2-15 (Attach. A, Ex. 8); *see also* Decl. of M. Sawyer at § III.C.2 (Doc. 47-2 at 12) (discussing incomplete and unapproved safety shutdown logic drawings).

[20] *See* Decl. of K. Abbott at ¶ 1 (Doc. 47-1).

[21] *Id*. at ¶¶ 7-15; Dep. of K. Abbott at 37:10-39:24; 49:14-50:10; 82:5-19; 87:20-25; 104:17-105:8; 141:19-142:19; 301:6-302:7 (Attach. A, Ex. 8).

[22] Dep. of K. Abbott at 37:22-38:4 (Attach. A, Ex. 8).

the basis of the certifications were not available.[23]   He also knew that Atlantis operations needed and was requesting a complete package of "as-built" drawings, and he knew that incomplete engineering results in dangerous facilities.[24]   This direct and independent knowledge forms the basis for Abbott's *qui tam* allegations that BP committed fraud on the government.

### 3.    Abbott's Claims Are Not Barred By the FCA Public Disclosure Bar.

Abbott's complaint "exposed a previously-uncovered fraud being perpetrated on the Government . . . [and] is not a parasitic suit by an opportunistic late-comer." *Grubbs*, 565  F.3d at 195.   BP argues that Abbott's *qui tam* claims are barred because Abbott did not have direct and independent knowledge of any certifications actually made by BP and amended his complaint to add allegations regarding the permit applications after receiving Freedom of Information Act ("FOIA") responses.   As Judge Rakoff sitting for the District Court for the Southern District of New York recently held, the fact that Abbott later received responses to FOIA requests, now deemed reports for the public disclosure rule, does not change the fact that he first obtained direct, first hand knowledge of the fraud.   *United States of America, The State of New York ex rel. Assoc. Against Outlier Fraud v. Huron Consulting Group*, 2012 WL 506824, *6 (S.D.N.Y. Feb. 16, 2012).   Judge Rakoff found that, "it would be wholly contrary to the purposes of both Rule 9(b) and the [FCA] to require relators with direct (though perhaps not complete) knowledge of the fraud to file their complaints *before* seeking corroboration through FOIA requests."   *Id.* (emphasis in original).

---

[23] *Id.* at 17:10-14; 270:5-15.
[24] *Id.* at 38:14-24; 56:9-57:20; 59:17-60:4; 216:9-17; 62:20-63:4; 143:2-10.

Abbott filed his original complaint on April 21, 2009, alleging FCA violations based on his detailed knowledge of BP's lack of engineer-approved and "as-built" drawings for Atlantis.  Doc. 1 at 25-56, 67.  At that time, no public disclosure of BP's production safety system permit application or the subsequent MMS approval had occurred.  On September 10, 2010, Abbott amended his complaint to add reference to information received from FOIA responses to reveal an "additional compelling fact" about claims previously alleged based on his original information.  Doc. 47 at ¶¶ 4.5-4.7 and 5.2(d); *see also Reagan*, 384 F.3d at 179 (a relator may be considered an "original source" where the relator's investigation into public documents reveals an "additional compelling fact").   The reference to the Atlantis production safety system permit application and subsequent MMS permit approval supported Abbott's allegations regarding 30 C.F.R. § 250.905(j), which was previously raised in Abbott's original complaint.  *Compare* Doc. 1 at ¶ 58 and Doc. 47 at ¶¶5.2(c) & (d).  Thus, despite reference to publicly disclosed information, Abbott's original source knowledge of BP's fraudulent scheme regarding its engineering documentation, as established by his original complaint, is the true basis of the allegations.

Further, Abbott alleges FCA violations under both 31 U.S.C. § 3729(a)(1) and § 3729(a)(2), and § 3729(a)(2) does not require proof of presentment.  *Grubbs*, 565 F.3d at 193 (*citing Allison Engine. Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008)).

Finally, the D.C. Circuit has addressed head-on BP's arguments that Abbott is not an "original source" because he was not directly involved in the permitting process, stating, "[r]are indeed would be the case in which relators could gain 'original source'

status, if such were the standard, because the misrepresented states of affairs, *e.g.* X, would almost always have been disclosed to the government independently by the alleged defrauder." *Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 657 (D.C. Cir. 1994).

**B.     SAFETY CONCERNS**

On August 15, 2008, about 10 months after Atlantis first oil, Barry Duff, Abbott's predecessor in the same position, sent an email to Atlantis project services manager Bill Naseman and Atlantis subsea delivery manager William Broman stating that project services was asked by the operations document control person to provide all subsea piping & instrument drawings ("P&IDs") regardless of their status.[25]  Duff stated in his email that, "[t]he P&IDs for Subsea are not complete have have [sic] not been approved or handed over to Operations."  *Id.*  He stated that:

> The risk in turning over drawings that are not complete are:
>
> 1) The Operator will assume the drawings are accurate and up to date. This could lead to catastrophic Operator errors due to their assuming the drawing is correct.  Turning over incomplete drawings to the Operator for their use is a fundamental violation of basic Document Control, the IM Standard and Process Safety Regulations.
>
> 2) Having the project document control person turnover drawings that are not complete, places the onus on her that they are the most current version.  Currently, there are **hundreds if not thousands** of Subsea documents that have never been finalized, yet the facilities have been turned over.  In some cases, Tinikka [Curtis] does not have all the versions.  Turning over the version she has, runs the risk of the wrong version being used.
>
> The point here is that even if we condoned handing over documents that were not approved/handed over, we run the risk of not handing over the most current version, (the one theoretically closest to being the most accurate).

---

[25] Aug. 15, 2008 Email from B. Duff to B. Naseman and W. Broman [BPEP_ABB_01524673] (Attach. A, Ex. 9).

> To re-iterate, it is fundamentally wrong to turn over documents to
> Operations (for Operations use and purposes), before they have been
> formally finalized and Handed Over to Operations.[26]

When asked about these statements at his deposition, "Q. Is all of that correct?," Duff

responded, "A. In my mind."[27]

## C.   ATTEMPTS AT RESOLUTION

BP conducted several meetings regarding how to solve the problems identified,

but no decision on the solution was reached.[28]   When Abbott came on board to replace

Duff in August 2008, he made the decision to move forward with getting the document

register and the spreadsheets that Duff created to the engineering leads to finalize the

engineering on the incomplete drawings.[29]   Abbott's proposed course of action was

required by law and by the Atlantis Records Management Project Execution Plan

("PEP") among other BP procedures.

The PEP required that projects records management check engineering technical

documents before transmitting them into BP's electronic database.[30]   In checking the

documents, records management was to assure that: (1) the documents were signed and

approved original drawings; and (2) the current revision number, date, and reason for

revision were on the original documents.   The PEP required that, "if any information is

---

[26] *Id.* (emphasis in original).

[27] Dep. of B. Duff (BP) at 90:2-15 (Attach. A, Ex. 10).

[28]   *Id.* at 72:11-75:10; *see* Aug. 15, 2008 Email from B. Duff to A. Gregg and B. Naseman [BPEP_ABB_01524667 to BPEP_ABB_01524668] (Attach. A, Ex. 11).

[29] Dep. of T. Curtis (BP) at 72:8-73:12; 92:19-93:2 (Attach. A, Ex. 12); *see* Nov. 24, 2008 Email from W. Broman [BPEP_ABB_01521407 to BPEP_ABB_01521409] (Attach. A, Ex. 13).

[30] Atlantis Records Management Project Execution Plan, Document number 1440-10-AD-PR-0005 at p. 4 (Section 4.1) [MUSTANG ENG 000205 at MUSTANG ENG 000210] (Attach. A, Ex. 14); *see also* Dep. of B. Naseman (BP) at 26:17-28:4; 45:17-46:2; 184:14-18 (Atlantis Project Services Manager testifying that it was his team's responsibility to ensure that BP personnel and contractors followed document control procedures and guidelines) (Attach. A, Ex. 15).

missing or incorrect, the project records management team will return the engineering technical document to the discipline leads to fix."  Abbott was attempting to return to the engineering leads a large body of incomplete engineering documents.  The documents were incomplete because the engineering had not been finished as required by law.  About half of the engineering leads responded to the requests, slowly providing feedback, and the other half did nothing.[31]

## D.    ABBOTT'S EFFORTS AFTER TERMINATION

Abbott informed BP, through its Ombudsman Program, and the Inspector General of the Department of the Interior of these facts before seeking counsel.  Abbott then complied with the provisions of 31 U.S.C. § 3730(b)(2) by providing a written disclosure of substantially all material evidence and information he possessed to the Attorney General of the United States and to the United States Attorney for the Southern District of Texas.

On August 25, 2009, the BP's Office of the Ombudsman[32] issued a confidential report substantiating Abbott's concerns.  The report states

The CI[33] asserted to the Office of the Ombudsman that the drawings and documentation for the Atlantis platform were not current, not available on the platform, and that the failure to have them available was a violation of the Subsea Project Execution Plan and various federal legal requirements. He stated that he had advised his management and coworkers of this issue during a contentious meeting in December, 2008.  Indeed, the Project Execution Plan, Rev. 3 states, on page 49, Section 6.2 :

*The BP Lead Engineer for each discipline area will ensure that all*
*technical documentation is updated to reflect the as-built condition*

---

[31] Dep. of T. Curtis (BP) at 93:19-95:18 (Attach. A, Ex. 12).
[32] The BP Ombudsman currently is the Honorable Stanley Sporkin (retired), former District Judge for the United States District Court for the District of Columbia.
[33] "CI" (Confidential Informant) in the report refers to Abbott.

*of the equipment prior to deployment to the field* (Exhibit 3)

The CI states, and other witnesses confirm, that the state of documentation for the Atlantis project was a concern for the Atlantis Subsea Team as far back as the fall of 2007 and into 2008. In other words, the issue had been recognized and was the subject of a project even before the CI came to work on the Atlantis project in September, 2008.

An effort was undertaken in December, 2008 to upgrade the attention and expected deliverables from the various engineering departments to organize the documentation to be accessible and retrievable to the platform, working out a new and user-friendly document numbering and management system. These issues were the subject of a continual series of meetings, including one in December, 2008 during which the CI became quite agitated about the issue and his perception that there was a failure to recognize the seriousness of the issue by various engineers and their departments. Witnesses who attended this meeting confirmed that the CI raised the issue with a lot of passion and concern. There is also agreement that there were varying degrees of acceptance and resistance around the table, with some engineers becoming quite annoyed with the CI and other agreeing with him. **Project supervisors generally agreed with the CI** that the issue was lagging behind schedule and that there needed to be better cooperation by the engineers and commitment to meet the project schedule.[34]

The Ombudsman's Report concluded:

4) Whether there was a violation of regulatory or project requirements with respect to the issue of current P&ID documentation.

**The original Project Execution Plan called for all the documents to be accurate, complete and transferred to the Platform when it went operational. That did not happen**, and there were no MOC documents that considered the risk presented to the project for the failure to meet that expectation at the time of the investigation.[35]

---

[34] BP Ombudsman Employee Concerns Program, Confidential Investigation Report, Case No: 2009-005 [BPEP_ABB_03463083 at BPEP_ABB_03463088] (emphasis added) (Attach. A, Ex. 16).
[35] *Id.* at BPEP_ABB_03453108 (emphasis added).

The Office of the Ombudsman recommended that BP, "[o]btain Global S&O review on the BP Atlantis P&ID issues facing the project to ensure it meets BP project expectations and all regulatory requirements."[36]

## E.   MMS INVESTIGATION

On February 24, 2010, United States Representative Raul M. Grijalva and eighteen other members of Congress wrote to then-MMS Director S. Elizabeth Birnbaum urging her to direct

> a full investigation of whether British Petroleum had a complete and accurate set of required engineering drawings for the BP Atlantis platform and its associated subsea components prior to the start of production from that platform, and to report back to Congress on the results of that investigation as soon as possible.[37]

On March 26, 2010, MMS Director Birnbaum responded to the February 24, 2010 Congressional letter, stating that MMS "will conduct a full investigation of this situation" and will complete its report by the end of May 2010.[38]

On July 21, 2010, MMS sent a letter to BP requesting "production of the engineering documents that MMS regulations required BP to maintain."[39]  In August 2010, BP responded to the agency's request and submitted certain documents and drawings.[40]  The materials that BP submitted to MMS for the investigation substantiate plaintiffs' claims that (1) registered professional engineers have not certified the Atlantis

---

[36] *Id.* at BPEP_ABB_03463109.

[37] Feb. 24, 2010 Letter from Rep. Grijalva (U.S. Congress) to E. Birnbaum (MMS) [BPEP_ABB_00115572 to BPEP_ABB_00115574] (Attach. A, Ex. 17).

[38] March 26, 2010 Letter from E. Birnbaum (MMS) to Rep. Grijalva (U.S. Congress) [BPEP_ABB_00115575] (Attach. A, Ex. 18).

[39] July 21, 2010 Letter from M. Saucier (MMS) to S. Todd (BP) [BPEP_ABB_00082829 to BPEP_ABB_00082830] (Attach. A, Ex. 19).

[40] Aug. 9, 2010 Letter from S. Todd (BP) to M. Saucier (MMS) [BPEP_ABB_00115564 to BPEP_ABB_00115566] (Attach. A, Ex. 20).

platform detailed structural plans and specifications; (2) BP has not developed "as-built" plans and specifications; and (3) registered professional engineers did not approve the designs for the mechanical and electrical systems installed.[41]

## ARGUMENT

### A.   BP'S ATLANTIS PLATFORM PERMIT APPLICATION WAS A FALSE CLAIM FOR GOVERNMENT PROPERTY.[42]

#### 1.   Introduction

A lessee submitting an application to install a platform on the outer continental shelf must certify to the government that the design of the structure was certified by a registered professional engineer and that a complete set of the certified design and "as-built" plans and specifications are being maintained at a designated location.   The applicable regulation states:

> The lessee shall have **detailed structural plans** as called for in paragraph (b)(1)(iii) of this section and specifications for new platforms or other structures and major modifications **certified** by a registered professional structural engineer or civil engineer specializing in structural design.  **The lessee shall also sign, date, and submit the following certification: Lessee certifies that the design of the structure/modification has been certified by a registered professional structural or a civil engineer specializing in structural design, and the structure/modification will be**

---

[41] The agency's eventual report to Congress on its investigatory findings focused on whether the subpart I platform regulations apply to the subsea portion of the production facility and whether the subpart H production safety system regulations expressly require "as-built" drawings.  For the purposes of this motion, plaintiffs assume that the agency's interpretation of the OCSLA regulations is correct.  This memorandum analyzes only those drawings that BP submitted to the agency for the investigation; there is no factual dispute that those drawings are covered by the subpart I and subpart H requirements.  Plaintiffs do not attempt herein to extend the subpart I platform certification to the subsea; nor do plaintiffs argue that the subpart H regulations expressly require "as-built" drawings.  Accordingly, Judge Hoyt's denial of Plaintiffs' Motion for Partial Summary Judgment (Doc. 108) has no effect on the arguments currently before the Court.

[42] BP contends that the OCSLA regulations in place in 2002 apply to Atlantis.  *See* Dep. of D. Sustala, Sept. 19, 2011 (BP) at 44:5-17 (Attach. A, Ex. 21); BP's Response to Partial MSJ, Doc. 147 at 20 ("Here, MMS approved the design of the Atlantis Platform in December 2002, long before the agency finalized its 2005 rulemaking . . . Thus, the 2002 version of the Regulations applies").  For the purposes of this Motion, plaintiffs analyze the case using the 2002 version of the platform certification; the certification currently is located at 30 C.F.R. § 250.905(k).

**fabricated, installed, and maintained as described in the application and any approved modification thereto.  Certified design and as built plans and specifications will be on file at-----.**[43]

The platform certification is a prerequisite to obtaining a permit to install the platform, which is a structure necessary for oil and gas production.[44]  BP submitted the false certification with its platform application in September 2002; MMS approved the platform installation on January 16, 2007.  BP's certification was untrue when it was made, and BP made the certification with the requisite scienter.  The platform permit Application was a false claim for government property, and BP's false statements were material to the permit approval.  A specific timeline of pertinent events follows:

September 2002 Platform Application

In September 2002, BP submitted its Atlantis Application to Design, Fabricate and Install a Platform.  The application included BP's platform certification.[45]

December 2002 MMS Approval

On December 12, 2002, pursuant to 30 C.F.R. § 250.900(b) and (c) (2002), MMS approved the "Design, Fabrication, and Installation Verification Plans for Platform A (Atlantis)" and BP's nomination of ABS, Americas as the Certified Verification Agent ("CVA").[46]

GVA Departure Request

---

[43] 30 C.F.R. § 250.901(d) (2002) (emphasis added).

[44] "Applications submitted pursuant to §250.901 shall require the approval by the Regional Supervisor prior to platform installation."  30 C.F.R. § 250.900(b)(2002).  **§ 250.901 Application for approval.** (a) All applications under the provisions of this subpart shall be submitted to the Regional Supervisor for approval."  30 C.F.R. § 250.901 (2002) (emphasis in original).

[45] Sept. 2002 Application to Design, Fabricate and Install a Platform at 9 [BPEP_ABB_00086577 at BPEP_ABB_00086590] (Attach. A, Ex. 2); *see* Dep. of D. Sustala, Sept. 19., 2011 (BP) at 64:7-20 (Attach. A, Ex. 21).

[46] Dec. 12, 2002 Letter from T. Laurendine for D. Howard, MMS, to D. Sustala, BP [BPEP_ABB_00086984] (Attach. A, Ex. 22).

On January 27, 2003, BP submitted to MMS a request for a "departure from 30 CFR 250.901(d) requiring certification by a registered professional engineer for the design work performed in Sweden by GVA Consultants AB, (GVA-C), for Platform A," where GVA-C was "the engineering firm chosen to design the Atlantis semi-submersible platform hull."[47]  BP requested that "GVA-C, as a foreign engineering firm, be exempted from jurisdictional-specific engineering licensing/registration and related design certification requirements."  On February 25, 2003, MMS issued a letter to BP approving the departure "from 30 CFR 250.901(d) requiring certification by a registered professional structural engineer for the design work performed in Sweden by GVA Consultants AB, (GVA-C), for Platform A (Atlantis)."[48]

Notably, no such departure request was made for Daewoo Shipbuilding and Marine Engineering ("DSME"), the Korean ship-building firm that actually provided the detailed structural plans for the hull.[49]  In fact, BP specifically and deliberately chose not to submit a departure request for DSME.

<u>Platform Installation</u>

On November 16, 2005, MMS sent an email to BP stating that MMS was in receipt of "the recommendation from ABS as the [CVA] for the Atlantis project to proceed with the installation of the PQ platform. . ."[50]  MMS "accept[ed] BP's proposed installation plan of the PQ 'Atlantis' platform in the proposed method."  *Id.*  By letter dated January

---

[47] Jan. 27, 2003 Letter from D. Sustala, BP, to D. Howard, MMS [BPEP_ABB_00086986 thru BPEP_ABB_0008689] (Attach. A, Ex. 23).

[48] Feb. 25, 2003 Letter from T. Laurendine for D. Howard, MMS, to D. Sustala, BP [BPEP_ABB_00087025] (Attach. A, Ex. 24).

[49] DSME Contract dated Sept. 1, 2001, § 1.3 "Engineering and Design" [BPEP_ABB_04076454 at BPEP_ABB_04076462] (emphasis added) (Attach. A, Ex. 25).

[50] Nov. 16, 2005 Email from T. Laurendine, MMS, to D. Sustala, BP [BPEP_ABB_00087049 to BPEP_ABB_00087050] (Attach. A, Ex. 26).

16, 2007, MMS approved the installation of the Atlantis platform.[51]   BP's regulatory

coordinator, Dennis Sustala, testified that the January 2007 Letter is the final approval of

the platform installation.[52]

### 2.   The Atlantis Detailed Structural Plans and Specifications Were Not Certified by Registered Professional Engineers.

#### a.   *No Factual Dispute Exists Regarding Which Drawings Are Covered By BP's Platform Certification.*

BP submitted to MMS the Atlantis platform drawings that supposedly were

certified by a registered professional engineer per BP's September 2002 platform

certification.   On August 9, 2010, Simon Todd, VP Thunder Horse (BP), sent a letter to

MMS responding to the agency's request for

> 1.  A copy (11" x 17") of the "as-built" drawings as required by 30 CFR 250.903(a)(1).  These "as-built" drawings should be a complete set of structural drawings as outlined in 250.905(d) and include a certification statement as outlined in 30 CFR 250.905(k).   "As-built" structural drawings should include cathodic protection systems; jacket design; pile foundations; drilling, production, and pipeline/flowline risers and riser tensioning systems; turret and turret and hull interfaces; mooring and tethering systems; and foundations and anchoring systems as applicable. Each drawing should include the revision history from each phase of the project from design, fabrication, and installation through its current revision.[53]

Todd's letter enclosed engineering drawings, stating "Books 1-6 contain BP's response

to [MMS's] request (No. 1) for copies of structural drawings referenced in 30 C.F.R. §

---

[51] Jan. 16, 2007 Letter from A. Shah for Lars T. Herbst, MMS, to D. Sustala, BP [BPEP_ABB_00087685] (Attach. A, Ex. 27).

[52] Dep. of D. Sustala, May 10, 2011 (BP) at 8:22-23; 40:15-42:5 (Attach. A, Ex. 28); *see also* BP's Response to Partial MSJ, Doc. 147 at 8 ("MMS and the United States Coast Guard gave BP the approval to install the Atlantis Platform in 2005.").

[53] July 21, 2010 Letter from M. Saucier (MMS) to S. Todd (BP) [BPEP_ABB_00082829 to 00082830].  In its letter, the agency referred to the renumbered 2005 Subpart I platform regulations. (Attach. A, Ex. 19).

250.903 and § 250.905."[54]   The letter also included the required platform certification statement found currently at 30 C.F.R. § 250.905(k).   Todd explained, "Because the Atlantis platform is comprised of several different major components, in making the foregoing certification statement BP relies on the work of multiple engineers, rather than any single engineer."   *Id*.   Accordingly, there can be no dispute that drawings included with Todd's August 2010 Letter are the detailed engineering drawings covered by BP's 2002 platform certification statement.[55]

Of the 1154 drawings for the hull and floating structure of the platform, only 8 (0.7%) are certified with a registered professional engineer's seal or covered under the GVA departure.[56]   BP's platform certification statement submitted on September 2002 was false (untrue) when made; it was false at first oil in October 2007; and it continues to be false to this day.   The design of the structure of the Atlantis platform has not been certified by registered professional engineers, and there is no certified design of the platform on file at BP's Houston Office.

> ### b. The Atlantis Hull Was Designed by a Korean Shipbuilding Firm That BP Knew Could Not Certify Engineering Drawings As Registered Professional Engineers.

DSME, a Korean shipbuilding firm, which BP admits could not certify drawings with a professional engineering stamp[57] as required by OCSLA regulations, prepared 1013 of the 1154 design drawings for the hull, floating, and mooring system that BP

---

[54]   Aug. 9, 2010 Letter from S. Todd (BP) to M. Saucier (MMS) [BPEP_ABB_00115564 to BPEP_ABB_00115566] (Attach. A, Ex. 20).

[55]   *See also* BP's Response to Partial MSJ, Doc. 147 at 8 ("The Atlantis Platform consists of the *topsides* (the deck, piping, hydrocarbon processing facilities, export lines, control room, living quarters, etc.), *hull* (which allows the platform to float), *moorings* (which keep the platform at its location), and *pilings* (which anchor the moorings).").

[56]   Decl. Mike Sawyer, Dec. 28, 2011 at ¶ 9 (Attach. C).

[57]   Dep. of D. Sustala, Sept. 19, 2011 (BP) at 85:4-19; 91:19-92:9; 104:14-105:3; 145:8-13 (Attach. A, Ex. 21).

submitted with Todd's Books 1-6.[58]   Sustala testified that he never told MMS that the

vast majority (approximately 95%) of engineering drawings for the load bearing

structure of the floating platform were prepared by DSME.[59]   Although the initial basic

hull design work was performed by GVA under the exemption that BP sought for the

work performed in Sweden, the detailed design required to be certified was performed

by DSME and not covered by any exemption.[60]

BP documents state that DSME performed the detailed design work for the

Atlantis hull.  The contract with DSME states:

> 1.3 Engineering and Design
> Contractor **shall perform detailed engineering and design** of the
> complete Semisubmersible floating platform facility; excluding process
> facilities modules, systems, and equipment explicitly stated within this
> Exhibit "A" as being supplied by others. Major Items in Contractor's
> detailed engineering and design scope include:
> **- the Semisubmersible hull and deck structure with associated access
> platforms, helideck and appurtenances;**
> **- mechanical, electrical and controls equipment and systems within the
> hull and deck structure**;[61]

In addition, the Atlantis Project Floating Systems Team Project Execution Plan states:

> Daewoo Shipbuilding and Marine Engineering (DSME) will perform the
> **detail engineering design**, fabrication engineering, fabrication and
> commissioning of the Atlantis PQ hull at their facility in Okpo, South
> Korea.[62]

It also describes DSME's scope of work:

### 9.4.1 Scope of Work

---

[58] Decl. Mike Sawyer, Sept. 28, 2011 at ¶ 9 (Attach. C).

[59] Dep. of D. Sustala, Sept. 19, 2011 (BP) at 139:7-140:13. (Attach. A, Ex. 21).

[60] Dep. of K. Dejohn (BP) at 67:20-68:15 (Attach. A, Ex. 29); Dep. of S. Todd, Dec. 5, 2011 (BP) at 294:13-17 (Attach. A, Ex. 30).

[61] DSME Contract dated Sept. 1, 2001, Sect. 1.3 "Engineering and Design" [BPEP_ABB_04076454 at 04076462] (emphasis added) (Attach. A, Ex. 25).

[62] Atlantis Project Floating Systems Team Project Execution Plan, Disc. Ex. 262 [BPEP_ABB_00111486 at BPEP_ABB_00111493] (emphasis added) (Attach. A, Ex 31).

DSME will be responsible for verifying and refining the Basic Design deliverables **to produce all detailed engineering deliverables** required to support the fabrication, commissioning and transportation of the Atlantis Hull.  The main elements of DSME's scope for detail engineering include the following:

- Detailing of Basic Design information. . .
- Weight Control
- Obtain classification and regulatory approval of the design drawings and calculations.[63]

BP was aware that DSME personnel were not registered professional engineers and could not stamp the drawings as such.[64]  BP knew that the modification of the platform certification statement for GVA did not cover DSME work.[65]  BP determined not to seek a waiver for DSME's work.[66]  BP also determined not to inform MMS of its decision because BP's verification agent (ABS), who was aware of the issue, agreed that only the GVA hull drawings would be submitted to MMS with the platform verification under 30 C.F.R. § 250.902 (2002).[67]  According to BP's plan, DSME would produce the detailed structural plans for the hull, but MMS would never see those drawings or learn that the drawings were not certified with a registered professional engineer's seal.

BP knew prior to submitting its September 2002 platform application with the 30 C.F.R. § 250.901(d) certification that DSME could not certify its structural drawings for the hull.  Then, on November 26, 2002, BP asked ABS if its design verification process "cover[ed BP's] obligation to certify plans and specifications found in 250.901," and ABS answered "no . . . [w]e do not sign 'off' on the design, that is the designers [sic]

---

[63] *Id.* at BPEP_ABB_0011525 (emphasis added).

[64] Dep. of D. Sustala, Sept. 19, 2011 (BP) at 145:8-13 (Attach. A, Ex. 21); Dep. of S. Todd, Dec. 5, 2011 (BP) at 295:5-25 (Attach. A, Ex. 30).

[65] Dep. of D. Sustala, Sept. 19, 2011 (BP) at 77:5-15 (Attach. A, Ex. 21).

[66] *Id.* at 116:21-24; 126:2-127:4.

[67] *Id.* at 129:22-130:16; Dep. of S. Todd, Dec. 5, 2011 (BP) 305:20-306:12 (Attach. A, Ex. 30).

responsibility, we only verify as is in 30 CFR 250.902 . . . and that does not necessarily cover all of 901."[68]

On November 27, 2002, Sustala attempted to set up a meeting with ABS's contact in Korea and stated, "[t]here seems to be talk that no one has had to certify plans, drawings and specifications and/or that the ABS verification is the same certification. Based on a reading of the regulations this seems rather illogical."[69]   Sustala knew not only that the CVA verification was separate and distinct requirement under the regulations[70] but also that BP needed to seek a waiver for DSME or get the DSME drawings certified by some other means.[71]

Moreover, Myles Butler forwarded Sustala's November 21, 2002 email to personnel on the floating systems team and added - in red - his understanding of who needs to stamp the drawings.[72]   For the certified design and "as-built" plans and specifications that needed to be kept on file for the life of the Atlantis platform per the 30 C.F.R. § 250.901(d) certification statement, Butler typed in "(DSME/BP)."[73]   Because

---

[68] Nov. 26, 2002 (1:56PM) Email from L. Pekel (ABS) to D. Sustala (BP) [BPEP_ABB_00112443] (Attach. A, Ex. 32); *see also* Nov. 26, 2002 (4:28PM) Email from D. Sustala (BP) to L. Pekel (ABS) [BPEP_ABB_00112441 to BPEP_ABB_00112442] (Attach. A, Ex. 33); Nov. 26, 2002 (4:38PM) Email from L. Pekel (ABS) to D. Sustala (BP) [BPEP_ABB_00112440] (Attach. A, Ex. 34); Dec. 6, 2002 (11:53PM) Email from L. Pekel (ABS) to D. Sustala (BP) [BPEP_ABB_00112401 to BPEP_ABB_00112402] (Attach. A, Ex. 35); *accord* Dep. of D. Sustala, Sept. 19, 2011 (BP) at 111:8-112:15 (Attach. A, Ex. 21).

[69] Nov. 29, 2002 Email exchange between P. Ganguly (Millennium Technical Consultants) and D. Sustala (BP) [BPEP_ABB_00112426 to BPEP_ABB_00112427] (Attach. A, Ex. 36).

[70] Dep. of D. Sustala, Sept. 19, 2011 (BP) at 128:14-23 (Attach. A, Ex. 21).

[71] *See* Oct. 24, 2002 Email from D. Sustala (BP) to P. Ganguly (Millennium Technical Consultants) [BPEP_ABB_00112616] ("Remind me, for the CVA process reviews under Daewoo, doesn't ABS have to also review some of the construction drawings.  Hence wouldn't we also have to obtain Daewoo lead engineer's resume info also?") (Attach. A, Ex. 37).

[72] Nov. 22, 2002 Email from S. Kinnaman  to D. Sustala [BPEP_ABB_00112450 to BPEP_ABB_00112452] (Attach. A, Ex. 38).

[73] *Id.* at BPEP_ABB_00112451.

DSME was producing the detailed design and the "as-built" drawings[74] for the hull, Butler's conclusion that the DSME set was the set that needed to be certified by a professional engineer was both obvious and correct.[75]   By regulation, the lessee was required to have the "**detailed** structural plans . . . and specifications for new platforms . . . certified by a registered professional engineer or civil engineer specializing in structural design."  30 C.F.R. § 250.901(d) (2002) (emphasis added).

Bryan Domangue, MMS Houma District Manager, testified that he was not aware that DSME provided engineering design services for BP Atlantis at the time he was reviewing the Atlantis permits.[76]

### c.    An Engineering Drawing Is "Certified" By Application of a Seal.

Under the Texas Engineering Practices Act, "[a] plan, specification, plat, or report issued by a license holder must include the license holder's seal placed on the document."  TEX. OCC. CODE § 1001.401(b).  A certified drawing must bear the seal of a licensed engineer.  Black's Law Dictionary defines "certify" as  "to authenticate or verify in writing."  BLACK'S LAW DICT. (9th ed. 2009).

The El Paso Court of Appeals has noted that engineering plans "[are] certified with the seal," and that an engineer's personal seal cannot be sold or transferred and "carr[ies] with [it] the [engineer's] representation of personal accountability independent of any employment contract with [his or her] employer."  *George Thomas Home, Inc. v. Southwest Tension Systems, Inc.*, 763 S.W.2d 797, 800 (Tex. App.—El Paso

---

[74] *See* DSME Contract at BPEP_ABB_04076464 ("As-Built Drawings") (Attach. A, Ex. 25).
[75] Nov. 22, 2002 Email from S. Kinnaman  to D. Sustala [BPEP_ABB_00112450 to BPEP_ABB_0011252] (Attach. A, Ex. 38)
[76] Dep. of B. Domangue (MMS) at 99:23-100:3 (Attach. A, Ex. 4).

1998, no writ); *see also Glenn v. Nortex Foundation Designs, Inc.*, 2008 WL 2078510, at *3 (Tex. App—Ft. Worth May 15, 2008, pet. denied) (a licensed structural engineer "applies his seal to certify the foundation's engineering plans").   Courts in other states have construed the import of certifying plans with a seal similarly.   The Supreme Court of Colorado also has held that where

> [p]lats must be certified by a licensed engineer or surveyor before they may be filed for public record, . . . [t]he required seal certifies expertise . . . . It also acknowledges the surveyor's responsibility to protect the public for any mistakes or negligence in the survey which bears the seal.

*South Park Land & Livestock Co., Inc. v. Hamilton Enter., Ltd.*, 538 P.2d 444, 445 (Co. 1975); *accord Beck v. Sampson*, 186 A.2d 783, 785 (Me. 1962) (stating that an architect's seal was placed when the architects "adjudged [the plans] to be in a finished state [and] to certify that such had been prepared by or under his direct supervision").

If an engineering drawing is missing the seal of a registered professional engineer, then that drawing is not a certified design.

### d.    BP Knew That Seals Were Required.

BP was aware that seals were required by MMS regulations in the earliest stages of the Atlantis project.   On October 23, 2002, Ben Thurmond (BP) sent an e-mail to Sustala, stating that he had been to an Atlantis hull planning meeting where he asked who was stamping the drawings for the hull.[77]   His question was met with confusion because there was apparently no plan to acquire professional engineering stamps for the hull drawings.   It was his understanding from work with Shell and Exxon that MMS regulations required professional engineering stamps, and he had heard that the hull

---

[77] Oct. 23, 2002 Email from B. Thurmond to D. Sustala   [BPEP_ABB_00112629 to BPEP_ABB_00112630] (Attach. A, Ex. 39).

and mooring drawings for BP Holstein would be stamped.  He asked for Sustala's comment on the issue.

> Sustala asked for clarification on the type of drawing, and Thurmond responded,
>
> [r]egardless of the type of drawing, none of the hull and mooring drawings for Atlantis hull and moorings will be stamped according to the current plans.  Unless stamping is somehow part of the CVA's (ABS) responsibility.  We need to check on this.  No one on [Floating Systems Team] has plans to stamp drawings.  And it's not in GVA's, KBR's, or DSME's scope.
> After receiving Thurmond's initial email, Sustala sent an email to one of the

Swedish Engineers from GVA inquiring about stamped certifications.

> Some of our regulations require that drawings be stamped by a Professional Engineer.  In the US a degreed engineer with sufficient experience can take a test and be recognized as a "Professional Engineer" –(PE).  Various regulations require certain drawings to be prepared and finally reviewed under the supervision of a "PE".  The engineer is given a stamp to mark the drawings.  Does sweden [sic] have a similar program?[78]

Sustala sent another e-mail later that morning to James Faulkner at BP, stating plainly that

> MMS regulations require that platform drawings and plans be prepared under the supervision of a PE [professional engineer].  **A written statement and PE stamp[79] is generally required.**  This is a USA type of procedure and many other countries do not have a similar program.
>
> In any case, I can probably get a waiver from this requirement, but will need you to provide a resume for each of the principal engineers at each of our foreign companies showing their education and experience.
>
> The alternative is to have BP engineers stamp all the drawings or hire a separate company to review and stamp all of the drawings.

---

[78] Oct. 24, 2002 Email from D. Sustala to K. Jansson (GVA) [BPEP_ABB_00112524 to BPEP_ABB_00112526] (Attach. A, Ex. 40).
[79] The terms professional engineering stamp and professional engineering seal are used interchangeably. *See* Dep. of R. Peloubet (BP) at 166:6-19; 168:14-25 (Attach. A, Ex. 41).

Since the foreign work is primarily [Floating System Team] it is up to you guys to determine whether you feel you gain advantage by having another review including the extra $$$ + Time [sic][80]

The next day, on October 25, 2002, Ralph Phillips from Mustang, who performed the topsides engineering, asked Sustala if he was available for a meeting with the Mustang manager of engineering "to discuss the options for PE stamping of Atlantis design drawings."[81]

On November 21, 2002, Sustala sent another email to recipients at both BP and Mustang with the subject heading "Certification Requirements for Platforms and Production Systems."[82]   In this e-mail, he expressly stated the requirements for complying with MMS regulations:

Traditionally, the easiest method of proving that particular drawings, plans or specifications were reviewed or prepared by or under the direct supervision of a registered professional engineer has been though the use of the PE stamp.  *It seems difficult to comply with MMS requirements without use of the PE stamp.*  The Atlantis Project should be prepared to stamp drawings and/or identify the particular registered engineers by Name, Title, and PE Registration No. that have certified or supervised preparation of particular designs, plans and specifications.

e.    *BP Knew That Its Platform Certification Regarding Professional Engineering Certification Was False.*

BP understood that it was certifying with its September 2002 platform application that the Atlantis detailed structural plans would be certified by a registered professional structural engineer or a civil engineer specializing in structural design and that those certified designs would be kept on file at BP's office in Houston.[83]  BP knew

---

[80] Oct. 24, 2002 Email from D. Sustala  to J. Faulker [BPEP_ABB_00112627] (emphasis added) (Attach. A, Ex. 42).

[81] Oct. 25, 2002 Email from R. Phillips to D. Sustala [BPEP_ABB_00112508] (Attach. A, Ex. 43).

[82] Nov. 21, 2002 Email from D. Sustala  [BPEP_ABB_00112453 to BPEP_ABB_00112454] (Attach. A, Ex. 44).

[83] Dep. of D. Sustala, Sept. 19, 2011 (BP) at 61:8-63:2 (Attach. A, Ex. 21).

that it had contracted on September 1, 2001, for the detailed design work and "as-built" drawings to be developed by DSME in Korea.[84]   BP knew that DSME's Korean personnel could not certify the drawings with a professional engineer's seal.[85]

BP made efforts to have the hull structural drawings certified with a professional engineering seal by a United States engineering company but did not actually have that work done.[86]   Ultimately, BP made a determination not to seek a waiver for the structural design work performed by DSME.[87]

BP did not inform MMS that DSME was performing the detailed design work and developing the "as-built" drawings to be maintained at BP's Houston office as required by the 30 C.F.R. § 250.901(d) certification.   BP agreed with its verification agency ABS not to submit any DSME drawings to the agency as part of the platform verification program under 30 C.F.R § 250.902, and BP did not seek the necessary deviation from the certification requirement.[88]   This failure to seek permission to rely on engineering documents prepared by persons who were not registered professional engineers and could not certify the plans and specifications with a professional engineering seal "indicates nothing less than an intention to deceive," as the Fifth Circuit held in *United States v. Aerodex*, 469 F.2d 1003, 1008 (5th Cir. 1972) (failing to seek

---

[84] DSME Contract [BPEP_ABB_04076454 at BPEP_ABB_04076462 and BPEP_ABB_04076464] (Attach. A, Ex. 25).

[85] Dep. of D. Sustala, Sept. 19, 2011 (BP) at 85:4-19; 91:19-92:9; 104:14-105:3; 145:8-13 (Attach. A, Ex. 21).

[86] Nov. 26, 2002 (1:56PM) Email from L. Pekel (ABS) to D. Sustala (BP) [BPEP_ABB_00112443] (Attach. A, Ex. 32); *see* Dep. of D. Sustala, Sept. 19, 2011 (BP) at 111:8-112:15 (Attach. A, Ex. 21).

[87] Dep. of D. Sustala, Sept. 19, 2011 (BP) at 116:21-24; 126:2-127:4 (Attach. A, Ex. 21).

[88] *Id.* at 129:22-130:16.

permission to substitute compliant parts or to disclose manner of purported compliance is false claim).[89]

DSME's designs for the hull were, in fact, inadequate.  BP had to rebuild entire systems in the hull at the integration site in Ingleside, Texas due, in part, to Coast Guard objections.[90]  Further, that BP managed to build a hull from engineering plans that were not certified by a registered professional engineer as required by regulation is irrelevant to the inquiry of whether BP submitted a false claim.  As the Fifth Circuit held in *Longhi*, "the focus of the FCA is on the truth of the statements to the government, not the end product."  *Longhi*, 513 F. Supp. 2d at 880 (citing *Aerodex, Inc.*, 469 F.2d at 1007).

The platform certification was literally false when submitted with BP's September 2002 platform application; it was false when the United States granted the final platform installation approval on January 16, 2007; and it was made with the requisite scienter under the FCA.[91]

---

[89] *See also United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 411-12 (3d Cir. 1999) (where defendants was made aware of need to disclose private research funding sources but failed to include them in submission, the omission will support a conclusion that defendant acted with actual knowledge of falsity of claim).  The failure to seek the waiver and proceed without informing the agency that DSME could not certify the final design drawings is especially egregious given the fact that BP's Floating Systems Team fully understood that the matter of the waiver, "may surface again in regard to the Daewoo Shipyard (DSME) detail design work," and informed Sustala that, "[t]he Atlantis Project will be likewise ready to provide similar documentation for waiver of DSME PE certification." *See* March 24, 2004 Email from S. Kinnaman to D. Sustala [BPEP_ABB_00110497 to BPEP_ABB_00110499] (Attach. A, Ex. 45).

[90] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 109:5-114:14 (Attach. A, Ex. 46); Nov. 12, 2005 Email from F. Ragan to K. Dejohn, L. Osborn and D. Sustala [BPEP_ABB_00110014 to BPEP_ABB_00110015] (Attach. A, Ex. 47).

[91] *See* Dep. of S. Todd, Dec. 5, 2011 (BP) at 302:10-19 (Attach. A, Ex. 30).

### 3.  BP Did Not Develop "As-Built" Drawings.

#### a.  BP Did Not Perform "As-Builting."

BP does not have a complete set of Atlantis "as-built" plans and specifications or a list of drawings that make up the "as-built" set.[92]  As discussed above, on August 9, 2010, Todd (BP), sent a letter to MMS responding to the agency's request for a copy of the complete set of "as-built" drawings as required by OCSLA regulations.[93]  Of the 2,104 drawings submitted to MMS in August 2010 as Todd's Books 1 – 6, the revisions histories show only 72 drawings (3.4%) are "as-built."[94]  1,667 of the drawings (79%) were last revised prior to May 2005, when the Atlantis platform integration began.[95]  Two hundred twenty-six drawings (226 or 11%) have no date.

"As-built" drawings, necessarily, are created *after an edifice is constructed*.  *See, e.g., McIntosh Land Co. Ltd. P'ship v. Fairfield Fletcher Ltd. P'ship*, 2005 WL 2656577, at *5 (M.D. Fla. Oct. 18, 2005) (plaintiffs unreasonably relied on assertion that plans were "as built" plans when the plans were created two years before construction was completed; "as built" plans are created after construction is finished); *DiBiase Corp. v. Jacobowitz*, 682 N.E.2d 1382, 1385 (Mass. App. Ct. 1997) ("as built" plans contemplate edifices already in being; requirement for "as built" plans can have no application either to land or to buildings yet to be constructed); *Bangor Water Dist. v. Malcolm Pirnie Eng'rs*, 534 A.2d 1326, 1327 n.1 (Me. 1988) ("As-built drawings are made after a construction project is

---

[92] Dep. of G. Malone (BP) at 49:25-50:11; 70:25-72:10 (Attach. A, Ex. 48).
[93] Aug. 9, 2010 Letter from S. Todd to M. Saucier (MMS) [BPEP_ABB_00115564 to BPEP_ABB_00115566] (Attach. A, Ex. 20).
[94] Decl. of Mike Sawyer, Dec. 28, 2011 at ¶ 10 (Attach. C)
[95] *Id.*; *See* Aug. 30, 2010 Email from C. Ward to K. Smith (Hull arrives in Corpus Christi from Korea on May 25, 2005.  Integration ran from May 2005 through August 2006.) [BPEP_ABB_03493064] (Attach. A, Ex. 49).

complete. These drawings are supposed to indicate how a project actually has been built, as opposed to how the project was planned to be built."); *Elliott v. Fosdick & Hilmer*, 460 N.E.2d 257, 312 (Ohio Ct. App. 1983) ("The very purpose of an 'as built' drawing is to reflect any changes which the field situation might have required to be made in the pre-project drawings"; safety problems introduced where plaintiff relied on inaccurate "as built" drawing that failed to reflect change in construction). Notably, Duff (BP) agrees, and testified that "as-builting" cannot take place until after everything is installed in place.[96]

The evidence demonstrates that "as-built" drawings were not created after the integration of the Topsides and the hull.[97] DSME fabricated the hull in Korea and marked its drawings "Rev. 60" to show fabricated condition upon the hull's leaving Korea.[98] The topsides and the hull were integrated in Ingleside, Texas, for over eighteen months[99] where many changes in the metal were made to combine the topsides and the hull into a single structure and entire systems were rebuilt.[100] BP, however, did not develop design drawings reflecting the "as-built" condition of the combined structure once all the changes were made.[101]

---

[96] Dep. of B. Duff (BP) at 110:3-15 (Attach. A, Ex. 10).
[97] Likewise, BP's subsea contractor Technip did not update design drawings for Atlantis to "as-built" condition. Dep. of J. Upchurch (Technip) at 106:21-24 (Attach. A, Ex. 50). If BP had asked Technip to produce "as-built" drawings and had provided the necessary "as-built" data, then Technip would have performed that work. *Id.* at 135:2-8.
[98] Dep. of K. Dejohn (BP) at 43:11-17 (Attach. A, Ex. 29).
[99] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 51:6-9; 56:18-25 (Attach. A, Ex. 46).
[100] Dep. of K. Dejohn (BP) at 41:16 – 44:9 (Attach. A, Ex. 29); Dep. of F. Ragan, Sept. 8, 2011 (BP) at 109:5-113:14 (Attach. A, Ex. 46); Dep. of B. Naseman (BP) at 98:16-22 (Topsides remediation necessary at integration shipyard); 139:6-140:7 (discussing Disc. Ex. 344, $3-4M allocated for carryover work required for hull at integration shipyard) (Attach. A, Ex. 15).
[101] Dep. of K. Dejohn (BP) at 133:23 - 135:2; 135:19-136:20 (Attach. A, Ex. 29).

Nor did BP "as-built" the Atlantis during the commissioning phase of the project.  Commissioning is the process of verifying the mechanical integrity of the equipment–ensuring that it actually functions and is safe to start up.[102]  BP's commissioning teams did not compare design documentation to the constructed facility.  A BP internal document states that in March 2008, 5 months after first oil, only 54% of the "As Builts from work carried out at Ingleside and subsequent modifications" and 0% of the "Other As Builts, DSME, GVA base design" were complete.[103]

Moreover, according to Linn Osborne, Project Manager of Mustang, BP's engineering contractor for the Atlantis topsides including portions of the production safety system, Mustang did not verify that the construction of the topsides conformed to the design after fabrication.   Although Mustang believes that McDermott International, Inc. would have been responsible for the confirmation, Mustang does not know whether McDermott actually performed the work.[104]

> **b.** **BP's Failure to Follow Its Own Specifications Requiring "As-Built" Stamps Shows That "As-Builting" Never Occurred.**

BP and its contractors created standards and procedures that, if followed, would have ensured compliance with the OCSLA regulations requiring "as-built" plans and specifications for the Atlantis.  The standards required the creation of "as-built" drawings and the clear marking of such drawings as "as-built," which is industry practice.[105]  For example:

---

[102] Dep. of R. Berger, Sept. 15, 2011 (BP) at 22:15-20; 23:14-24:10; 153:14-154:6; 169:15-21 (Attach. A, Ex. 51).
[103] March 5, 2008 Email from B. Naseman to A. Taylor attaching FST Handover Schedule [BPEP_ABB_01524687 to BPEP_ABB_01524688] (Attach. A, Ex. 52).
[104] Dep. of L. Osborne (Mustang) at 19:17-20:9; 23:16-20; 44:6-46:14; 48:21-24 (Attach. A, Ex. 53).
[105] *See* Decl. of Glen Stevick at ¶¶10-15 (Attach. D).

(1)    BP's Specification for Data and Information Handover From Projects into Operations, Spec. No. 1400-85-IM-SP-8700. Section 4.2 Requires that "[t]he Project must ensure that the "As Built" documentation **shall be clearly identified as "As Built"** and verified as correct by inclusion of authorized approval signatures."[106]

(2)    BP Gulf of Mexico SPU Atlantis Engineering Workflow Process, BP Doc. No. 1440-10-GE-RP-1007. "As individual projects are completed, the documentation is handed over to Operations as outlined in 1400-85-IM-SP-8700, which defines the formats, timing and condition of the documentation as it is handed over to Operations. **As-builting is required** for the indicated drawings prior to handover."[107]

(3)    BP GOM DW Projects Document Control Procedure, BP Doc. No. ssproj-10-PC-PR-000001: "This procedure is required for ALL BP DWP Projects."[108] "Upon completion of installation the latest revision of Issued for Construction is **marked up to reflect any constructed changes and issued 'As Built.'"**[109]

(4)    BP Gulf of Mexico Deepwater Development Program Contractor Project Document Control Procedure, No. 1400-10-AD-PR-0219 at § 6 states: "The status of the documents shall also be **clearly identified . . . Revised as Noted and As-Built**."[110]

(5)    BP Gulf of Mexico Deepwater Development MEI [Mustang Engineering Inc.] Project Document Control Procedure, No 1400-10-AD-PR-0214 at § 5 states: "The status of the documents shall also be **clearly identified: . . . As-Built**."[111]

(6)    BP Gulf of Mexico Deepwater Development Atlantis Project Orientation and Procedures Manual (POPM), No. 1440-21-POPM-PR-0001. Section 4 devotes 15 pages entirely to the required

---

[106] Specification for Data and Information Handover from Projects into Operations, 1400-85-IM-SP-8700 [BPEP_ABB_00115909 at BPEP_ABB_00115917] (emphasis added) (Attach. A, Ex. 54).

[107] Atlantis Engineering Workflow Process [BPEP_ABB_03500136 at BPEP_ABB_03500143] (emphasis added) (Attach. A, Ex. 55).

[108] Document Control Procedure, ssproj-10-PCPR-000001 [BPEP_ABB_01631097 at 01631100] (Attach. A, Ex. 56).

[109] *Id.* at BPEP_ABB_01631106 (emphasis added).

[110] Contractor Document Control Procedure, 1400-10-AD-PR-0219 [BPEP_ABB_03505121 at 03505126] (emphasis added) (Attach. A, Ex. 57).

[111] MEI Document Control Procedure, 1400-10-AD-PR-0214 [BPEP_ABB_03505155 at BPEP_ABB_03505159 to BPEP_ABB_03505160] (emphasis added) (Attach. A, Ex. 58).

procedures for "redlining" and "as-builting" drawings and to itemizing which drawing must be "redlined" and which must be "as-built." It also includes a sample "As-Built" stamp. The Primary Steel Drawings for the Atlantis Platform were required to be "as-builted" at fabrication, at integration, and at commissioning.[112]

Likewise, BP's contracts with its Atlantis engineering contractors Mustang and Technip require the contractors to provide, at a minimum, "as-built" drawings that are "stamped as-built." BP's contract with Mustang states that Mustang was to provide "*As-built drawings and documentation.*"[113] It also states that:

At a minimum, Contractor shall provide to Company the following documentation upon Completion of the Work:

11.6.3 One set of reproducible rolled Mylar tracings and two sets of folded blue line prints **stamped "As-Built"including:**

- Civil Drawings
- Process Drawings
- Piping Drawings
- Structural Drawings
- Electrical and Instrument Diagrams
- Layout Plans
- Equipment lists
- Safety plans.[114]

BP's contract with Technip includes nearly identical language, also requiring "as-built" drawings to be stamped "As-Built."[115]

No BP deponent recalls a decision being made not to follow BP's "as-builting" procedures.[116] But Frank Ragan, who was the controls system engineer for Mustang on

---

[112] Project Orientation and Procedures Manual, 1440-21-POPM-PR-0001 [BPEP_ABB_01453338 at BPEP_ABB_01453359 to BPEP_ABB_01453374] (Attach. A, Ex. 59); *see also* Decl. of Glen Stevick at ¶11 ("As-built drawings are typically kept during all phases of a construction project.") and ¶13 (Attach. D).

[113] Topsides Design Engineering and Project Services Contract, Ex. A "Scope of Work," Section 2.3.4.1 [MUSTANG ENG 0000001 at MUSTANG ENG 0000072] (Attach. A, Ex. 60).

[114] *Id.* at MUSTANG ENG 000090.

[115] Well Systems Integrations and Design Services Engineering Contract, Ex. A "Scope of Work," Section 11.6 [T-USA000001 at T-USA000056] (Attach. A, Ex. 61).

Atlantis and is now a BP employee, testified that BP did not follow an established procedure for upgrading engineering drawings to "as-built."[117]   Ken Dejohn, engineering team lead/operations manager for Atlantis, testified that the procedural requirements were "impractical."[118]   Bill Naseman, Atlantis project services manager, the person charged with ensuring that BP contractors and engineers followed the document control guidelines testified that he did not think BP procedures address "as-built" drawings.[119]   He agreed, however, that the purpose of having document control is to keep track of documentation necessary for operations, and that it is important to have appropriate engineering drawings.[120]

### c.   Atlantis Was Over Budget By Almost $4 Billion.

Atlantis first oil was delayed for over a year, and the Atlantis Project was over budget by $3.9 billion.  The original cost of the project was forecasted at $2.003 billion, and first oil was scheduled for July 2006.[121]   A delay in schedule beyond the date initially selected for first oil affects the value of the project going forward, and meeting that first oil date is very important.[122]   Atlantis achieved first oil in October 2007, a significant delay that decreased the value of the project.[123]   In addition, the overall cost of the project increased from $2.003 billion to $5.932 billion, in part because of carryover

---

[116] Dep. of B. Duff (BP) at 138:15-139:6 (Attach. A, Ex. 10); Dep. of F. Ragan, Sept. 8, 2011 (BP) 175:13-176:7 (Attach. A, Ex. 46); Dep. of K. Dejohn (BP) at 136:21-138:20 (Attach. A, Ex. 29); Dep. of R. Malone (BP) at 188:13-189:12 (Attach. A, Ex. 62); Dep. of S. Todd, Dec. 5, 2011 (BP) at 386:13-25 (Attach. A, Ex. 30).

[117] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 33:8-16; 34:23-36:7; 162:3-163:1 (Attach. A, Ex. 46).

[118] Dep. of K. Dejohn (BP) at 48:20-50:24 (Attach. A, Ex. 29).

[119] Dep. of B. Naseman (BP) at 187:23-188:20 (Attach A, Ex. 15).

[120] *Id.* at 184:19-185:13.

[121] Finance Memo. [BPEP_ABB_03534372 to BPEP_ABB_03534379] (Attach. A, Ex. 63); Dep. of B. Naseman (BP) at 63: 7-9; 67:7-70:4 (Attach. A, Ex. 15 )

[122] Dep. of B. Naseman (BP) at 82:17-22; 90:13-91:14 (Attach. A, Ex. 15).

[123] *Id.* at 105:7-106:2; 109:14-110:5.

work required for the hull at the integration yard and topsides remediation that was required.[124]   At the time BP contractors were supposed to be developing "as-builts" under their contracts, which were set up on a time and materials basis,[125] BP was seeking authorization for a threefold increase in the Atlantis budget.  Naseman testified that he does not know where the money for updating engineering documents to "as-built" was allocated in the budget, but he speculated the money could be found under "BP Travel & Entertainment."[126]

### d.    BP Claims to Rely On Documentum to Find Latest Revision.

BP claims that the latest design revision of an engineering drawing as found in its electronic filing system Documentum may be relied upon as the "as-built."[127]  This claim is directly contrary to BP's many internal procedures and specifications relating to "as-builting."   It is not supported by any written procedure or specification and was unknown to Duff and his project services co-workers in August 2008 when he wrote his email refusing to turn over incomplete documents to operations.  It requires assuming that thousands of document revision histories are wrong and that the documents were upgraded without any written record.   This purported "policy" seems to have originated during the MMS investigation.  It is not a system; it is an excuse.

---

[124]  GOM, Atlantis South Supplementary FM and Atlantis Phase 2 Strategy [BPEP_ABB_03534380, BPEP_ABB_03534382,  BPEP_ABB_03534384,  BPEP_ABB_03534386,  BPEP_ABB_03534388, BPEP_ABB_03534390, BPEP_ABB_03534392] (Attach. A, Ex. 64); Atlantis South Supplement Cost Estimate Summary [Disc. Ex. 347] (Attach. A, Ex. 65); Dep. of B. Naseman (BP) at 98:16-22; 139:6-140:7; 102:4-19; 176:20-177:24 (Attach. A, Ex. 15).

[125]  Dep. of B. Duff (BP) at 32:9-33:8 (Attach. A, Ex. 10); Dep. of K. Dejohn (BP) at 103:23-106:7 (Attach. A, Ex. 29).

[126]  Dep. of B. Naseman (BP) at 178:16-18; 181:14-183:18 (Attach. A, Ex. 15).

[127]  Dep. of F. Ragan, Sept. 8, 2011 (BP) at 155:8-19 (Attach. A, Ex. 46); Dep. of K. Dejohn (BP) at 55:3-24 (Attach. A, Ex. 29); Dep. of R. Peloubet (BP) at 161:21-163:16 (Attach. A, Ex. 41).

As noted above, the latest revision date for at least 79% of the drawings BP now claims are the "as-built" set was before integration of the topsides and hull, and none of those are revised "as-built."  If no changes or markups are made to a drawing, then it is industry practice for the engineer of record to provide an annotation indicating whether additional engineering evaluation was necessary and where it can be found.  Once all changes have been reconciled, the revision history is entered showing "as-built," and the engineer stamps the drawing.[128]  BP written procedure is the same.[129]

All BP witnesses testified that there is no way to look at an Atlantis engineering drawing and determine whether it has undergone the "as-builting" process because BP did not follow its internal procedures and industry practice which requires engineering drawings to be clearly labelled.[130]  Moreover, both Ragan and Robert Peloubet (engineering manager for Atlantis subsea projects) testified that reliance on any descriptor on an Atlantis engineering document is inappropriate.[131]  Their experience with BP was that a document may have an "as-built" stamp but subsequent changes have been made.  In fact, BP witnesses have testified that the process of comparing the design drawing to actual construction never occurred.[132]

Even assuming the latest revision could be considered an "as-built" drawing, BP did not create or implement such a policy.  There is no such written procedure.  The

---

[128] Decl. of Glen Stevick at ¶12 (Attach. D).

[129] *See infra*. Section A.3.b above.

[130] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 155:8-19 (Attach. A, Ex. 46); Dep. of K. Dejohn (BP) at 55:3-24 (Attach. A, Ex. 29); Dep. of R. Peloubet (BP) at 164:4-12 (Attach. A, Ex. 41); Dep. of S. Todd, Vol. II (BP) at 365:5-24 (Attach. A, Ex. 41).

[131] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 155:8-19 (Attach. A, Ex. 46); Dep. of R. Peloubet (BP) at 21:17-20; 164:4-12 (Attach. A, Ex. 41).

[132] Dep. of K. Dejohn (BP) at 133:23 - 135:2; 135:19-136:20 (Attach. A, Ex. 29); Dep. of R. Berger, Sept. 15, 2011 (BP) at 153:14-154:6 (Attach. A, Ex. 51).

Documentum system is so disorganized that operations personnel resort to taping document registers on the wall of their office or requesting necessary drawings directly from BP's contractors.   Project management did not know which were the latest versions.[133]

BP contracted with Mustang for the project management of Atlantis, and Mustang was tasked with turning over all the finalized engineering documents to BP through transfer to Documentum.[134]   Ultimately, however, the contract with Mustang was closed out before the process of finalizing and transferring the subsea documents to BP's Documentum occurred.[135]   Documents were supposed to be coded with a sector number that would cause the documents to be uploaded into certain folders in Documentum automatically, but the coding was not consistent, and documents were mislabeled.[136]   Accordingly, the team needed assistance from the engineering leads to determine the true status of each document.[137]

As part of that process, Duff recommended changing the numbering scheme on the documents because it was difficult to know what phase the document was for, *i.e.*, whether it was for Drill Center 1 or Drill Center 3 and whether the document was drawn for the system before the manifold changeout or after (SS-1 versus SS-2).[138] Further, Duff and Curtis had found that the documents were not coded correctly with

---

[133] Dep. of T. Curtis (BP) at 63:3-64:12 (Attach. A, Ex. 12).

[134] Dep. of B. Duff (BP) at 19:15-20:4; 27:14-28:13 (Attach. A, Ex. 10).

[135] *Id.* at 28:14-24; 89:17-90:1.

[136] Dep. of T. Curtis (BP) at 27:10-28:16 (Attach. A, Ex. 12).

[137] Dep. of B. Duff (BP) at 54:12-55:6; 56:1-20; 63:12-24; 117:23-118:17; 119:17-23 (Attach. A, Ex. 10); *See* April 25, 2008 Email from B. Naseman to W. Broman and B. Duff [BPEP_ABB_00091459] (Attach. A, Ex. 67).

[138] Dep. of B. Duff (BP) at 64:19-65:4 (Attach. A, Ex. 10); Dep. of T. Curtis (BP) at 31:19-33:20 (Attach. A, Ex. 12); *see* May 6, 2008 Email from B. Duff to A. Gregg, M. Garland, and T. Curtis [BPEP_ABB_01519199, BPEP_ABB_01519200] (Attach. A, Ex. 68).

precise sector numbers, so there were quality assurance issues regarding whether the documents were being loaded into the correct folder into Documentum.[139]   If a document was loaded into the wrong folder, there was no way to retrieve the document once it was loaded incorrectly.   In addition, it was not always possible to determine whether the document to be loaded was the latest version of the engineering drawing.[140]

Ron Berger, Atlantis senior subsea operations engineer, was also concerned with the Atlantis Documentation Handover Project ("ADHP").[141]   Berger testified that Mustang did not know how to load the engineering documentation and had frequent turnover.   He was worried that subsea documentation might not exist in Documentum if it was not loaded properly by someone who understood the subsea documents.   As a result, on May 11, 2006, he sent an email invoking "STOP the JOB" on the ADHP because the work was unsafe.[142]

Berger's concerns with Documentum's reliability have borne out.   In fact, just two days before the Deepwater Horizon incident occurred, operators on Atlantis were having difficulty finding the drawings they needed from Documentum, and Berger (BP) sent the operators a register he keeps taped to the wall in his office with the document

---

[139] Dep. of B. Duff (BP) at 65:17-67:13 (Attach. A, Ex. 10); Dep. of T. Curtis (BP) at 29:2-30:13; 31:19-33:20 (Attach. A, Ex. 12).

[140] Dep. of T. Curtis (BP) at 63:3-64:12 (Attach. A, Ex. 12).

[141] Dep. of R. Berger, Sept. 15, 2011 (BP) at 27:4-15; 165:11-168:16 (Attach. A, Ex. 51).

[142] May 13, 2008 Email from G. Imm to R. Berger [BPEP_ABB_00089380] (Attach. A, Ex. 69).  Anyone has the ability to invoke "STOP the JOB" if they think the work is unsafe.  *See* Dep. of B. Naseman (BP) at 199:5-11 (Attach. A, Ex. 15).

numbers he believes correspond to the designs that reflect the constructed Platform.[143]

In addition, Atlantis operations personnel who were troubleshooting controls malfunctions in July 2008 had to request critical documents directly from BP's subsea contractor because the necessary drawings could not be found in Documentum.[144] Further, as late as May 2008, Mike Garland from BP project services directed Mustang to access floating systems documents contained on the floating systems server because neither the topsides nor floating systems documents were in Documentum.[145]

### *e.*    *"As-Built" Drawings Are Critical to Safe Operations.*

The installation of a complex facility such as Atlantis requires revisions and alterations of equipment to be made such that the facility as installed or "as-built" differs significantly from that depicted on construction drawings.  To ensure that changes made during construction are safe and follow appropriate engineering principles and that operators and engineering personnel have drawings that reflect the condition of the facility after installation, lessees undergo an "as-built" procedure.  "As-built" drawings are not merely redlines to previous versions of a drawing; "as-built" drawings have been rechecked by an engineer after redlining, have been re-issued with the changes, and have been marked "as-built."[146]

---

[143] April 20, 2010 Email from R. Peloubet to S. Todd [BPEP_ABB_00115759 to BPEP_ABB_00115760] (Attach. A, Ex. 70); Dep. of R. Berger, Sept. 15, 2011 (BP) at 183:12-186:16 (Attach. A, Ex. 51); Dep. of S. Todd, Dec. 5, 2011 (BP) at 440:1-442:8 (Attach. A, Ex. 30).

[144] July 22, 2008 Email from N. Oza (BP) to S. Berg (Technip) [BPEP_ABB_03482184 to BPEP_ABB_03482185] (Attach. A, Ex. 71).

[145] May 12, 2009 Email from L. Osborne (Mustang) to M. Garland (BP) [BPEP_ABB_03505962 to BPEP_ABB_03505963] (Attach. A, Ex. 72); Dep. of L. Osborne (Mustang) at 167:12-171:24 (Attach. A, Ex. 53).

[146] Decl. of Glen Stevick at ¶9 (Attach. D).

John Upchurch, vice president of deepwater engineering for Technip, BP's engineering contractor for the Atlantis subsea including portions of the production safety system, and a Texas registered professional engineer, defines an "as-built" drawing as "a drawing that depicts the condition of a piece of equipment as it was actually built or constructed."[147]   He considers it important to have a complete set of "as-built" drawings for a production facility like Atlantis because, "you want to know what you're operating.  You want to know that your equipment was built the way it was intended to be built."[148]   Ragan  (BP) understands the phrase "as-builting" to mean, "a process of checking drawings, seeing if there are discrepancies, and updating them to match the current configuration."[149]   Osborne (Mustang) also agrees that it is important to be able to determine whether the drawings on which procedures rely actually reflect the "as-built" condition and that an inability to make that determination creates a risk of using the wrong type of drawing to develop or finalize procedures.[150]

Todd (BP) agreed that it is important to verify construction drawings against the "as-built" facility.[151]   The "as-builting" process is necessary to check for unintended deviations from the design and correct those and to record intentional deviations.  He stated that "as-builts" ensure that operators can deliver safe and reliable operations.[152] He also testified that production facilities use thorough and detailed operating

---

[147] Dep. of J. Upchurch (Technip) at 29:24-30:19; 31:15-32:16; 42:11-22; 169:9-24 (Attach. A, Ex. 50); *see also* Decl. of Glen Stevick at ¶¶7-8 (Attach. D).
[148] Dep. of J. Upchurch (Technip) at 169:9-171:25 (Attach. A, Ex. 50); *see also* Decl. of Glen Stevick at ¶¶10-11 (Attach. D).
[149] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 152:12-16 (Attach. A, Ex. 46).
[150] Dep. of L. Osborne (Mustang) at 157:2-16 (Attach. A, Ex. 53).
[151] Dep. of S. Todd, May 9, 2011 (BP) at 95:4-96:10 (Attach. A, Ex. 73).
[152] Dep. of S. Todd, Dec. 5, 2011 (BP) at 284:3-285:5 (Attach. A, Ex. 30).

procedures that must be based on accurate "as-built" drawings for activities that are "critical to safety and operability."[153]

Likewise, Upchurch testified that operating procedures and safety procedures rely on the accuracy of "as-built" drawings, and that if the procedures instruct operators to take action that is inconsistent with the actual operation of the facility, then it could cause "a breach of containment of hydrocarbons" or "a safety problem or a risk of harm to individuals."[154]  Upchurch testified further that it is important to be able to distinguish between drawings that are actually "as-built" and drawings that are not.[155] He testified that if Technip provided an as-built drawing, then Technip would have stamped it "as-built."[156]

### f.   BP Acted in Reckless Disregard of the Falsity of Its Platform Certification Regarding "As-Built" Drawings.

BP acted in reckless disregard of the falsity of its platform certification regarding the development and maintenance of "as-built" plans and specifications for Atlantis. *See Longhi*, 513 F. Supp.2d at 877 (Defendant acted in reckless disregard of the truth when it submitted an incorporation date with its grant proposal that was inaccurate where Defendant admitted, "Dr. Munshi simply gave no thought to the date when he submitted the report.").  Sustala never checked to see if BP had a specification defining "as-built" drawings and never confirmed whether "as-built" drawings were compiled

---

[153] Dep. of S. Todd, May 9, 2011 (BP) at 97:19-25 (Attach. A, Ex. 73).
[154] Dep. of J. Upchurch (Technip) at 170:7-171:25 (Attach. A, Ex. 50).
[155] *Id.* at 172:15-19.
[156] *Id.* at 177:7-12.

and maintained at BP's Houston office in accordance with OCSLA regulations prior to first oil (or ever).[157]

Dejohn (BP) testified that it was "impractical" to update design drawings to "as-built," and that BP's "as-builting" procedures reflected a "tremendous degree of rigor."[158]   Testifying as BP's corporate representative, Dejohn stated plainly that, from the beginning of fabrication, BP never intended to revise to "as-built" in accordance with its written procedures.[159]   When given an opportunity to change or modify his answer, Dejohn, supported by instructions from counsel, stood by his plain answer that compliance was never intended.   BP's platform certification regarding "as-built" drawings, therefore, was literally false when made, it was false at first oil, it remains false today, and it was made with the requisite scienter.[160]

### g.   Todd Misled MMS About BP's "As-Built" Standards.

In addition, BP was not truthful in its responses to MMS during the agency's investigation.   BP initially represented to MMS investigators that it had followed strictly BP's written procedures requiring "as-builting" at fabrication, integration, and commissioning and clearly labelling "as-built" drawings.[161]   When MMS realized that BP's supposed "as-built" drawings did not show "as-built" revision histories and

---

[157] Dep. of D. Sustala, Sept. 19, 2011 (BP) at 150:17-22 (Attach. A, Ex. 21); Dep. of B. Naseman (BP) at 47:5-17 (testifying that neither Sustala nor Dejohn every contacted Atlantis Project Services to ensure that the engineering documents BP received from its contractors met regulatory requirements) (Attach. A, Ex. 15).

[158] Dep. of K. Dejohn (BP) at 48:20-50:24 (Attach. A, Ex. 29).

[159] *Id.* at 159:12-160:23.

[160] Even if Dejohn had not testified that it was BP's intention from the beginning of fabrication not to comply with the "as-builting" requirements, this Court already has held that certifications of future compliance can trigger FCA liability, reasoning that "by the time BP started producing oil and gas, its commitments for future compliance, if not fulfilled, had become false statements."   *Abbott*, 781 F. Supp. 2d at 465 n. 18; *see also Augustine*, 289 F.3d 409.

[161] July 30, 2010 Email from S. Todd (BP) to B. Domangue (MMS) (with Power Point presentation attached stating that BP followed its Specification for Handover) [BPEP_ABB_00115609 at BPEP_ABB_00115620] (Attach. A, Ex. 74).

requested an explanation, BP developed an entirely new claim.  In an email from Todd responding to a question regarding whether BP had any company standard that defines "as-built" for engineering drawings and how that standard compares to industry standards, BP omitted any reference to its many specifications that actually require "as-builts" to be so labelled.[162]  Instead, Todd developed a new standard, without citation to any internal BP document, omitting the critical requirement for marking "as-built."[163] Todd testified that he and upper level management were aware that the documents BP was submitting to the agency in Books 1-6 were not revised "as-built."[164]

Todd testified that he does not think any person made a specific decision not to follow the written procedures.[165]  He also testified that he does not think that failing to update drawings to "as-built" status was a BP company practice.  He testified that he learned during the MMS investigation that the Projects side of Atlantis was not, in fact, revising to "as-built," so he determined that was the customary and usual business practice for *Atlantis*.  In other words, the failure to follow BP's customary and usual business practice was now the customary and usual business practice for that *one project team*; a distinction BP failed to reveal to the federal investigators.

### 4.    BP's False Certifications Were Material to the Platform Permit

---

[162] Aug. 20, 2010 Email from B. Domangue to D. Sustala [BPEP_ABB_01622474] (Attach. A., Ex. 75).  The 2005 amendments to the Subpart I regulations state that the requirement to maintain the "as-built" drawings under 30 C.F.R. § 250.903 (2006) is such that, "respondents would keep them as usual and customary business practice."  70 Fed. Reg. 41556, 41517-72 (July 19, 2005).  BP's written business procedures detailing how "as-built" drawings are to be produced and requiring the clear marking of such drawings "as-built" are the best evidence of BP's usual and customary business practice.  Likewise, BP's contracts with its Atlantis engineering contractors Mustang and Technip requiring "as-built" drawings that are stamped "as-built" are clear evidence of BP's usual and customary business practice (which was not followed because BP's contractors did not develop "as-built" drawings).

[163] Aug. 25, 2010 Email from S. Todd (BP) to B. Domangue [BPEP_ABB_00082845 to BPEP_ABB_00082846] (Attach A, Ex. 76).

[164] Dep. of S. Todd, May 9, 2011 (BP) at 60:16-61:3; 63:23-64:19; 68:17-69:10 (Attach. A, Ex. 73).

[165] *Id.* at 50:24-54:3.

**Approval.**

This Court held that: "Unless and until the permit process was satisfied, BP did not have the lawful right to drill for, or extract, any oil or gas. . . Accordingly, false statements made during that process could certainly have had a natural tendency to affect the government's decision to allow BP to explore and develop the leases." *Abbott*, 781 F. Supp. 2d at 466.  The Court noted that "the FCA requires proof only that the defendant's false statements 'could have' influenced the government's payment decision or had the 'potential' to influence the government's decision, not that the false statements actually did so." *Id.* at 467 (*quoting Longhi*, 575 F.3d at 469.)

Before conducting activities under its Exploration Plan or its Development Operations Coordinations Document, BP was required to obtain approval of the Atlantis Platform.  30 C.F.R. § 250.281.  The subpart I regulations required that BP submit a certification that the detailed structural plans for the platform were certified by a registered professional engineer and that the certified design and "as-built" plans and specifications will be on file in a specified location.  30 C.F.R. § 250.901(d) (2002).  The regulations stated that the regional supervisor must approve the application prior to platform installation.  30 C.F.R. § 250.900(b)(2002).  Without BP's false certifications and government approval based on those certifications, "BP would never have received authorization to extract oil and gas from the OCS."  *Abbott*, 781 F. Supp. 2d at 467.  Moreover, the United States affirmatively stated to Judge Hoyt that, "false statements made during [the permit] process could certainly have had a natural tendency to affect the Government's decision to allow BP to explore and develop the lease."  Doc. 69 at 12.

Therefore, BP's false certifications were material to the government's decision to permit BP to install Atlantis.

**B.    BP'S ATLANTIS PRODUCTION SAFETY SYSTEM APPLICATION WAS A FALSE CLAIM FOR GOVERNMENT PROPERTY. [166]**

### 1.    Introduction

OCSLA regulations expressly require "[p]roduction safety equipment . . . designed, installed, used, maintained, and tested in a manner to assure the safety and protection of the human, marine, and coastal environments."   30 C.F.R. 250.800(a). Regulations further condition commencement of oil and gas production upon MMS approval of the production safety system, which must comply with American Petroleum Institute ("API") Recommended Practice ("RP") 14C adopted by reference into the text of the regulations.[167]   To obtain approval, BP was required to submit a permit application containing, among other things, a: "5) Certification that the design for the mechanical and electrical systems to be installed were approved by registered professional engineers."   *Id.* at § 250.802(e)(5).   BP submitted the false certification with its Atlantis production safety system permit application on August 1, 2005; MMS approved the permit on May 3, 2007.   BP's certification was untrue when it was made, and BP made the certification with the requisite scienter.   The production safety system permit application was a false claim for government property, and BP's false statements were material to the permit approval.

---

[166] The production safety system permit application requirements have not been renumbered in the Code of Federal Regulations and are the same today as they were in 2002.

[167] "Production ***shall not commence*** until the production safety system has been approved and a preproduction inspection has been requested by the lessee." 30 C.F.R. § 250.800(a) (emphasis added).

## 2.      Definition of Production Safety System

The MMS petroleum engineer who approved the Atlantis production safety system permit,[168] defines a production safety system as "the devices used to measure and subsequently terminate production should there be an abnormal detectible condition."[169]  He testified that the Atlantis production safety system includes, *inter alia*, the surface controlled subsurface safety valves, which are located 100 feet below the mud line in each well; the underwater safety valves of which there are two at each well site; the tree valves; the fast-acting chokes; the controls; the electronic communications links to the wells; and the boarding valves.[170]  He agreed that one of the purposes of the production safety system is to detect abnormal conditions, like gas leakage, and have equipment to react to and minimize any potential adverse effects.[171]

According to API RP 14C, the production safety system extends to all process equipment from the wellhead to the discharge point downstream of the process facilities.  *See* API RP 14C incorporated at 30 C.F.R. §§ 250.198; 802(e)(2) & (3).[172]  API RP 14C specifically states that the Safety Analysis Function Evaluation Chart ("SAFE Chart"), which is required to be submitted with the production safety system application (*see* 30 C.F.R. § 250.802(e)(2)), "should list all process components[173] . . . with

---

[168] Dep. of B. Domangue (MMS) at 7:4-13; 61:21-63:15  (Attach. A, Ex. 4).  Mr. Domangue is currently the district manager for the BSEE Houma District.

[169] *Id.* at 56:16-58:24.

[170] *Id.* at 232:18-233:10.

[171] *Id.* at 153:6-12.

[172] MMS issued a Final Rule incorporating the 7th Edition of API RP 14C into the regulations governing oil, gas, and sulphur operations on the OCS on August 9, 2002.  67 Fed. Reg. 51,757 (Aug. 9, 2002) (eff. date Sept. 9, 2002).  MMS explained that, "[t]he legal effect of incorporation by reference is that the material is treated as if it were published in the <u>Federal Register</u>.  This material, like any other properly issued regulation, then has the force and effect of law."  67 Fed. Reg. 51,757.

[173] Section 3.4(e) of API RP 14C defines "all process components" as:

their required safety devices, and should list the functions to be performed by each device."  API RP 14C, Paragraph 4.3, Page 16.

The chief of the Regulations and Standards Branch, MMS, explained in an email to plaintiff FWW that the production safety system review of subsea systems, wellheads, trees, manifolds, pipelines/flowlines, controls, umbilicals, and risers are conducted by MMS under subpart H of the regulations.[174]  The 30 C.F.R. § 250.802(e) certification statement, therefore, extends to those components.

### 3.     Production Safety System Permit Application and Approval

As part of its Atlantis production safety system permit application, BP submitted 522 drawings by letters dated February 23, 2005, February 25, 2005, August 1, 2005, October 11, 2005, May 4, 2006, May 8, 2006, May 23, 2006, and September 19, 2006.[175]  With the August 1, 2005 letter, BP submitted the professional engineering statement as Item 5 of Volume II of its production safety system application.[176]  The statement makes the following certification:

> Per the requirements of 30CFR250, Section 250.802(e)(5), this document certifies that the design for the Mechanical and Electrical systems for the Atlantis semi-submersible production unit, South Green Canyon Block 743 **were reviewed and approved by registered professional engineers licensed in the state of Texas**.

---

All process components on a production platform comprise the entire process from the wellhead to the most downstream discharge point; thus, all process equipment and functions are incorporated into the safety system.
API RP 14C -- Recommended Practice for Analysis, Design, Installation, and Testing of Basic Surface Safety Systems for Offshore Production Platforms, Sect. 3.4(e), Page 8 (Attach. A, Ex. 77).
[174]  February 17, 2010 Email from W. Hauser, MMS, to Z. Corrigan, FWW [FWW0018028 to FWW0018029] (Attach. A, Ex. 78).
[175]  *See* May 3, 2007 Letter from B. Domangue, MMS, to D. Sustala, BP [BPEP_ABB_00085724 to BPEP_ABB_00085727] (Attach. A, Ex. 79).
[176]  Professional Engineering Statement (Item 5) [BPEP_ABB_00085234] (Attach. A, Ex. 80).

*Id.* (emphasis added).[177]   BP never submitted the second certification statement verifying that the installation of the mechanical and electrical systems of the Atlantis Facility was in accordance with the approved designs.[178]

On May 3, 2007, MMS approved the Atlantis production safety system pursuant to 30 C.F.R. § 250.802(e), stating, "we hereby approve the following: 1.  Design and installation of the production equipment and subsea systems with all attendant controls."[179]   The May 5, 2007 letter from MMS to BP was the final formal approval from the agency allowing BP to commence oil and gas production from the field.[180]

### 4.     The Designs for the Atlantis Mechanical and Electrical Systems Were Not    Approved By Registered Professional Engineers.

#### a.     *A Texas Registered Professional Engineer Who Approves an Engineering Document Must Seal the Document.*[181]

All fifty states and the District of Columbia regulate the practice of engineering.[182]   Such regulation typically includes the licensing of engineers as

---

[177] The body of the Feb. 2005 Letters and the Aug. 2005 Letter also include the following certification:

BP certifies that the designs for the mechanical and electrical systems to be installed were completed under the supervision of registered professional engineers.  Feb. 23, 2005 Letter from D. Sustala, BP, to Michael Saucier, MMS [BPEP_ABB_01598219 to BPEP_ABB_01598220] (Attach. A, Ex. 81); Feb. 25, 2005 Letter [BPEP_ABB_00084533 to BPEP_ABB_000843534] (Attach. A, Ex. 82); Aug. 1, 2005 Letter [BPEP_ABB_00084932 to BPEP_ABB_00084933] (Attach. A, Ex. 83).  BP's Regulatory Coordinator testified that he considered the certifications to be equivalent to the official Professional Engineering Statement certification.  Dep. of D. Sustala, May 10, 2011 (BP) at 84:16-85:21 (Attach. A, Ex. 28).

[178]   Domangue (MMS), testified that he did not require submission of the second sentence of the certification statement because of the MMS preproduction inspection.  Dep. of B. Domangue (MMS) at 70:5-71:16 (Attach. A, Ex. 4).

[179]   May 3, 2007 Letter from B. Domangue, MMS, to D. Sustala, BP [BPEP_ABB_00085724 to BPEP_ABB_00085727] (Attach. A, Ex. 79).

[180] Dep. of B. Domangue (MMS) at 83:1-85:1 (after MMS issued formal approval of production safety system, BP could commence production; calling the preproduction inspection requirement in the approval letter a "misnomer" because he had already conducted his inspections before issuing the permit approval) (Attach. A, Ex. 4).

[181] Note that BP certified that the designs were approved by "registered professional engineers *licensed in the state of Texas.*"  Professional Engineering Statement (Item 5) [BPEP_ABB_00085234] (Attach. A, Ex. 80).

[182] *The Professional Engineering* at 27-29 (Nat'l So. Prof. Eng. July 2007) (Attach. A, Ex. 84); *see* Decl. of G. Stevick at ¶16 (Attach. D).

"registered professional engineers" or the equivalent.[183]  It is illegal for anyone who is not a Texas registered professional engineer to engage in the practice of engineering in the State of Texas.[184]

The Texas Engineering Practices Act requires that a Texas registered professional engineer obtain a seal "in a design authorized by the Board, showing the license holder's name and the legend "Licensed Professional Engineer" or "Registered Professional Engineer."  TEX. OCC. CODE § 1001.401 (Use of Seal).  Prior to September 1, 2005, Texas law required that "[a] plan, specification, plat, or report issued by a license holder must include the license holder's seal placed on the document."  Act of May 22, 2001, 77th Leg., ch. 1421, § 1, 2001 Tex. Gen. Laws 4570, 4587 (previously codified as TEX. OCC. CODE § 1001.401(b)).  The purpose of the seal is to "assure the user of the engineering product that the work has been performed or directly supervised by the professional engineer named and to delineate the scope of the engineer's work."  22 TEX. ADMIN. CODE § 137.33(a).[185]

Texas registered professional engineers:

---

[183] *See, e.g.,* Texas Engineering Practices Act, TEX. OCC. CODE § 1001.301 *et seq.*; Rules Concerning the Practice of Engineering and Engineering Licensure, 22 TEX. ADMIN. CODE § 137.1; LA. R.S. 37:681 & 682(10); CAL. BUS. & PROF. CODE § 6735.5; NEV. REV. STAT. § 625.520; UTAH CODE § 58-22-601.

[184] "(c) The legislature intends that:
    (1) the privilege of practicing engineering be entrusted only to a person licensed and practicing under this chapter;
    (2) only a person licensed under this chapter may:
        (A) engage in the practice of engineering;
        (B) be represented in any way as any kind of "engineer"; or
        (C) make any professional use of the term "engineer"; and
    (3) this chapter will be strictly complied with and enforced."
TEX. OCC. CODE § 1001.004(c); *see* TEX. OCC.  CODE § 1001.301 (License Required).  The practice of engineering is defined to mean public or private service or creative work requiring special knowledge of the mathematical, physical, or engineering sciences.  *See* TEX. OCC. CODE § 1001.003(b); *see also id.* at § 1001.003(c) (listing tasks included within the practice of engineering).

[185] *See also* Decl. of Glen Stevick at ¶17 (Attach. D).

59

> shall only seal work done by them, performed under their direct supervision . . . or shall be standards or guideline specifications that they have reviewed and selected.  Upon sealing, engineers take full responsibility for that work.

22 TEX. ADMIN. CODE § 137.33(b).  "Direct supervision" is defined as:

> The control over and detailed professional knowledge of the work prepared under the engineer's supervision.  The degree of control should be such that the engineer personally makes engineering decisions *or personally reviews and approves proposed decisions prior to their implementation*. The engineer must have control over the decisions either through physical presence or the use of communications devices.

22 TEX. ADMIN. CODE § 131.81(10) (emphasis added).  Requiring application of a seal upon issuance of a design drawing is consistent with the Texas Engineering Practice Act's stated purpose to "fix responsibility for work done or services or act performed in the practice of engineering."  TEX. OCC. CODE § 1001.004(b)(3).

A Texas Attorney General opinion issued in December 2004 confirmed this broad sealing requirement, requiring a Texas registered professional engineer to seal his design plans for an offshore platform to be constructed in Norway and erected in international waters.  Tex. Att'y Gen. Op. No. GA-0287 (2004), 2004 WL 2980275 (Tex. A.G.).  The Texas Attorney General found that despite the ultimate location of the construction or placement of the offshore platform, the registered professional engineer was required to seal his designs by Texas law.  *Id.*

In response to the Attorney General's opinion, the Texas legislature amended the language of the sealing requirement, effective September 1, 2005, to provide that

> A plan, specification, plat, or report issued by a license holder for a project to be constructed or used in this state must include the license holder's seal placed on the document.  A license holder is not required to use a seal required by this section if the project is to be constructed or used in another state or country.

60

TEX. OCC. CODE § 1001.401(b)(2006).   The Texas legislature arguably intended the amendment to "reduce difficulties when Texas engineering documents are used for outside projects and must likewise be sealed by the other state."  *See House Comm. on Licensing & Admin. Procedures*, Bill Analysis, Tex. C.S.H.B. 1817, 79th Leg., R.S. (2005).

The amended language cannot be understood to exempt the Atlantis from sealing requirements.  Atlantis was constructed in Ingleside, Texas and is being used in federal waters.[186]  It was not constructed in another state or country; it is not being used in another state or country.  Moreover, the engineering drawings on which BP's production safety system certification was based are dated prior to the September 2005 effective date of that amendment.  Indeed, BP's production safety system certification statement was submitted to MMS on August 1, 2005.  Accordingly, any Texas registered professional engineer who claims to have certified the Atlantis drawings was required by law to apply his professional engineer seal or stamp to fix responsibility for the work done.

###### b.      *None of the Designs for the Production Safety System Bear the Stamp or Seal of an Individual Registered Professional Engineer.*

Despite the requirements of Texas and other states, none of the designs for the Atlantis production safety system bear the stamp or seal of a registered professional engineer.   As part of its Atlantis production safety system permit application, BP submitted 522 design drawings to MMS in the following categories:

2006-09-18 PSS-14 Vol 1 Amended              SAFD, Rev 4

---

[186] Dep. of L. Osborne (Mustang) at 32:3-11 (Attach. A, Ex. 53); Dep. of W. Naseman (BP) at 41:6-14 (Attach. A, Ex. 15); Dep. of F. Ragan, Sept. 8, 2011 (BP) at 51:6-9; 56:18-25 (Attach. A, Ex. 46); Dep. of K. Dejohn (BP) at 42:2-22 (Attach. A, Ex. 29).

| | |
|---|---|
| 2005-02-25 PSS-2 Vol 1 | SAFD, Rev 1 |
| 2005-08-01 PSS-5 Vol 2 | Safety Plan |
| 2005-08-01 PSS-5 Vol 2 | Hull Drawings |
| 2005-08-01 PSS-5 Vol 2 | Topsides Layouts |
| 2005-08-01 PSS-5 Vol 2 | Hull Layouts |
| 2005-08-01 PSS-5 Vol 2 | Safety Plans Topside |
| 2005-08-01 PSS-5 Vol 2 | Safety Plans Hull |
| 2005-08-01 PSS-5 Vol 2 | Topsides Elec One Lines |
| 2005-08-01 PSS-5 Vol 2 | Hull Elec One Lines |
| 2005-08-01 PSS-5 Vol 2 | Topsides Haz Area Class Plans |
| 2005-08-01 PSS-5 Vol 2 | Hull Haz Area Class Plans |
| 2005-02-25 PSS-3 P&IDs | SAFE Chart P&IDs & Others |

Of the 522 drawings submitted with the application, none (0%) was marked with the seal or stamp of a registered professional engineer.[187]

Mustang, through its designated corporate representative Osborne, testified that the initials that appear on drawings could be persons with engineering degrees or designers.[188]   In fact, 90% of the persons whose initials appear in the "engineer" block are not Texas registered professional engineers.[189]   Ninety-seven percent of the persons whose initials appear in the "approved" block are not registered professional engineers.

MMS's review of information submitted by BP during the agency's investigation supports the conclusion that the designs for the Atlantis mechanical and electrical systems were not approved by registered professional engineers.  In its letter of July 21, 2010, MMS required BP to "provide a list of all registered professional engineers associated with the [production safety system] certification, including contact information."[190]   BP's August 9, 2010 letter purported to submit a list of registered

---

[187] Decl. of Mike Sawyer at ¶ 11 (Attach. C).
[188] Dep. of L. Osborne (Mustang) at 172:7-18 (Attach. A, Ex. 53).
[189] Decl. of Mike Sawyer at ¶ 12 (Attach. C).
[190] July 21, 2010 Letter from M. Saucier (MMS) to S. Todd (BP) [BPEP_ABB_00082829 to BPEP_ABB_00082830] (Attach. A, Ex. 19).

professional engineers associated with BP's certification.[191]  Upon review, MMS noted that none of the initials in the revision blocks of the drawings or the professional engineer stamps on the drawings seem to match the professional engineers BP provided on the list."[192]

A review of the list of engineers provided by BP clearly shows that not one of the engineers on the list initialled or stamped the drawings produced to MMS.  Of the engineers listed, four (4) had incorrect professional engineering information, two of the Texas professional engineering license numbers do not exist, and one engineer had his license granted in 2009, well after the August 1, 2005 certification.[193]  Osborne testified that he did not prepare the list of engineers submitted by BP to the agency and he did not know if it was verified or if anyone at Mustang reviewed the list before BP sent it.[194]

> **c.    BP's Contractors Admit No Registered Professional Engineer Approved the Designs For The Mechanical and Electrical Systems of the Atlantis Production Safety System.**

Mustang designed the topsides portion of the production safety system.[195]  Although Osborne (who is not a registered professional engineer) was identified by Mustang as responsible for gathering registered professional engineer certification for the designs for the Atlantis mechanical and electrical systems, he was not able to identify any registered professional engineer who approved any part of the production

---

[191]  August 9, 2010 Letter from S. Todd (BP) to M. Saucier (MMS) [BPEP_ABB_00115564 to BPEP_ABB_00115566] (Attach. A, Ex. 20).
[192]  August 31, 2010 Email from B. Domangue (MMS) to S. Todd (BP) [BPEP_ABB_00082852 to BPEP_ABB_00082854] (Attach. A, Ex. 85).
[193] Decl. of Mike Sawyer at ¶ 13 (Attach. C).
[194] Dep. of L. Osborne (Mustang) at 138:24-140:16 (Attach. A, Ex. 53).
[195] *Id.* at 48:21-24; 58:7-14.

safety system.[196]   He testified that no individual registered professional engineer approved the designs for the mechanical and electrical systems that make up the production safety system for the topsides.[197]   No individual registered professional engineer at Mustang has taken professional responsibility for the engineering designs. Further, Osborne testified that there would be cases where an individual registered professional engineer would not have any supervisory role in particular drawings and that acquiring professional engineer stamps would take extra time and cost additional money.[198]   He agreed that a drawing without a stamp or seal has not been approved by a registered professional engineer "as a professional engineer."[199]

Ragan, the team leader for the development of the controls systems, which control the safety shutoff valves and are a part of the production safety system, testified that he is not aware of any registered professional engineer having approved the Atlantis mechanical and electrical systems either orally or in writing.[200] Ragan is not himself a registered professional engineer, but Ragan was responsible for designing the Atlantis control systems and preparing the SAFE chart and the logic contained therein.[201]   The SAFE chart and shutdown safety logic drawings document the shutdown logic, which is the hierarchical logic in an electrical controller that, given a

---

[196] *Id.* at 28:20-21; Jan. 29, 2004 Email from R. Phillips to D. Sustala, J. Hart, and L. Osborn [BPEP_ABB_00110518 to BPEP_ABB_00110519] (Attach. A, Ex. 86).

[197] Dep. of L. Osborne (Mustang) at 61:15-66:22; 137:17-25; 140:8-16; 146:1-11 (Attach. A, Ex. 53).

[198] *Id.* at 134:15-137:8; 150:4-151:6; 152:20-23.

[199] *Id.* at 112:14-113:9.

[200] Dep. of F. Ragan, Sept. 8, 2011(BP) at 57:22-61:4; 87:3-9; 138:12-20; 90:10-91:13 (Attach. A, Ex. 46); *see also* Dep. of J. Upchurch (Technip) at 114:7-15 (Attach. A, Ex. 50).  Ragan's knowledge is BP's knowledge.  He was a Mustang employee contracted by BP to perform the service of representing BP's interest on the controls.  He is now a BP employee.  *See* Dep. of F. Ragan, Sept. 8, 2011 (BP) at 33:8-16; 39:5-41:6 (Attach. A, Ex. 46).

[201] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 14:2-15:12; 170:5-12; 171:4-10 (Attach. A, Ex. 46).

certain input, will execute electrical and mechanical orders to make the facility safe.[202]

Specifically, the electronic controller processes a given input to output electronic signals that are then transmitted electrically to mechanical equipment that causes the shutdown valves to close mechanically.[203]   Ragan testified that he could not recall any specific individuals on the controls team who were registered professional engineers.[204]

Technip designed the subsea portion of the Atlantis production safety system.[205] Its designated corporate representative, Upchurch, testified that if a drawing is missing a stamp, then that drawing lacks professional engineering approval.[206]  He also testified that there were no professional engineer requirements under Technip's Atlantis contract with BP.[207] Further, he stated that designers and drafters would have initialed the drawings they prepared, and that such initials are not the equivalent of professional engineer stamps or seals.[208]

DSME designed the portions of the production safety system located in the hull, and DMSE employees could not approve the mechanical and electrical systems as registered professional engineers.[209]

---

[202] Dep. of R. Peloubet (BP) at 48:10-49:13 (Attach. A, Ex. 41).

[203] *Id.* at 183:19-187:23; Dep. of F. Ragan, Sept. 8, 2011 (BP) at 97:4-16 (Attach. A, Ex. 46); System Certification Package, 1440-35-SB-SP-3033_ATS_SIC_Rev0.doc, page 29 (contained within TS Subsea Control System 956, Document Number: 1440-20-CM-PR-956-8001 [BPEP_ABB_00854373]) (Attach. A, Ex. 87).

[204] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 80:13-22 (Attach. A, Ex. 46).

[205] Dep. of J. Upchurch (Technip) at 139:18-140:25 (Attach. A, Ex. 50).

[206] *Id.* at 86:10-12; 137:2-12.

[207] *Id.* at 82:24-83:7.

[208] *Id.* at 27:24-28:24.

[209] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 54:1-55:16; 57:22-61:4 (Attach. A, Ex. 46).

### d.    BP Made No Effort To Verify that Its Certification Was True.

Sustala testified that he made no effort to determine whether the certification statement regarding the Atlantis mechanical and electrical systems was true.  Sustala never checked with BP's contractors to determine whether registered professional engineers had in fact approved the systems, and he did not look for professional engineer stamps on the drawings submitted to the agency.[210]  He testified that he relied on Dejohn (BP), not a registered professional engineer, who gave Sustala the unsigned, typed certification statement on BP letterhead to include in the submission to MMS.[211]  Sustala testified that he had no reason to believe the certification statement came from BP's engineering contractors.

Sustala clearly understood that Texas law required a professional engineer who approves a design to apply his seal to that design.  Sustala attempted to convince BP to apply for a waiver for the DSME work on the hull that concerned the mechanical and electrical systems.[212]  Again, Sustala knew that DSME could not approve their designs as registered professional engineers.  He was told simply to have the operations manager (Dejohn) submit a letter to MMS with the certification, which Sustala knew could not be true.  BP's regulatory coordinator on Thunder Horse[213] was irritated by Sustala's confusion about this practice stating,

> Come on Dennis, I don't want to go back and forth on hthis [sic].  The reg says "certification that the design for the mechanical and electrical systems to be installed were approved by resgitered [sic] professional

---

[210] Dep. of D. Sustala, May 10, 2011 (BP) at 89:24-90:16 (Attach. A, Ex. 28).

[211] *Id.* at 87:7-88:5; 118:11-121:6.

[212] March 24, 2004 Email from D. Sustala (BP) to S. Kinnaman (Mustang) [BPEP_ABB_00110497 to BPEP_ABB_00110499] (Attach. A, Ex. 88).

[213] Thunder Horse is another BP deepwater floating production facility in the Gulf of Mexico.

engineer", so the letter certifies just that.   The reg does not mention stamping.[214]

Although the regulation itself does not state that a professional engineer's stamp or seal must be on the designs, a lessee must have an affirmative basis for making the certification statement in order to obtain billions of dollars worth of government-owned oil and gas.  Setting aside the issue that "[a] professional engineer licensed in Texas must place his seal on engineering plans, specifications, plats, and reports prepared under authority of his Texas license,"[215] "approve" means "to give formal or official sanction to."[216]  BP had no basis for making the certification that registered professional engineers had given formal or official sanction to the mechanical and electrical systems to be installed in the Atlantis, and, at least with respect to the work done by DSME, affirmatively knew the certification was false.  Indeed, BP's Todd refused to answer the direct question, "[d]id a professional engineer approve the mechanical and electrical systems of the Production Safety System?"[217]

> e.   **MMS Accepted the Certification Submitted Without Further Inquiry.**

Domangue (MMS) testified that he understood that the presence of professional engineering stamps on the drawings would have been self-proving, but he was trained not to go beyond the certification statement submitted by an applicant.[218]  He testified that he made no inquiry into whether the initials on the drawings submitted were the

---

[214] March 25, 2004 Email from D. Sustala (BP) to A. Laplante (BP) [BPEP_ABB_05211191 to BPEP_ABB_05211193] (Attach. A, Ex. 89).
[215] Tex. Att'y Gen. Op. GA-0287 (Tex. A.G.), 2004 WL 2980275 (Tex. A.G.).
[216] MERRIAM-WEBSTER'S COLLEGIATE DICT. (10th Ed. 1999); *see also* BLACK'S LAW DICT. (9th ed. 2009) ("approve" is defined as "[t]o sanction officially; to ratify; to confirm;").
[217] Dep. of S. Todd, Dec. 5, 2011 (BP) at 290:18-293:8 (Attach. A, Ex. 30).
[218] Dep. of B. Domangue (MMS) at 180:4-13; 182:16-20 (Attach. A, Ex. 4).

initials of professional engineers.[219]   Indeed, when he learned for the first time during his deposition that the SAFE chart, which he described as the "road map that indicates the manner in which the platform will cease production as a result of a detected abnormal condition on board or associated with the subsea production," was not prepared by professional engineers, he asked, "under what auspices did BP issue this statement if these weren't registered professional engineers?"[220]

Domangue testified that it is hard to tell whether the drawings submitted with the production safety system application were stamped by registered professional engineers, but he knew the SAFE chart, the process flow diagrams, the safety equipment layouts, and the electrical one-line diagrams were not stamped or sealed.[221] He never told anyone at BP that they needed professional engineer stamps on the drawings submitted with the application.[222]   Domangue is not a registered professional engineer, and he was never trained by MMS regarding state laws that require a professional engineer who approves a design to apply his seal or stamp.[223]   While Domangue might not be aware of Texas law, he unequivocally believed that the subpart H certification statement had to be true.[224]   In other words, the designs for the mechanical and electrical systems to be installed in the Atlantis had to be approved by registered professional engineers.   Moreover, "it is a matter of law for the court to interpret a relevant statutory or regulatory requirement and if the language of the

---

[219] *Id.* at 186:6-189:2.
[220] *Id.* at 189:3-14; 255:2-258:18.
[221] *Id.* at 73:13-75:1.
[222] *Id.* at 78:11-17.
[223] *Id.* at 154:12-15; 161:6-14.
[224] *Id.* at 177:14-178:10.

requirement is clear, even expert testimony is not persuasive."  *UMC Elecs. Co.*, 43 Fed.

Cl.  at 794 (*citing United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980)).

> *f.    An Engineering Firm Cannot Approve Designs As A Registered Professional Engineer.*

BP claims that designs issued by an engineering company registered with the

State of Texas can be considered "approved" by a registered professional engineer, *i.e.*,

the company itself.[225]  Contrary to BP's claims, only an individual licensed professional

engineer–*i.e.*, a person–may approve or certify an engineering design.[226]   An

engineering firm registered with the state is not a registered professional engineer.[227]

Under Texas law, a firm is entitled to register as an "engineering company" so

long as it has registered professional engineers on its payroll, and the company then

becomes entitled to offer its engineering services to the public.[228]   But the company

itself does not become a licensed engineer and is not listed as such by the State Board of

---

[225] Dep. of K. Dejohn (BP) at 19:17-23:10 (Attach. A, Ex. 29); *see* Dep. of L. Osborne (Mustang) at 41:12-43:19; 115:9-117:15 (Attach. A, Ex. 53).

[226] *See* Tex. Occ. Code § 1001.301(a) (only individuals licensed under chapter 1001 may practice engineering in the State of Texas); *id.* at 1001.401(a) (each licensed engineer holds a Board-designed seal showing the licensee's name and the legend "Licensed Professional Engineer" or "Registered Professional Engineer"); *id.* at § 1001.401(b) (requiring an engineer to seal, as well as sign, each "plan, specification, or report" that the engineer issues).

[227] *See, e.g., id.* at § 1001.405(e)(3) ("Each service, work or act performed by the business entity that is part of the practice of engineering is either personally performed by an engineer or directly supervised by an engineer who is a regular full time employee of the business entity."); Louisiana Rules, 46 LA ADC Pt LXI, § 2701(A)(4)(a)(i) ("Firms are not authorized to possess seals."); Nev. Rev. Stat. § 625.407 ("All engineering or land-surveying work done at a place of business must be performed under a professional engineer or professional land surveyor, respectively, who has been placed in responsible charge of the work and who is employed full-time at that particular place of business."); Nevada Rules, NAC 625.610 ("Each licensee shall validate a stamp or seal by signing his name legibly in opaque ink across the face of the impression made by the stamp or seal…"); Cal. Bus. & Prof. Code § 6732 ("It is unlawful for anyone other than a professional engineer licensed under this chapter to stamp or seal any plans, specifications, plats, reports, or other documents with the seal or stamp of a professional engineer."); Utah Code § 58-22-603 ("A professional engineer or professional structural engineer may only affix the licensee's seal….").

[228] Tex. Occ. Code. § 1001.405(b) (requiring business entities that engage in the practice of engineering to register with the Board); *id* at § 1004.405(c) (To register, a business entity annually must complete an application listing, among other things, "the name and address of each officer or director . . . and each engineer who engages in the practice of engineering on behalf of the business entity.").

Engineering.[229]   The licensing of an engineer as a registered professional engineer is limited to individuals.[230]

The Texas Attorney General has issued an opinion stating that, "[p]roperly sealed documents issued by an engineer employed by an unregistered firm are not invalid under that Act." Tex. Att'y Gen. Op. GA-0274 (2004), 2004 WL 2678848 (Tex. A.G.).   The Attorney General noted that "[s]eals carry with them the [engineer's] representation of personal accountability independent of any employment contract with [his or her] employer."   *Id.* (internal citations omitted).  Osborne (Mustang) admitted that no professional engineer has taken full professional responsibility for designs for the mechanical and electrical systems of Atlantis, which is the very purpose of the subpart H certification requirement.[231]

When asked whether Technip, would "review the drawings of another contractor . . . to approve those drawings such that they could be stamped with a professional engineering stamp . . . ," Upchurch replied unequivocally,

> No. Under PE guidelines identified by the State of Texas, the PE stamps can only be applied by *personnel who were materially engaged in the execution of the work.*  So it's not permissible for a PE to simply review someone else's work and stamp it.[232]

---

[229] *See* 22 Tex. Admin. Code § 133.11 ("The board shall receive, evaluate and process all applications for licenser as a professional engineer received from individuals.").

[230] *See, e.g.*, Tex. Occ. Code § 1001.002 (defining "Engineer" as a "person licensed to engage in the practice of engineering in this State"); La. R.S. 37:682(4) ("'Engineer' or 'professional engineer' shall mean an individual . . . ."); Cal. Bus. & Prof. Code § 6701 ("'Professional engineer,' within the meaning and intent of this act, refers to a person…"); Nev. Rev. Stat. § 625.060 ("'Professional engineer' means a person who by reason of his or her professional education and practical experience is granted a license by the Board to practice professional engineering."); Utah Code § 58-22-102 ("'Professional engineer' means a person licensed under this chapter as a professional engineer.").

[231] Dep. of L. Osborne (Mustang) at 112:14-113:9; 140:8-16 (Attach. A, Ex. 53).

[232] Dep. of J. Upchurch (Technip) at 135:9-136:18 (Attach. A, Ex. 50).

Additionally, a seal by a registered professional engineer typically must be an approved state seal image with the individual registered professional engineer's name and license number.  Technip's BP Well Integration and Design Engineering Atlantis Sealing Plan, dated January 7, 2004, follows this standard, defining "Seal or Stamp" as a "raised impression, permanent ink printed or computer generated representation of an approved State seal image, providing the *Professional Engineer's name* and registration/license information.[233]

>    g.    ***BP Acted in Deliberate Ignorance By Submitting Its Production Safety System Certification Without Confirming Its Truthfulness.***

Sustala knew that the subpart H certification statement was false for the work DSME performed.  If Sustala had made even a modest inquiry, then he would have discovered that the certification statement for the Mustang and Technip work also was false.  Sustala knew that the drawings he submitted with the production safety system permit application did not have professional engineer stamps on them, as did Dejohn.[234]  Dejohn also testified that no one at Mustang ever provided BP anything in writing certifying the Atlantis mechanical and electrical systems.[235]  In fact, as the person who managed the contract with Mustang, Dejohn knew that Mustang employed designers with computer-aided design training who actually created the drawings and persons with engineering degrees who billed at lower rates than senior engineers.[236]  Courts have found that an FCA defendant acts in deliberate ignorance or reckless

---

[233] BP Well Integration and Design Engineering Atlantis Sealing Plan § 3.3 [T-USA0001407 at T-USA0001419] (Attach. A, Ex. 90).

[234] Dep. of D. Sustala, Sept. 19, 2011 (BP) at 191:12-16 (Attach. A, Ex. 21); Dep. of K. Dejohn (BP) at 94:15-95:2 (Attach. A, Ex. 29).

[235] Dep. of K. Dejohn (BP) at 107:7-108:4 (Attach. A, Ex. 29).

[236] *Id.* at 103:23-106:16.

disregard when he fails to make a minimal examination of the records that support his claim.  *See Farmer*, 523 F.3d at 348 (*citing UMC Elecs. Co.*, 43 Fed. Cl. at 794); *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997); *United States v. Lorenzo*, 768 F. Supp. 1127, 1131-32 (E.D. Pa. 1991).

> **5.    BP's False Certification Was Material to the Production Safety System Permit Approval.**

Before conducting activities under its Exploration Plan or its Development Operations Coordinations Document, BP was required to obtain approval of the Atlantis Production Safety System.  30 C.F.R. § 250.281.  The subpart H regulations required that BP submit a permit application containing, among other things, a: "5) Certification that the design for the mechanical and electrical systems to be installed were approved by registered professional engineers."   *Id.* at § 250.802(e)(5).   The regulations expressly state that "[p]roduction ***shall not commence*** until the production safety system has been approved and a preproduction inspection has been requested by the lessee."  30 C.F.R. § 250.800(a) (emphasis added).

Domangue, the MMS petroleum engineer who approved the production safety system permit testified that he was trained to follow the applicable statutes and regulations in the permit process and that, until he was satisfied that an applicant had complied with subpart H, he would not approve the permit.[237]  He testified that when he issued the Atlantis permit approval, MMS had the statement from BP certifying that registered professional engineers had reviewed and approved the systems.[238]   He testified further that he always looks for the certification statement in a permit

---

[237] Dep. of B. Domangue (MMS) at 158:19-23; 71:8-16 (Attach. A, Ex. 4).
[238] *Id.* at 67:6-20.

application, and that he would not have issued the permit if he had known the certification was false.[239]   Therefore, BP's false certifications were material to the government's decision to permit BP to install Atlantis.

## C.   DAMAGES ARE EQUAL TO THE ATLANTIS FIELD RESERVES VALUE.

### 1.   Introduction

The United States is entitled to damages equal to the value of the oil and gas BP obtained because of the false permit applications.   Based on BP testimony and relevant documents, the value of historical production through December 31, 2010 from the Atlantis field is $7,852.65 million.[240]   The value of the proved reserves not yet produced as of December 31, 2010 is $17,863.90 million.[241]   The sum of the historical production and proved reserves is $25,716.55 million and is, without dispute, the minimum value of the oil and gas reserves of the Atlantis field.   The contested permits granted BP access to all the oil and gas reserves on the five unitized leases that make up the Atlantis field, using the approved installations.

Should this Court order remediation of the Atlantis or revoke BP's leases, then the appropriate damage value is historical production – trebled – minus royalty payments already submitted to the government.   Absent an injunction, the United

---

[239] *Id.* at 175:13-22; 177:14-178:10.

[240] *See* Decl. of Scott Bayley for reserve values (Attach. E).

[241] BP has three reserve categories: (1) proved reserves; (2) probable reserves; and (3) contingent resources.   Dep. of D. Elmer (BP) at 34:13-35:10 (Attach. A, Ex. 91).   BP is required, for their financial filings with the Securities and Exchange Commission, to provide an estimate of proved resources.   *Id.* at 36:20-37:18.   Proved resources are those that BP has a high confidence are there, usually based on an appraisal well.   BP's corporate representative testified that the sum of proved reserves plus probable reserves is the most likely number that could be above or below actual oil and gas recovery.   *Id.*  at 41:13-44:16.   For the purposes of this motion, Plaintiffs assess damages to the United States as the sum of historical production and proved reserves; there can be no factual dispute that BP has gained the benefit of the proved reserves.   However, the true value of the Atlantis field includes both probable reserves and contingent resources as well.

States is entitled to damages equal to the sum of the historical production and proved reserves – trebled – minus royalty payments.

### 2.    Statutory Basis for Damages

An individual who violates the FCA is liable to the United States for civil penalties of "not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person."  *See* 31 U.S.C. § 3729(a); *see also Cook Cty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 120 (2003) (discussing the treble damages provision).  A purpose of the multiple damages provision of the FCA is to make the Government whole for its losses.  *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943).  To satisfy this purpose, each FCA case requires an individualized approach to calculating damages; "[n]o single rule can be, or should be, stated for the determination of damages under the Act."  *Unites States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (quoting S. Rep. No. 615, 96th Cong., 2d Sess. at 4).

### 3.    The Government Can Recover As Actual Damages The Value Of The Oil and Gas BP Obtained Because Of The False Permit Applications.

The Fifth Circuit has held that damages are limited to the amount that was paid out by reason of the false claim.  *Aerodex,* 469 F.2d at 1011.  More recently, the Fifth Circuit held that in FCA cases, "where there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the amount the government actually paid to the Defendants."  *Longhi*, 575 F.3d at 473.

The *Longhi* court found that the United States received no tangible benefit from a fraudulently induced research grant.  *Id.*  The government had not ordered a specific

product or good under a standard procurement contract, and the end product did not belong to the United States.  *Id.*  Instead, the purpose of the grant program was to enable small businesses to reach a phase where they could commercially market their products, and the benefit to the government was to award money to eligible, small, deserving businesses.  *Id.*  The court found that the "intangible benefit of providing an 'eligible deserving' business with the grants was lost as a result of the Defendants' fraud" and held that the district court appropriately valued damages in the amount the government actually paid to the Defendants.  *Id.*

Here, BP submitted two false permit applications to install the Atlantis platform and production safety system, both prerequisites to producing oil and gas.  Judge Hoyt held that BP received in the bargain, "critical government permits that effectuate[d BP's] right to drill for and develop oil from a federal lease. . . "  *Abbott*, 781 F. Supp. 2d at 464.  Judge Hoyt stated that, "Unless and until the permit process was satisfied, BP did not have the lawful right to drill for, or extract, any oil or gas."  *Id.* at 466.  Prior to the permit approvals, BP's rights under the lease contracts "amounted primarily to an opportunity to try to obtain exploration and development rights in accordance with the procedures under the standards specified in the cross-referenced statutes and regulations."  *Mobil Oil*, 530 U.S. at 620-21.

What the government is supposed to gain through the permit process is the assurance that all production facilities are "designed, installed, and maintained in a manner which provides for efficiency, safety of operation, and protection of the environment," 30 C.F.R. § 250.802(a), and all platforms and related structures are

designed, fabricated, used, maintained, inspected, and assessed, "so as to ensure their structural integrity for the safe conduct of drilling, workover, and production operations," 30 C.F.R. § 250.900(a).   Where a lessee falsely certifies that they have obtained the required engineering approvals and maintain the required documentation for the installations, the "intangible benefit of [the permit process] was lost as a result of Defendants' fraud," and "it is appropriate to value damages in the amount the government actually paid to the Defendants," *Longhi*, 575 F.3d at 473, *i.e.*, the value of the oil and gas obtained.

*Longhi* and other decisions support the finding that where the government receives no value from a bargain, whether the intended intangible benefit was vitiated by a false claim or whether the goods or services received by the government were so deficient as to be worthless, the proper measure of damages is the amount the government paid as a result of the false claim.   For example, in *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008), the Seventh Circuit held that where the government offers a subsidy with conditions, and those conditions are not satisfied, nothing is due.   The appropriate measure of damages in such circumstances is the entire amount received on the fraudulent claims.   *Id.* at 453.   In addition, the Ninth Circuit in *United States v. Mackby*, 339 F.3d 1013 (9th Cir. 2003), ruled that the fact that the defendant's clinic actually performed the physical therapy for which he falsely claimed reimbursement under Medicare does not limit the government's injury.   *Id.* at 1018-19.   The court noted that, "[i]n the legislative history to the FCA, Congress specifically rejected a 'no harm, no foul argument.'"   *Id.* at 1019.   The court went on to state that, "[t]he government has

a strong interest in preventing fraud, and the fraud of such false claims extends beyond the money paid out of the treasury." *Id.* (citing *United States ex rel. Rosales v. San Francisco Housing Auth.*, 173 F. Supp. 2d 987, 1019-20 (N.D. Cal. 2001) (discussing Congress's purpose in the FCA to maintain public confidence in the government by protecting against fraud)).

Further, in *United States v. TDC Management Corp., Inc.*, 288 F.3d 421 (D.C. Cir. 2002), the D.C. Circuit held that the district court did not err in adopting a "but for" measure of damages based on what the government would have paid out had it known the information that TDC omitted from its monthly progress reports. *Id.* at 428.   The court stated that, "[o]nce TDC deviated from its contracted role as impartial ombudsman by seeking a financial stake in joint ventures with private investors and by charging fees for the provision of material assistance to minority entrepreneurs, the district court then could properly find that the Program no longer had any value to the government." *Id.*  The court noted that the Program at issue did not call for TDC to produce a tangible structure or asset of ascertainable value, as occurred in *Ab-Tech Construction, Inc. v. United States*, 31 Fed. Cl. 429 (Fed. Cl. 1994) (holding that the government had not received any loss where it received what it paid for–an automated data processing facility built in accordance with contract drawings and specifications) and *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966) (finding of no damages was not clearly erroneous where government got the mortgage it contracted for).

Moreover, the Sixth Circuit held that an award of government damages equalling the full contract price was appropriate where the brake shoe kits delivered to

the Army were completely valueless, not only because most of them did not meet the contract specifications, but also because none of them came with the quality assurance of a product that had been subjected to periodic production testing required by the contracts. *Compton*, 142 F.3d at 304.

Also, the District Court in *United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158 (D.D.C. 2007), held that, "fraudulently induced government loans (even if repaid in full) are part of the original loss to the government." *Id.* at 179.  The court relied on the D.C. Circuit's ruling in *TDC Mgmt.*, holding that, "[u]ltimately damages are measured based on what the government would have paid out had it known of the information that [the defendant] omitted." *Id.* at 178.  The court noted that *Ab-Tech Construction,* on which Defendant's relied, "constitutes persuasive rather than controlling precedent" and that, "[s]uperior precedent instructs that causation is met where false statements are critical to eligibility for a loan or bear upon the likelihood of an applicant's meeting loan payments.  When these conditions are present, it is likely that the entire amount of federal funds expended on a program would not have been spent." *Id.* at 178.  (internal citations omitted).  The court in *Purcell* held that, "Ex-Im's benefit of the bargain was inextricably intertwined with the fulfillment of its terms and representations (such as the disclosure certificate) of the bargain.  Because this is what the defendants denied to Ex-Im, damages are appropriate." *Id.* at 179-80.

### 4.    The United States Is Entitled to Treble Damages.

Before the government may recover treble damages, it must "demonstrate the element of causation between the false statements and the loss." *United States v. Miller*, 645 F.2d 473, 475-76 (5th Cir. 1981); *see United States v. Hibbs*, 568 F.2d 347, 351 (3d Cir.

1977).  The Third and Fifth Circuits in these cases concluded that the submitter of a false claim should be liable only for those damages that arise because of the *falsity* of the claim, *i.e.*, only for those damages that would not have come about if the defendants' misrepresentations had been true.  *See Miller*, 645 F.2d at 475-76; *Hibbs*, 568 F.2d at 351.

Here, if BP's permit applications had not been false, then the United States would not have "spent" its federal oil and gas reserves on useless assurances that the installations on the outer continental shelf were designed in a sound manner.  The D.C. Circuit has found that if the government can show it relied on representations in a contractor's progress reports in deciding to make payments, "those payments may constitute damages under the Act."  *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 200 (D.C. Cir. 1995).  The court determined that its holding met the falsity test from the Third and Fifth Circuits above because if the contractor's misrepresentations had been true, then the payments would have been money well spent, not money spent on useless goods.  Therefore, the entire payment fraudulently induced may constitute damages.  Here, the government agent who reviewed the Atlantis Production Safety System application testified unequivocally that he relied on BP's false certification when he granted BP the critical permit and that he would not have issued the permit if he had know the certification was false.[242]

### 5. Royalty Payments on Produced Oil and Gas May Be Subtracted From the Trebled Damage Amount.

BP contends that the government suffers no damages from fraudulently acquired permits where a lessee continues to pay royalty payments for produced oil pursuant to

---

[242] Dep. of B. Domangue (MMS) at 67:6-20; 175:13-22; 177:14-178:10 (Attach. A, Ex. 4).

its lease provisions.  As the United States pointed out earlier in this case, "BP does not merely overstate the importance of its lease, it also cheapens the importance of the permit application process."  Doc. 69 at 13.  Even if the Court were to conclude that BP had conferred a benefit on the government through royalty payments, the government's damages clearly are not zero, as BP suggests.  Any benefit would be treated properly as an offset after trebling the full value of the improperly secured oil and gas.  *See Longhi*, 575 F.3d at 469 n.11 *and United States v. Thomas*, 709 F.2d 968, 972 (5th Cir. 1983) (both citing *United States v. Bornstein*, 423 U.S. 303, 314 (1976) (superceded on different grounds)).  Otherwise, defendants "would not have risked losing anything by [their] misconduct except for the illegal profit to which [they were] never entitled anyway, while had [they] never been brought to account for [their] fraud [they] would have been free to enjoy [their] unlawful gains with impunity."  *Faulk v. United States*, 198 F.2d 169, 172 (5th Cir. 1952).

## D.   THE ATLANTIS SHOULD UNDERGO AN AGGRESSIVE AUDIT AND REPAIR OR BP'S LEASES SHOULD BE REVOKED.

### 1.   Introduction

BP's OCSLA violations have created major process safety risks on Atlantis.  The critical pressure relief valves are inadequate for service, posing the risk of oil and gas release and consequent fire or explosion.  The production safety system controls on Atlantis do not comply with emergency shutdown logic as required by MMS and are plagued with numerous malfunctions which have resulted in repeated loss of well control.  Indeed, wells are being run for months at a time without redundant electronic

communications to the wells.  These are major dangers to safety and the environment and are a direct result from incomplete engineering.

The rules and regulations issued by the Secretary of the Interior under OCSLA "apply to all operations conducted under a lease issued or maintained under the provisions of [OCSLA]."  43 U.S.C. § 1334(a).  Therefore, BP's regulatory violations[243] regarding Atlantis amount to statutory violations of OCSLA.  The regulatory violations are also violations of the Atlantis leases, which are "conditioned upon compliance with regulations issued under [OCSLA]." 43 U.S.C. § 1334(b).  BP's violations present an imminent risk of long term or irreparable harm to the Gulf of Mexico ecosystem for which there is no adequate remedy at law, and the operation of Atlantis should be enjoined until BP comes into compliance with the critical regulations.  In the alternative, BP's leases should be forfeited and cancelled by this Court pursuant to 43 U.S.C. § 1334(d).

### 2.     Plaintiffs Have Standing to Seek Injunctive Relief Under OCSLA.

Article III of the Constitution allows federal courts to decide only "actual cases or controversies," and "[t]he concept of standing is part of this limitation."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) ("Standing to sue is part of the common understanding of what it takes to make a justiciable case.").  To meet the Article III requirements for standing, a plaintiff must demonstrate that: (1) it has suffered an "injury in fact" that is actual and imminent, not conjectural or hypothetical; (2) there is a causal connection between

---

[243] BP is in violation of, *inter alia*, 30 C.F.R. § 250.800; 30 C.F.R. § 250.802(a), (b), (e); 30 C.F.R. § 250.900(a), (b), (c)(2002); and 30 C.F.R. § 901(d) (2002); 30 C.F.R. § 250.803(b)(1); 30 C.F.R. § 250.803(b)(1)(i).

injury complained of and the challenged action; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).   Only one plaintiff, Abbott or FWW, need establish standing to satisfy Article III's case-or-controversy requirement.   *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981).

As an association, FWW may sue in its own right or on behalf of its constituents. To sue in its own right, FWW "must demonstrate that [it] has suffered injury in fact, including such concrete and demonstrable injury to [its] activities-with [a] consequent drain on [its] resources-constituting ... more than simply a setback to [its] abstract social interests."  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quotations and citations omitted).  It is sufficient for standing purposes "that purported illegal action increases the resources the group must devote to the programs independent of its suit challenging the action."  *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  To sue on behalf of its members, FWW may demonstrate standing as long as "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (internal citation omitted).  For representational standing, FWW "must demonstrate that it has at least one member who . . . can

establish the elements of standing." *Friends of the Earth, Bluewater Network Div. v. U.S. Dept. of Interior*, 478 F. Supp. 2d 11, 17 (D.D.C. 2007).  Here, FWW has demonstrated both organizational and representational standing.

### a.       Plaintiffs Will Be Injured if BP is Not Enjoined.

To meet the first prong for standing, the plaintiffs must "have a direct stake in the outcome." *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972) (*superseded on other grounds*).   The plaintiffs need to suffer harm to some aesthetic, environmental, or recreational interest.  *Id.* at 734-35.  "These injuries need not be large, an 'identifiable trifle' will suffice." *Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 71 (3d Cir. 1990) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14 (1973)). The Fifth Circuit has found the injury requirement satisfied when an organization, on behalf of its members, sought to prohibit the draining of several ponds.  *See Save Our Comm. v. E.P.A.*, 971 F.3d 1155, 1160-61 (5th Cir. 1992).   That organization asserted that "its members resided in the vicinity of or owned property [nearby], and enjoyed 'the wildlife, aesthetics, open space, ecological and other values of the wetlands, ... and [were] directly and beneficially interested in the continued protection, preservation, and enhancement of these values.'"  *Id.* at 1160-61.

In denying BP's Motion to Dismiss, Judge Hoyt held that plaintiffs here maintain interests similar to those recognized in *Save Our Comm.  See Abbott*, 781 F. Supp. 2d at 470.[244]  The Court noted that

---

[244] Two other Courts of Appeals have found allegations similar to plaintiffs sufficient to confer standing under OCSLA.  First, in *Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 563 F.3d 466, 479, 483-4 (D.C.

> Abbott is a Texas native and has a direct interest in the protection, preservation and enhancement of the Gulf of Mexico environment. Further, Abbott and FWW members are 'directly and beneficially interested in the continued protection, preservation and enhancement of' values derived from the Gulf of Mexico environment. These interests are germane to FWW as an organization that promotes safe and sustainable seafood for customers while simultaneously helping protect the environment and supporting the long-term well-being of coastal fishing communities.

*Id.*

Specifically, Abbott, a native of the Gulf Coast of Texas, has a direct interest in the protection, preservation, and enhancement of the Gulf of Mexico environment.[245] Abbott avers that he has frequented Galveston to enjoy its beaches, fish and recreate in its waters, and simply to enjoy the aesthetics of Gulf of Mexico. He likewise enjoys consuming seafood derived from the Gulf of Mexico. As a result, Abbott maintains a direct interest in ensuring his future ability to enjoy these activities.

FWW member Donna M. Boland, who owns property on the Gulf Coast in South Padre Island, avers her economic interest in rental income from her property, her aesthetic interest in the vegetation and wildlife of the Gulf Coast, and recreational interests in the temperature of Gulf Coast water and desire to consume Gulf Coast seafood are threatened by BP's failure to abide by the law.[246]

---

Cir. 2009), the D.C. Circuit found that an environmental group had standing to bring a citizen suit under OCSLA standing where the particularized interest was enjoyment of the indigenous animals of the Alaskan areas in the Leasing Program. The Court determined that DOI's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to the Center for Biological Diversity's members' enjoyment of the animals affected by the offshore drilling and that setting aside the Lease would redress harm. Second, in *Conservation Law Found. of New England, Inc. v. Sec'y of Interior*, 790 F.2d 965, 969 (1st Cir. 1986), the First Circuit found that an environmental group had standing to bring an OCSLA citizen suit action where its members "depend upon the fishing resources and marine environment of Georges Bank . . . for food, recreation, scientific study, and commercial benefits." *Id.*

[245] *See* Decl. of Kenneth Abbott (Attach. F).
[246] *See* Decl. of Donna Boland (Attach. G).

FWW member Allen Estay, who lives in Louisiana adjacent to the bayou approximately 25 miles from the Gulf of Mexico, avers that he is the owner and operator of Bluewater Shrimp Company, which purchases and processes shrimp caught by fisherman in the Gulf of Mexico and that the Deepwater Horizon oil spill has significantly harmed his business.[247]   He avers that his economic interest in his business, his recreational interests boating, fishing, and swimming in the Gulf of Mexico, and his aesthetic interest in the birds and wildlife of the Gulf of Mexico and bayou are threatened by BP's failure to comply with the environmental laws and regulations that apply to the Atlantis and are meant to prevent accidents and protect the marine environment and resources of the Gulf of Mexico.

FWW member Nancy James, who lives in Santa Rosa Beach, Florida, 500 yards from the Gulf of Mexico, avers an economic interest in the value of her property that is directly related to good water quality, pollution-free beaches, and nearby beach-related recreational activities.[248]   James avers that her economic interest in her townhouse and her recreational and aesthetic interests in swimming, boating, and bird-watching are threatened by BP's failure to abide by the law.

In addition, FWW chief operating officer Lane Brooks avers the OCSLA claims are germane to FWW's organizational mission and that, as a result of BP's violations of law with respect to Atlantis, FWW had suffered a subsequent drain on its resources.[249] FWW has spent significant resources including months of staff time on efforts to educate the public, members of Congress, and MMS regulators about the problems at

---

[247] *See* Decl. of Allen Estay (Attach. H).
[248] *See* Decl. of Nancy James (Attach. I).
[249] *See* Decl. of Lane Brooks (Attach. J).

the facility.  Brooks avers that a threat of an oil spill from the Atlantis injures FWW's interests because it would force the organization to spend more of its resources on educating consumers about the unsafe nature of Gulf seafood and its work to prevent fish farming, imported seafood, and the country's reliance of natural gas obtained through fracking.

The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy standing requirements.  *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979).  Further, courts have allowed standing in environmental harm cases based on an alleged increased risk of harm, reasoning that environmental and health injuries are often purely probablistic.  *See, e.g., Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) (Finding standing where Plaintiffs allege motor-vehicle emissions will cause rise in sea level associated with increased greenhouse gas emissions, stating: "The risk of catastrophic harm, though remote, is nevertheless real."); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234-35 (D.C. Cir. 1996) ("The more drastic the injury that government action makes more likely, the lesser the increment in probability to establish standing."); *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993) ("[E]ven a small probability of injury is sufficient to create a case or controversy-to take a suit out of the category of hypothetical-provided of course that the relief sought would, if granted, reduce the probability"); *Natural Res. Def. Council ("NRDC") v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,

204 F.3d 149, 160 (4th Cir. 2000); *Overseas Shipholding Group, Inc. v. Skinner*, 767 F.Supp. 287, 293 (D.D.C. 1991) (increased risk of water pollution which would result from a major oil spill due to change in ship configuration sufficient for standing); *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 556 (1996) ("That this injury is couched in terms of future impairment rather than past impairment is of no moment.").

Just as in *Mountain States*, even an incremental increase in the risk of a major oil discharge from deepwater Atlantis in the Gulf of Mexico is a sufficient threat to environmental interests to support standing. Glen Stevick, a registered professional engineer in the states of California, Nevada, and Utah, testified that, where BP has over 7,000 drawings for Atlantis that are not stamped by a registered professional engineer or marked "as-built," no one knows what stage of engineering the drawings really reflect. [250] Stevick concludes that it is *almost certain* that a safety problem will occur.

### b. Plaintiffs' Threatened Injury is Traceable to BP's Conduct.

BP's failure to maintain engineering documents required by MMS regulations creates a substantial likelihood that the plaintiffs' threatened harm will become a reality. Plaintiffs are not required to show with "scientific certainty" that BP "caused the precise harm suffered by the plaintiffs" in order to show that an injury is "fairly traceable" to BP's actions. *See Lujan*, 504 U.S. at 560-61; *Save Our Comm.*, 971 F.2d at 1161. Instead, the "plaintiffs need only show that there is a 'substantial likelihood' that defendant's conduct caused [or could cause] plaintiffs' harm." *Powell Duffryn Terminals, Inc.*, 913 F.2d at 72 (internal citation omitted).

---

[250] *See* Decl. of Glen Stevick at ¶¶ 1-5 (Attach. D); Dep. of G. Stevick at 48:4-54:5 (Attach. A, Ex. 92).

MMS relies on the regulations in question to prevent oil spills.  Indeed, the April 17, 2003 Site-Specific Environmental Assessment, SEA No. N-7646, for Atlantis shows that strict enforcement of MMS regulations regarding engineering and safety requirements for production safety systems, which include the requirement that the "design for the mechanical and electrical systems to be installed were approved by registered professional engineers," prevents or minimizes the potential for oil spills and resulting damage:

> **Spill Prevention**
> The MMS has comprehensive pollution-prevention requirements that include numerous redundant levels of safety devices, as well as inspection and testing requirements to confirm that these devices work. Many of these requirements have been in place since about 1980. Spill trends analysis for the GOM OCS show that spills from facilities have decreased over time, **indicating that MMS's engineering and safety requirements have minimized the potential for spill occurrence and associated impacts. Details regarding MMS's engineering and safety requirements can be found at 30 CFR 250.800 Subpart H.**[251]

BP's Environmental Impact Assessment submitted in December 2002 likewise relies upon the enforcement of protections provided by 30 C.F.R. § 250, subpart I, including the very regulation requiring engineering drawings for the platform to be certified by a registered professional engineer.[252]

Additionally, Dr. Richard Pierce, a chemical oceanographer and director of the Mote Marine Laboratory Center for Ecotoxicology, testified that a major deepwater

---

[251] Site-Specific Environmental Assessment, SEA No. N-7646 at E-2 (Apr. 17, 2003) [FWW0008573 at FWW0008620] (Attach. A, Ex. 93).

[252] DOCD, Environmental Impact Statement § 8.3, [BPEP_ABB_03534784] (Dec. 2002)("BP has submitted a proposed Platform Verification Plan to the MMS that will demonstrate that the proposed platform structure and moorings will be designed, fabricated, installed, used, inspected, and maintained to assure structural integrity for the safe conduct of production operations considering the specific environmental conditions at the platform location as mandated by Title 30, Chapter II, Subchapter B, Subpart I - Platforms and Structures, Sections 250.900 -250.914.") (Attach. A, Ex. 94).

discharge of crude oil would have irreparable and long-term adverse impacts on the Gulf of Mexico ecosystem.[253]   Dr. Pierce's expertise is in the fate and effects of toxic chemicals in the aquatic environment.   His conclusions are not speculative - they are based on published scientific studies, previous oil spills, published data, and toxicity data of chemical components of crude oil.[254]   He testified that the Gulf of Mexico ecosystem has been compromised by the Deepwater Horizon disaster and that an additional spill could cause irreversible damage to recovering ecosystems.[255]

Accordingly, failure to comply with the regulations is "fairly traceable" to plaintiffs' threatened injury.

### c.   Plaintiffs' Claims are Redressable.

The third prong of standing requires that a plaintiff's injuries be capable of redress by the requested relief.   *Lujan*, 504 U.S. at 560-61.   Requiring BP to halt production at Atlantis until compliance is verified or forfeit its leases would redress the plaintiffs' threatened harm because BP's violations of OCSLA and its implementing regulations create an impermissible, inherent risk of an incident at Atlantis.   Until the risk of such an incident can be remedied, prohibiting production at Atlantis ensures protection of the environment and thereby of the plaintiffs' interests.   *See, e.g., W. Va. Highlands Conservancy v. Johnson*, 540 F. Supp. 2d 125, 143 (D.D.C. 2008); *Natural Res. Def. Council v. E.P.A.*, 489 F.3d 1364, 1371 (D.C. Cir. 2007); *see also Warth v. Seldin*, 422 U.S. 490, 515 (1975) (explaining that when an associational plaintiff "seeks a declaration,

---

[253] Dep. of R. Pierce at 19:15-25; 23:4-12; 122:10-123:9; 124:15-16; 127:9-16; 161:10-24; 170:25-171:10 (Attach. A, Ex. 95).

[254] *Id.* at 37:13-21; 58:6-59:22; 119:22-120:10.

[255] *Id.* at 107:23-109:3; 169:20-170:24.

injunction, or some other form of prospective relief, it can reasonably be supposed that

the remedy, if granted, will inure to the benefit" of the association's members).

Summarizing the more detailed issues of standing discussed above, the Supreme Court

recently clarified, "[a]t bottom, the gist of the question of standing is whether

petitioners have such a personal stake in the outcome of the controversy as to assure

that concrete adverseness which sharpens the presentation of issues upon which the

court so largely depends for illumination." *Massachusetts*, 549 U.S. at 517. Plaintiffs

here have demonstrated a personal stake in the outcome of this litigation and meet the

test for standing.

### 3.      BP's Continued Operation of Atlantis Is Dangerous.

For a permanent injunction to issue, the plaintiff must prevail on the merits of his

claim and establish that equitable relief is appropriate in all other respects. *See Amoco

Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987). The elements required for

injunctive relief are: (1) a substantial likelihood that the parties will prevail on the

merits, (2) a substantial threat that the parties will suffer irreparable injury if the

injunction is not granted, (3) the parties' threatened injury outweighs the threatened

harm to the party whom the parties seeks to enjoin, and (4) granting the preliminary

injunction will not disserve the public interest. *Lake Charles Diesel, Inc. v. GMC,* 328 F.3d

192, 195 (5th Cir. 2003) (quoting *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,*

760 F.2d 618, 621 (5th Cir. 1985)).

However, the Fifth Circuit has recognized that courts may issue "an injunction

without making findings of irreparable harm, inadequacy of legal remedy, or the

balance of convenience, provided that traditional equitable principles permit such a

course of action." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996).   The Fifth Circuit in *Marine Shale Processors* considered two such traditional principles of equity-wilfulness and protecting the public interest.   Both are applicable here.  BP has acted with at least reckless disregard to the truth of its certifications in the critical permit applications, and another massive oil spill in the Gulf of Mexico would cause significant harm to the public interest.

> ### a. BP Has Violated OCSLA and MMS Regulations.

As to the first element, plaintiffs have established above BP's violations of OCSLA and MMS regulations.

> ### b. BP's Conduct Poses a Substantial Threat of Irreparable Harm.

Simply put, the longer Atlantis remains operative without statutorily required engineering documents, the greater the risk of an oil spill.   Previous catastrophes at facilities similar to Atlantis establish not only the importance of regulatory compliance but also the fragility of the environments surrounding these facilities.   The Gulf of Mexico just recently suffered the devastating effects of the Deepwater Horizon disaster. In addition to the immediate loss of human life, birds drowned in oil, dolphins washed onshore, and land was covered in oil, and the massive oil spill has caused long term and irreparable harm to the Gulf of Mexico ecosystem.   Compliance with OCSLA regulations serves to protect the public from such catastrophes, and BP's persistent and ongoing regulatory violations jeopardize the safety and welfare of persons, property, and the environment.

(1)    *BP's Failure to Obtain Approval By Registered Professional Engineers of its Designs Increases the Risk of an Oil Spill or Explosion.*

(a)    **Introduction**

States regulate the practice of engineering to protect the heath, safety, and welfare of their citizens.[256]   Some states began regulating the practice of engineering only after the occurrence of disasters attributable to engineering failures.  For example, Texas began regulating the practice of engineering in 1937, months after hundreds died in an explosion in a school in New London caused by a natural gas leak attributed to faulty engineering.  California began regulating the practice of engineering after the failure of the St. Francis Dam in 1928, which killed more than 500 people.[257]

A registered professional engineer duly licensed by a state typically has graduated from an engineering or science curriculum that is approved by a licensing authority, has engaged in the practice of engineering for a period of years, has passed the examination requirements set by the state, and has met minimum character requirements.[258]   Further, registered professional engineers are typically subject to continuing education requirements.[259]

The costs for services of a licensed registered professional engineer are usually higher than for services of less experienced engineers who are not licensed registered

---

[256] *See, e.g,* Tex. Eng. Prac. Act § 1001.401(a) – (b) ; La. R.S. 37:681; Cal. Bus. & Prof. Code § 6704; Nev. Rev. Stat. § 625.005; Utah Rules, Utah Admin. Code r. R156-22-302c; Decl. of Glen Stevick ¶16 (Attach. D).

[257] *The Professional Engineering* at 27 – 29 (Nat'l Soc. Prof. Eng. July 2007) (Attach. A, Ex. 84); Decl. of Glen Stevick at ¶ 20 (Attach. D).

[258] For example, see Tex. Eng. Prac. Act § 1001.302 - .304; La. R.S. 37:693-95 Cal. Bus. & Prof. Code § 6751-59; Nev. Rev. Stat. § 625.183; Utah Code § 58-22-302; Decl. of Glen Stevick at ¶ 21 (Attach. D).

[259] *See, e.g.,* Texas Rules § 137.17; La.R.S. 37:697.1 Nevada Rules, NAC 625.430; Utah Code § 58-22-304.

professional engineers.[260]   As a result, unless approval or certification of engineering designs by a registered professional engineer is required and enforced, a company will have an economic incentive to use less experienced engineers, increasing the risk of harm from faulty engineering.  Effects of BP's failure to use appropriately credentialed registered professional engineers are evident in the numerous engineering-related failures and dangers discussed below.

> **(b)      Atlantis Pressure Relief Valves Are Not Fit for Service According to BP's Own Criteria.**

Production platforms such as Atlantis process hydrocarbons through pressure vessels.  The production safety system is required to include pressure relief valves to avoid explosions or loss of containment due to overpressure; both pressure vessels and their pressure relief valves are required to comply with applicable provisions of the American Society of Mechanical Engineers ("ASME") Boiler and Pressure Vessel Code. 30 C.F.R. § 250.803(b)(1).   "The relief valves shall conform to the valve-sizing and pressure-relieving requirements specified in [ASME]  documents; . . ."  30 C.F.R. § 250.803(B)(1)(i).

During December 2009, a BP internal "S&O" Audit found that Atlantis did not have necessary "sizing calculations" for 150 of its 401 pressure relief valves.[261]   The Audit found Atlantis in violation of requirements that it "have documented engineering

---

[260] *See, e.g.,* Dep. of L. Osborne (Mustang) at 152:20 – 23 (Attach. A., Ex. 53); Decl. of Stevick at ¶ 23 (Attach. D).
[261] Gulf of Mexico SPU - Atlantis S&O Audit, 30 November 2009 to 11 December 2009, Entity Verifiable Findings, Audit 0935 [BPEP_ABB_04147184 & BPEP_ABB_04147199] (Attach. A, Ex. 96).

data to demonstrate that existing facilities are fit for service;" Atlantis was directed to obtain or re-create the missing calculations.[262]

Sizing calculations are a necessary part of the engineering design for pressure relief valves.  Sizing calculations constitute the unique design basis for each valve; they become permanent safety information pertaining to the equipment that is vital for ensuring mechanical integrity and fitness for service.[263]  By the time of the S&O Audit, BP Atlantis had been in operation for over 3 years without the necessary design basis for over one-third of its critical pressure safety valves.

BP obtained the services of WorleyParsons, a well-known engineering firm, which produced a number of reports on the pressure relief valves.  Mike Sawyer's attached Declaration provides his findings through the date of the report.

> During the sizing study Parsons found that a number of valve[s] in service are inadequate (undersized), others had missing data that is now unavailable from the manufacturer, and still others had missing and/or incomplete inlet/outlet piping calculations.[264]

The most serious finding regarded PSV-41003, a valve that is located to protect a 16" diameter oil pipeline that carries the processed oil off the platform toward shore. WorleyParsons sizing calculations for that valve determined it to be "inadequate" for service.[265]

WorleyParsons calculations found the ASME required relief area (size) for a valve for this service to be almost 60 sq. in. compared to the ASME size of the valve

---

[262] Audit Report, Safety & Operations Audit, Final Report 13, January 2010 [BPEP_ABB_04147214 at BPEP_ABB_04147241] (Attach. A, Ex. 97)
[263] Decl. of Mike Sawyer, March 30, 2012 at ¶¶ 7-10 (Attach. K)
[264] *Id.* at ¶ 10.
[265] *Id.* at ¶¶ 11-17; WorleyParsons, PSV-41003 Sizing Check Calculation, August 19, 2010 [BPEP_ABB 02828782 at BPEP_ABB_02828784, BPEP_ABB_02829785 (Attach. A, Ex. 98).

actually in service of less than 3 sq.in.  The valve is undersized by a factor of 20 to 1, demonstrated by the graph below:



The required relief rate must allow outflow from the pipeline in the amount of over 25,000 gallons per minute, obviously impossible by far for a relief area under three inches.

WorleyParsons determined the most credible and plausible scenario requiring operation of PSV-41003 was a power failure shutting down the pipeline pumps, with leakage through the check valve back to the oil pipeline.[266]  This would create back flow in the pipeline requiring the protection of a valve with a relief area of at least 59.5 sq. in. A smaller relief valve is not fit for this service and does not "conform to the valve-sizing and  pressure-relieving  requirements"  of  ASME  in  violation  of  30  C.F.R.  § 250.803(b)(1)(i).  Failure to provide a valve at the location of PSV-41003 adequate to

---

[266] Decl. of Mike Sawyer, March 30, 2012 at ¶¶18-19 (Attach. K).

relieve the required excess capacity during an upset could result in a release of hydrocarbons within the production module and subsequent fire or explosion or both. A release of hydrocarbons under pressure from a pipeline such as this would likely take the form of a highly flammable vapor cloud that could rapidly engulf the platform; any ignition source could cause explosive ignition of the vapor cloud with catastrophic results.

Such a scenario is quite similar to the immediate cause of both the Deepwater Horizon and Texas City tragedies.[267]   On Deepwater Horizon, the pressure relief volume overwhelmed the flare header, escaped containment and ignited.   At Texas City, a combination of liquid and vapor hydrocarbons escaped containment and was explosively ignited.  It is well established that such a release of hydrocarbons

> is a factor in virtually all threats to safety.  Thus, the major objective of the safety system should be to prevent the release of hydrocarbons from the process and to minimize the adverse effects of such releases if they occur.[268]

Power losses resulting in platform shutdowns have already occurred on Atlantis on multiple occasions.  Among the emails discussing controls malfunctions (discussed at Section D.3.b.1.c below), there are several which record platform power failures leading to total loss of power on the platform and shutdown of the platform.[269]   The

---

[267] *Id.* at ¶¶ 11-12.
[268] API RP 14C -- Recommended Practice for Analysis, Design, Installation, and Testing of Basic Surface Safety Systems for Offshore Production Platforms, Sec. 3.2, p. 7 (Attach. A, Ex. 77).
[269] *See, e.g.,* June 15, 2008 Root Cause Analysis Report – Gas Turbine Generator ZAN-500 Shutdown [BPEP_ABB_04135740] (Attach. A, Ex. 99); Feb. 11, 2008 Email from F. Ragan to W. Dean (Technip) [BPEP_ABB_03514575] (Attach. A, Ex. 100); Sept. 22, 2007 Email from S. Maxwell to R. Oneta [BPEP_ABB_03502155 to BPEP_ABB_03502156] (Attach. A, Ex. 101).

total number of loss of power events is unknown, because the automatic logs generated by the controls system to record system events have been lost or destroyed.[270]

When such power losses cause platform shutdowns, WorleyParsons' analysis finds the pipeline protection left only to check valves.  As Mr. Sawyer explains,

> Check valve failure is quite common. In fact, when conducting HAZOP Studies, a check valve is not an acceptable safeguard.  According to API RP 520 (2007) Section 4.3.4.4, check valves cannot be relied on to be leak free for relief purposes.[271]

The WorleyParsons report to BP is dated August, 19, 2010.  It documents a clear and present danger of catastrophe to the platform with *no* acceptable protection. Today, 4 ½ years after start of production, and eighteen months after the WorleyParsons report, the inadequate valve is still in place.[272]

And, as Mr. Sawyer's Declaration makes clear, this is only one of many PSVs which are either inadequate, or which cannot be documented as fit for service for other reasons.[273]

> **(c)   Atlantis Production Safety System Subsea Controls System Has Experienced Repeated Malfunctions Resulting In Loss of Well Control.**

The design of the critical shutdown system of Atlantis, which is an essential part of the production safety system, violates both federal regulations and the Atlantis production safety system permit itself.[274]   The electro-mechanical controls for the

---

[270] Dep. of S. Cotton (BP) at 5:13-14; 8:20-23; 9:19-10:3; 21:1-22:20; 23:12-25; 33:15-34:2; 36:5-18; 38:5-39:6 (Attach. A, Ex. 102).
[271] Decl. of Mike Sawyer, March 30, 2012 at ¶ 19 (Attach. K).
[272] Piping & Instrument Diagram, Pipeline Pumps (Drawing No. 1440-20-PI-DG-4389) [BPEP_ABB_02832882] (Attach. A, Ex. 103).
[273] Decl. of Mike Sawyer, March 30, 2012 at ¶¶ 20-23 (Attach. K).
[274] Aug. 26, 2008 Email from Berger to Broman [BPEP_ABB_ 03579591 to BPEP_ABB_0357952] (Attach. A, Ex. 104).

Atlantis shutdown system have malfunctioned repeatedly from before start-up until now.  The system was designed and is administered by persons who are not registered professional engineers and who seem to accept system instability and repeated malfunction as a way of life.  The safety shutdown logic drawings were not approved by a registered professional engineer *or by any person whatsoever* before being included as part of the controls system.[275]

Maintaining well control is a critical congressional policy.  43 U.S.C. § 1332(6).  The Atlantis subsea controls system is intended to control undersea well valves and receive data from undersea sensors through redundant data links (two to each well) running several miles to the wells.   Repeated and continuing malfunctions have resulted in total loss of communications on both redundant paths, resulting in loss of well control,[276] as well as loss of redundancy in communications with the wells.[277]

Nearly a thousand pages of emails, summarized in a controls malfunction timeline[278] report total or partial losses of well control events including: (a) multiple failures of single board computers  which send and receive data communications to the wells, causing total loss of well control on both redundant channels to two wells simultaneously; (b) loss of all communications with a well on one data channel; (c) partial or intermittent loss of data communication with a well; and (d) loss of data from downhole gauges.   In other loss of well control events there have been erratic or

---

[275]  Safety Shutdown Logic Drawings , BP. Doc. No. 1440-35-SB-DG-3021 through 3030 [BPEP_ABB_03359747 to BPEP_ABB_03359757] (Attach A., Ex. 105 – redacted).

[276] Dep. of S. Cotton (BP) at 21:23-22:10 (estimating 5-10 total loss of communication events) (Attach. A, Ex. 102).

[277] Dep. of K. Angel (BP) at 18:4-20:11 (Attach. A, Ex. 106); Aug. 26, 2008 Email from Berger to Broman [BPEP_ABB_ 03579591 to BPEP_ABB_0357952] (Attach. A, Ex. 104).

[278] Controls System Malfunctions Timeline and supporting documentation (Attach. A, Ex. 107).

improper operation, including: (a) well tree valves opening and closing uncommanded; (b) uncommanded well shut-in events; (c) failure of the choke valve (used as a shut off valve in emergencies) to open and close as commanded; (d) failure of the choke valve fast acting module [used for quick shutdown in emergencies] to function.   Other miscellaneous malfunctions have included: operator screens presenting an inaccurate subsea situational picture; malfunctions of SmartTool (a software program used to control the valves); subsea power and control unit (a major component of the subsea controls system) malfunctions; the multiple malfunctions and improper data readings of subsea electronics module (a device which sends and receives data communications on the well tree) and a large quantity of network errors related to operating the fastcan server.   From the start of production (Oct. 6, 2007) until about the end of 2008, these malfunctions were documented by email frequently.

From early 2009 to the present day, the problems have continued but with little documentation produced by BP.  Keith Angel, who became head of the subsea team in May 2009, testified that (1) on Well 112, he has lost data communications on one data line and has been running the well with one non-redundant communication path for 4-5 months;[279] (2) on Well 131, he has had a similar problem for about 6 months or so;[280] (3) on Wells 123 and 124 (which share the same communications line), he has a probable ground fault which was discovered through the line insulation monitor.[281]  The line insulation monitors, in general, have provided erratic data since January 2008.[282]  The

---

[279] Dep. of K. Angel (BP) at 18:4-20:11 (Attach. A, Ex. 106).
[280] Id. at 20:16-21:13.
[281] Id. at 23:3-21.
[282] Jan. 3, 2008 Email from B. Young to N. Oza and R. Berger [BPEP_ABB_03512831] (Attach. A, Ex. 108).

reason for the erratic data has never been diagnosed, and BP claims the problem "spontaneously" resolved itself in June 2011, but an unresolved, undiagnosed problem is likely to surface again.[283]

Angel recalled other problems, such as having to change out at least three subsea electronics modules, changing out a number of faulty fast acting choke valve modules, having Well 131 shut itself during a restart.[284]   Indeed, BP had to reset the subsea power and control unit in order to regain communications with the well.   There were other problems that Angel could not recall well enough to list.[285]

Loss of communications between the operator and the well means a loss of control of the flow and flow path of oil and gas production.   The communications links carry data information from subsea sensors related to pressure, temperature, and flow rate.   Loss of one of the two data paths eliminates redundancy, and redundancy is required for safe operations.   Loss of both communications pathways creates the unsafe condition of wells "running blind," with no ability to send control signals or receive data through the electronic communications.

Additionally, the uncommanded opening, closing, and cycling of well valves represents a loss of control of the well.   During a 5 ½ hour period in January 2008, the Atlantis Event Log recorded approximately 1,000 events where the controls system on well DC 124 acted independently of the operator.[286]   One of the valves that opened repeatedly was the cross over valve, which is a valve that connects the production

---

[283] Dep. of K. Angel  (BP) at 23:22-25:8 (Attach. A, Ex. 106).
[284] *Id.* at 25:21-27:17.
[285] *Id.* at 27:4-5.
[286] Jan. 7, 2008 Email from N. Oza re: FW Subsea vavles (sic) opening without request [BPEP_ABB_04125309] (Attach. A, Ex. 109).

tubing (which contains oil and gas production under high pressure) to the annulus.[287]

The valve  movement released oil into the annulus, which could have created a hydrate

often associated with blowouts.[288]   On another occasion, the controls system shut-in

Well 122 entirely without being commanded, as Angel later reported happened on Well

131.[289]

**(d)      The Design of the Atlantis Controls Violated
Federal Regulations.**

Even  more  critical  than  these  recurring  instabilities,  the  Atlantis  shutdown

system  does  not  comply  with  federal  requirements  for  emergency  shutdown,  and  BP

has  failed  to  notify  MMS  of  its  violation  or  remedy  the  defective  design.    Federal

regulations require the major safety shutdown valve, located deep in the well bore, to

close  within  2  minutes,  45  seconds  (2:45)  of  automatic  detection  of  an  abnormal

condition  on  the  platform.    30  C.F.R.  §  250.803(b)(4)(ii).    MMS  granted  Atlantis  a

"deviation"  to  allow  the  valve  to  remain  open  up  to  one  hour  using  a  "delay  timer,"

but, during the delay period, other valves controlled through the electronic data links

must close to shut off well flow.[290]   Use of the delay timer is prohibited if total ("dual")

loss of communications with a well exists, since the electronic data paths could not close

any valves in that situation.   However, the design of the Atlantis controls system failed

to effectively incorporate that prohibition, so that the controls system allows the delay

---

[287] Jan. 7, 2008 Email from W. Broman to N. Oza [BPEP_ABB_03559672 to BPEP_ABB_03559673] (Attach. A, Ex. 110).

[288] Dep. of R. Berger, Nov. 2, 2011 (BP) at 98:12-25; 147:19-23 (Attach. A, Ex. 111); *see also* Dep. of J. Upchurch (Technip) at 144:5-145:1 (Attach. A, Ex. 50).

[289] Aug. 10, 2008 Email from J. Little Re: DC122 Shut in [BPEP_ABB_03626944 to BPEP_ABB_03626945] (Attach. A, Ex. 112).

[290] *See* May 3, 2007 Letter from B. Domangue, MMS, to D. Sustala, BP [BPEP_ABB_00085724 to BPEP_ABB_00085727](Attach. A, Ex. 79); Dep. of B. Domangue (MMS) at 203:4-204:14 (Attach. A, Ex. 4).

101

timer to be used even when total loss of communication with wells exists, as explained in more detail below.

The Atlantis shutdown system implementation involves two interrelated controls systems, the emergency support system and the subsea controls system.[291]   30 C.F.R. § 250.801(i).  Critical engineering documents related to these systems were not approved by registered professional engineers.[292]

In an emergency shutdown, the surface safety valve (or boarding valve) must close within 45 seconds after the safety system detects an abnormal condition.  The subsurface safety valve located deep in the well bore must close within two minutes thereafter (a total of 2:45).  30 C.F.R. § 250.803(b)(4)(ii).  For Atlantis, this second valve is called the surface-controlled subsurface safety valve.  30 C.F.R. § 250.803(b)(4).  The surface-controlled subsurface safety valve is required to close in response to shut-in signals from the emergency support system, or signals from fire detection devices.  30 C.F.R. § 250.801(i).

Closure of the boarding valve immediately shuts off the flow of volatile hydrocarbons onto the platform, a first safety response to a process release or upset.  Closure of the subsurface safety valve within the well bore, totally shuts down flow from the well and prevents further escape of production from the well under any circumstances.  These valve closings occur through a dump of hydraulic pressure by a

---

[291] Dep. of F. Ragan, Sept. 8, 2011 (BP) at 66:3-68:5; 70:18-71:16; 74:5-16 (Attach. A, Ex. 46).

[292] Functional Design Specification for the Master Control Station, Subsea Control Unit, BP Doc. No.: 1440-35-SB-SP-0030 [BPEP_ABB_02895422 to BPEP_ABB_02895423] (Attach. A, Ex. 113); Safety Shutdown Logic Drawings, BP Doc. No. 1440-35-SB-DG-3021 through 3030 [BPEP_ABB_03359747 to BPEP_ABB_03359757] (Attach. A, Ex. 105 - redacted); Subsea Control System Cause and Effects, BP Doc. No.: 1440-35-SB-RP-0114 [BPEP_ABB_02408632] (Attach. A, Ex. 114); Master Control Station Site Integration Test, BP Doc. No.: 1440-35-SB-PR-0130 [BPEP_ABB_03244795] (Attach. A, Ex. 115).

signal from the emergency support system to the hydraulic pressure unit located on the platform.

The "deviation" allows Atlantis to delay the closing of the surface-controlled subsurface safety valve for up to one hour. During that period, in lieu of closure of the surface-controlled subsurface safety valve, MMS allows BP to close a group of valves located on the well tree just downstream[293] of the wellhead; these closures are activated by electronic signals from the subsea control system through the redundant electronic pathways to the subsea electronic modules on the well trees, several miles from the platform. A total or dual loss of communications with one or more wells would prevent the electronic signals from closing the tree valves on those wells. In such an event, use of the delay time is *not* allowed.[294]

The loss of communications with wells produced through Atlantis have included 5-10 total ("dual") losses of well communications, according to the current lead engineer for instrumentation and controls on Atlantis Steve Cotton,[295] although the actual number is unknown,[296] and cannot be ascertained without data logs. BP's controls expert has no idea how many dual communications failures or other malfunctions occurred or how many failed to generate alarms; he only knows they were not recognized until almost a year had passed.[297]

---

[293] In the oil and gas industry, the bottom of the well is the farthest "upstream" point. Produced hydrocarbons are said to move "downstream" through the production facility, to refining (midstream) and to retail outlets (downstream). Any point in the process may be said to be "upstream" or "downstream" of any other point.

[294] June 21, 2004 Preliminary Deepwater Operations Plan at 10-19 through 10-22 [BPEP_ABB_00087921] (Attach. A, Ex. 116).

[295] Dep. of S. Cotton at 21:23-22:10 (Attach. A, Ex. 102).

[296] *Id.* at 12:4-9; Dep. of L. Holzenthal, Jr. at 126:10-127:18 (Attach. A, Ex. 117).

[297] Dep. of L. Holzenthal, Jr. at 126:10-127:1 (Attach. A, Ex. 117).

After eleven (11) months of production, Atlantis operations documented that dual losses of communication not only were occurring, but that the malfunctions were not being promptly detected; wells were "running blind" without alarms, or operator realization of what was happening.[298]   Electronic signals of the loss of communications with the wells *should have been, but were not* being sent to the emergency support system.[299]   BP operations understands this to be a violation of the authorized production safety system logic.[300]

In lay terms, single board computer faults were resulting in a failure to generate the proper alarms, which in turn resulted in the failure to have an emergency shutdown when required.[301]   This would allow the surface-controlled subsurface safety valve to remain open with only the boarding valve closed, in direct violation of 30 § C.F.R. 250.803(b)(4).   It creates unlawful and unnecessary dangers both to the platform and persons on it, and to the environment.[302]

BP operations recognized this situation as "a non-compliance with the [emergency shutdown] safety logic of the subsea system" on August 26, 2008, almost a year after the start of production.[303]   They notified management, but did not notify

---

[298] *Id.* at 85:8-17, 89:8-14; Aug. 26, 2008 Email from Berger to Broman [BPEP_ABB_ 03579591 to BPEP_ABB_03579592] (Attach. A, Ex. 104); Aug. 5, 2008 Email from S. Cotton to K. Dejohn and F. Ragan re: FW: Atlantis update [BPEP_ABB_04136705 to BPEP_ABB_04136709] (Attach. A, Ex. 118).

[299] Dep. of S. Cotton (BP) at 55:10-57:3 (Attach. A, Ex. 102).

[300] Aug. 26, 2008 Email from Berger to Broman BPEP_ABB_ 03579591 to BPEP_ABB_03579592] (Attach. A, Ex. 104); Dep of S. Cotton (BP) at 58:11-23 (Attach. A, Ex. 102)

[301] Aug. 5, 2008 Email from S. Cotton to K. Dejohn and F. Ragan re: FW: Atlantis update [BPEP_ABB_04136705 to BPEP_ABB_04136709] (Attach. A, Ex. 118); Dep of L. Holzenthal at 124:9-125:10 (Attach. A, Ex. 117).

[302] *See* Decl. of Mike Sawyer, Dec. 28, 2011 at ¶¶ 15-21(Attach. C).

[303] Aug. 26, 2008 Email from Berger to Broman [BPEP_ABB_ 03579591 to BPEP_ABB_03579592] (Attach. A, Ex. 104).

MMS of the non-compliance.[304]  The non-compliance existed because this failure mode was not considered during the design of the controls system.[305]

The SAFE chart for Atlantis failed to include critical subsea valves that regulate, control, and contain the process flow, including the subsea tree production isolation valve, choke, cross over valve, annulus master valve, and annulus wing valve.  By omitting these critical components from the safety shutdown logic functionality, the controls system software, which relies upon this functionality, has been improperly designed.  Ragan (BP) admitted in an internal email that there was "no specific design for where some of the [controls] software would reside," and that he was "not aware of any issued document which formed the basis of the design."[306]  Another BP employee involved in the design wrote that "most of us are not literate enough on software to actually understand the changes being made and their impact."[307]  This grave disconnect and failure to undertake design responsibility is why approval by registered professional engineers is needed.

### (2)    BP's Failure to Develop "As-Built" Drawings Creates a Significant Threat of Harm to Persons, Property, and the Environment.

If "as-built" drawings are not clearly marked "as-built," operators of the facility have no assurance that the process for creating "as-built" drawings—with construction changes approved by engineers to ensure that they are safe—actually occurred.  Worse

---

[304] *Id.*; *See* Dep. of B. Domangue (MMS) at 217:3-220:1; 229:16-232:12; 236:8-239:7; 248:21-249:13; 260:22-261:18 (Attach. A, Ex. 4).
[305] Oct. 28, 2008 Email from Cotton to Waterhouse re: Subsea Comms MOC-08-218 Hazard Review [BPEP_ABB_04135730] (Attach. A, Ex. 119).
[306] Jan. 22, 2007 Email from R. Peloubet re: Operations Managers Meeting and Higher [BPEP_ABB_03498616 to BPEP_ABB_03498618] (Attach. A, Ex. 120).
[307] *Id.*

yet, such operators, either in normal practice or during an emergency, will rely on documents that may not reflect the "as-built" condition of the facility by incorrectly assuming that a drawing that has not been updated is in fact the "as-built" version.

In fact, this situation occurred following the Deepwater Horizon well blowout in the Gulf of Mexico on April 20, 2010.  BP experienced difficulties in activating blowout preventer hydraulic components due to a lack of updated "as-built" drawings.  Sir William Castell, chairman of BP's Safety Environmental Ethics Assurance Committee, stated that it has been "extremely difficult" to get appropriate drawings that allow them "*to assess the position of various pieces of equipment . . . even when lives are threatened . . . .*"[308] Similarly, Gillian Cowlam, BP's Technical Authority for the North Sea, and one of the BP personnel participating in the investigation of the Deepwater Horizon Blowout, states "*it would have been more useful to have had up-to-date drawings.*"[309]  Steve Newman, President and CEO of Transocean testified about the difficulties associated with not having "as-built" drawings.  "What we learned in the initial few hours following the explosions as we attempted to intervene on the [blowout preventer] with the [Remote Operated Vehicle], we learned that the actual arrangements on the BOP did not—were not properly reflected on the drawings."[310]

---

[308] Dep. of W. Castell (BP) at 117:09 to 119:08 (Attach. A, Ex. 121).

[309] Dep. of G. Cowlam (BP) at 190:09 to 190:17 (Attach. A, Ex. 122).

[310] Dep. of S. Newman (Transocean) at 105:1-106:9 (Attach A., Ex. 123); *see also* Dep. of P. Campbell (Wild Well Control) at 351:8-352:13 (Attach. A, Ex. 124) (CEO of Contractor hired by BP during the DWH disaster testified about the lack of "as-builts," "Well, to put it simply, we're barking up the wrong tree. In other words, we're trying to follow with a flying eyeball where that line initiates and where it terminates, and that doesn't match up with the drawing. ); Dep. of R. Turlak (Transocean) at 297:6-19; 298:2-6; 298:14-24 (Attach. A, Ex. 125) .

Accordingly, BP's failure to perform "as-builting" and maintain a complete set of "as-built" plans and specifications for Atlantis poses a significant threat of harm to persons, property, and the environment.

### c.   The Threatened Injury Outweighs Harm to BP

As to the third element, this Judge Hoyt held in his denial of BP's Motion to Dismiss that, "the threatened damage to the Gulf Coast quite clearly outweighs the threatened damage to BP.  Furthermore, BP would likewise suffer monetary injury from a potential oil spill."  *Abbott*, 781 F. Supp. 2d at 472.  There can be no harm from requiring BP to comply with the law.

### d.   The Public Interest Weighs In Favor of Granting Injunction

The Supreme Court has held that, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Amoco*, 480 U.S. at 545.  Recognizing this, Judge Hoyts stated in his earlier ruling allowing Plaintiffs' injunction claim to go forward that,

> As to the final element, the Gulf Coast environment sustains unique wildlife and aesthetic beauties, and thousands of people rely on it for income.  Further destruction of the Gulf by a spill or other incident at Atlantis would undoubtedly affect the public interest in a dramatically negative manner.  Moreover, an incident at Atlantis could result in the permanent closure of the facility.  While the Court appreciates the national interests in being able to drill for and produce oil and gas in the Gulf, the permanent loss of a producing oil and gas facility would cause a greater economic impact to the public than prohibiting production for the duration of time it takes for BP to comply with the relevant regulations.

*Id.*

Accordingly, Plaintiffs have met the test for enjoining operation of Atlantis.

### 4.      A Special Master Should Be Appointed To Oversee a Remediation Plan.

BP's first false certification for Atlantis permits was issued to MMS in September 2002, while BP was on probation for a federal crime in Alaska.   In the Alaska prosecution, BP, p.l.c. (ultimate parent and one of the defendants here) and BP America (the U.S. parent company and defendant here), promised in their plea agreement to "ensure" no further violations of federal law by subsidiaries operating in the United States, specifically to include the business units in the Gulf of Mexico.  Since the Alaska conviction, BP units covered by the Alaska plea agreement committed additional crimes.

BP has the worst safety record of any major oil company, and it has a history of breaking promises.  Therefore, plaintiffs request that the Court issue an injunction requiring full compliance with OCSLA and MMS regulations and that the Court impose a remediation plan under the direction of a master to assure that BP follows the Court's order. In the alternative, plaintiffs ask this Court to forfeit and cancel BP's Atlantis leases.

### CONCLUSION

BP was required to submit applications for four permits for the Atlantis to become fully operational; BP lied to get at least two of the four permits.  The Atlantis is unsafe because of incomplete engineering and unreliable documentation, and continued operations pose a significant threat to the Gulf of Mexico ecosystem.  For the foregoing reasons, plaintiffs request that this Court hold BP liable under the FCA and

OCSLA, award damages to the United States, assess statutory penalties for BP's false

claims, and enjoin operation of Atlantis or revoke BP's leases.

Dated: April 4, 2012

By:   /s/ David L. Perry
        David L. Perry
        State Bar No. 15800000
        Federal Bar No. 5685
        P.O. Box 1500
        Corpus Christi, Texas 78403
        Telephone: (361) 880-7500
        Facsimile:  (361) 887-9507
        dlperry-business@perryhaas.com

        **ATTORNEY-IN-CHARGE FOR
        PLAINTIFFS**

**OF COUNSEL:**

**WATTS GUERRA CRAFT LLP**
Mikal C. Watts
State Bar No. 20981820
Federal Bar No. 12419
MCWatts@wgclawfirm.com
J. Hunter Craft
State Bar No. 24012466
Federal Bar No. 24377
HCraft@wgclawfirm.com
Christopher V. Goodpastor
State Bar No. 00791991
Federal Bar No. 18505
CGoodpastor@wgclawfirm.com
Francisco Guerra IV
State Bar No. 00797784
Federal Bar No. 22568
fguerra@wgclawfirm.com
Edward W. Allred
State Bar No. 50511764
Federal Bar No. 22973
eallred@wgclawfirm.com
Emily C. Jeffcott
State Bar No. 24069993
Federal Bar No. 1069933
EJeffcott@wgclawfirm.com
811 Barton Springs Road
Suite 725
Austin, Texas 78704
Telephone: (512) 381-1964
Facsimile:  (512) 479-0502

**MALLETT, SAPER, BERG LLP**
Edward A. Mallett
State Bar No. 1283000
Federal Bar No. 442
Edward@mgscounsel.com
JPMorgan Chase Tower
600 Travis St., Suite 1900
Houston, Texas 77002
Telephone: (713) 236-1900
Facsimile:  (713) 228-0321

**PERRY & HAAS**
René Haas
State Bar No. 21406800
Federal Bar No. 5680
RHaas@perryhaas.com
P.O. Box 1500
Corpus Christi, Texas 78403
Telephone: (361) 880-7500
Facsimile:  (361) 887-9507

**Mary M. Whittle**
Attorney at Law
TX State Bar No. 24033336
D.C. Bar No. 973916
3930 Argyle Terrace, N.W.
Washington, DC 20011
Telephone:  (202) 320-1612
mmwhittle@mac.com

**HOGAN & HOGAN**
Richard P. Hogan, Jr.
State Bar No. 09802010
Federal Bar No. 8026
rhogan@hoganfirm.com
Jennifer Bruch Hogan
State Bar No. 03239100
Federal Bar No. 7187
jhogan@hoganfirm.com
909 Fannin, Suite 2700
Houston, Texas  77010
Telephone: (713) 222-8800
Facsimile:  (713) 222-8810

## CERTIFICATE OF SERVICE

I hereby certify that on this the 4th day of April 2012, a true and correct copy of the foregoing document was filed with the Court's ECF system and was served via electronic means through transmission facilities from the Court upon those parties authorized to participate and access the Electronic Filing System for the Southern District of Texas.

/s/ David L. Perry
David L. Perry