

UNITED STATES DISTRICT COURT      SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| United States of America | § | |
| *ex rel.* Kenneth W. Abbott, *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| *versus* | § | Civil Action H-09-1193 |
| | § | |
| BP Exploration and Production, Inc., *et al.,* | § | |
| | § | |
| Defendants. | § | |

## Opinion on Summary Judgment

1.   *Introduction.*

On behalf of the government, two citizens sued an oil company. They say that the government leased the company minerals based on lies about its platform designs. Because the company responsibly worked with the government, the company's designs comply with the law, and the government consented, the company will prevail.

2.   *Platform.*

BP leased five blocks offshore of Louisiana in the Green Canyon from the United States of America for mineral production. These blocks are on the outer continental shelf 190 miles south of New Orleans – the Atlantis field. The lease incorporated regulations that required (a) BP to certify that its platform designs were safe, (b) the Department of the Interior to approve its designs, and (c) BP to track design changes.

Since 2007, BP has used the Atlantis platform to drill wells and produce oil. The Department of the Interior has approved its designs and operations each year, accepting BP's compliance with the lease.

3.   *Abbott and Food & Water Watch.*

For five months in 2008, Kenneth W. Abbott worked as a temporary clerk ashore for Technip – a contractor for BP on sub-sea pipelines and equipment. He is not an engineer or an

accountant. Abbott says that he was responsible for "auditing" paperwork. In early 2009, he was fired in a reduction in force.

Food & Water Watch, Inc. – an advocacy group – used the Freedom of Information Act to obtain papers that BP had given Interior from August 2009 through September 2010. It joined Abbott's action. They will be jointly called Abbott.

4.   *The Laws.*

Abbott sought to have the Atlantis idled and to recover the full value of the Atlantis Field – $88 billion – trebled to $256 billion. He says that BP cheated the government by misrepresenting its designs.

To be liable under the False Claims Act, the contractor must have intentionally defrauded the nation out of a pecuniary benefit through its inducement or performance of the contract between them.[1]

Under the Outer Continental Shelf Lands Act, Abbott wants to enjoin drilling with Atlantis until BP adopts safer operations.[2]

5.   *False Claims.*

According to Abbott, BP falsely certified that its designs had been properly stamped. His stamp anxiety arose from his reading e-mails suggesting that papers with the final design of the rig were missing. He also found a schedule that listed the incomplete and missing designs of Atlantis equipment like some subsea wellheads, manifolds, and pipelines. He interpreted the list to mean that BP had its initial designs but lacked some records.

After Abbott was fired, he complained to BP's ombudsman. The ombudsman said that his concerns about missing papers were "substantiated," but BP had already cured the problem before he complained. She told Abbott that other things that he mentioned were not required by Interior. He mis-characterizes the letter.

In September of 2010, after reviewing the government's files, Abbott amended his complaint to include facts about 2005. BP's regulatory compliance coordinator had told the

---

[1] *See* 31 U.S.C. § 3729(a).

[2] *See* 43 U.S.C. § 1349.

government that (a) it had completed its designs under the supervision of a registered professional engineer and (b) its as-built designs would be stored in Houston. Abbott says that BP intentionally cheated the United States if designs were missing either the as-built rubber stamp or the engineer's rubber stamp,

6.    *Public Information.*

This court has no jurisdiction over this claim because it is based on public information.[3] Unless Abbott is an original source, he is not qualified to sue under the False Claims Act. Public information – readily available – is an impermissible basis for a private claim.[4]

Abbott thinks that BP falsely certified that its designs are safe because of papers he got from Interior through the Freedom of Information Act. A federal agency's written response to a citizen's question is a public disclosure.[5] Because public records disclose the facts relied on in the petition, Abbott cannot be an original source.

To qualify as an independent, fresh source, the relator must be someone with direct and distinct knowledge of the wrongdoing who has voluntarily warned the government.[6] The e-mails and schedules that Abbott saw in 2009 said that BP had been missing some records. A second report about missing paperwork in 2009 that he happened to see was not clandestine or incriminatory, neither was it complete.

Abbott has no direct, first-hand knowledge of what stamps were on which of BP's drawings. He has never seen them. He has only seen e-mails and working documents saying that someone says that someone else concluded that a few stamps appear missing. He is not an original source because he does not have "direct and independent knowledge of the information

---

[3] 31 U.S.C. § 3730(e)(4).

[4] United States *ex rel.* Fried. v. W. Indep. Sch. Dist., 527 F.3d 439, 441-42 (5th Cir. 2008).

[5] Schindler Elevator Corp. v. United States *ex rel.* Kirk, 13 S. Ct. 1885, 1889 (2011).

[6] 31 U.S.C. § 3730(e)(4).

on which the allegations are based."[7] The papers were punch lists – not a formal accounting or engineering exception, much less an attempt to hide anything.

 This is not a circumstance that supports an accusation of corruption, much less corruption in 2005. Abbott did not work for BP or its contractor in 2005, and he did not work on the certifications themselves. Precise and verifiable facts make you an original source, not unfounded suspicions.[8] Abbott has only seen working papers that BP created to help it track the paperwork errors that it needed to fix. Its hiring of file clerks and spending money to keep track of these omissions shows that it was trying to correct its inevitable mistakes, not hide them. No evil inference is possible.

 Food & Water Watch founders off the ways. It simply jumped on Abbott's case. It knows nothing.

7.  *Safety Stamps.*

 Not every transgression of a federal regulation generates a claim. If he were qualified to sue, Abbott would have to prove that (a) BP represented something as true that was not, (b) it misrepresented it consciously, and (c) its lie was significant in Interior's decision to lease the minerals.[9]

 BP never misrepresented – much less knowingly distorted what it was doing. Abbott says that it deceived the government when it said that it had complied with safety regulations. He says that BP's records are often missing two rubber stamps: a stamp on the final, in-service drawing that says "as-built;"and a certification by a professional engineer.

 Abbott has mistaken the stamp – an indicia of preparation for safety – for safety itself. The regulations only say that a professional engineer must certify that the design and that as-built plans must be kept for weight-bearing structures on the platform, not underwater

---

[7] *Id.*

[8] United States *ex rel.* Lam v. Tenet Healthcare Corp., 287 Fed. App'x 396, 400 (5th Cir. 2008).

[9] United States *ex rel.* Stuery v. Cardinal Health, Inc., 625 F.3d 262, 268 (5th Cir. 2010).

components.[10] Stamps may be a common way companies keep track of contractual compliance, with public and private contracts, but they are not required themselves.

Although the Constitution does not contemplate an independent judiciary that defers to the other branches,[11] Interior's conclusion that BP complied with the regulations is persuasive. Abbott's view is empty. Interior says that it did not rely on BP's stamps. If a regulation had said that a "stamp" was required, its omission would need to have been evaluated for its effect.

Being thorough, Interior had the American Bureau of Shipping – an independent inspector – approve the design, fabrication, and installation of Atlantis. After this suit began, Interior again inspected BP's engineering drawings and other papers. It concluded for a second time that BP had complied with its regulations.

Abbott has no facts to suggest that BP told Interior anything wrong. Still, he has persisted in claiming that it lied – lied on an important fact. Interior, the American Bureau of Shipping, and BP agree that the regulations do not always require these stamps. Abbott's conclusion that missing stamps are a material distortion of BP's performance confuses technique with purpose. A single stamp could be critical. These were not.

Abbott has also not explained – with facts, logic, or science – how these paperwork wrinkles could have had a "natural tendency to influence" Interior's decision to allow BP to lease these blocks for the consideration agreed.[12] After reviewing Abbott's claims, Interior continued the lease with BP.

The genesis of this suit is a disgruntled layman's speculation about complex laws and engineering, abetted by ideologues. Political motives are good as long as the claimant meets all of the rules and standards that applies to every other litigant.

---

[10] 30 C.F.R. § 250.901(d); 30 C.F.R. § 250.802(e)(5).

[11] U.S. Const. art III.

[12] 31 U.S.C.A. § 3729 (2012); United States *ex rel.* Longhi v. United States, 575 F.3d 458, 470 (2009).

8.    *Damages.*

Abbott initially said that the United States should recover more than $266.4 billion. His technician, Scott A. Bayley, CPA, concluded that the value of the Atlantis field is approximately $88.8 billion – $32 billion from past production and $56.8 billion from expected production. He then trebled the $88.8 billion.

Bayley is not an expert. He has imagined standards for recovery and economics. Instead of using data about historic prices, he interpolates backwards from estimates about future prices. His report is a press release, not a serious, analytical study of the value of the field. It will be struck.

In 2012, Abbott abandoned his demand for the value of the estimated reserves and "contingent resources." He also agreed not to seek damages for all values if the court imposes the changes in engineering that he wants under the Outer Continental Shelf Lands Act.

Under the False Claims Act, the measure of damages is equal to the difference between the value that the government received and the value that it would have had absent the fraud.[13] This statute was passed to encourage people to report contractor fraud during the Civil War. It was about lame mules and woolless blankets.[14]

The law addresses the quality of the contractor's performance, not insignificant variations in process. If the government hires a company that promises not to use an unregulated subcontractor and it nevertheless uses one, no damages arise unless the plaintiff can show that government materially paid more or received less because of the outlawed work.[15]

Misreading the law, Abbott says that damages under the Act equal the amount spent by the government, no matter what it received in return. That may be true when the government's return is difficult to value.[16] If a scientist fraudulently causes the government to

---

[13] United States v. Bornstein, 423 U.S. 303, 316-17 n.13 (1976).

[14] An Act to prevent and punish Frauds upon the Government of the United States, March 2, 1863, ch. 67, § 3, 12 Stat. 696 (1863).

[15] United States *ex rel.* Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 911 (4th Cir. 2003).

[16] United States *ex rel.* Longhi v. United States, 575 F.3d 458, 472-73 (5th Cir. 2009).

give him $1 million to research Mars, he will owe the government $1 million. He may not retain the funds because the government received intangible or potential benefits.

BP has fully paid the United States under the leases – more than $600 million in royalties, bonuses, and rental fees. In exchange, the government met its responsibility by furnishing its lease to the resources.

Knowing of no diminution in practical performance by BP, Abbott says that the government was harmed because Atlantis is unsafe. That is not the standard at law. Abbott's measure of damages would pass cost-free to the government the discovery of the field, producing wells, pipeline networks, and costs directly required to produce the oil.

In summary, Abbott will take nothing from BP on his claim under the False Claims Act because (a) it is based on public information, (b) BP complied with the safety regulations, and (c) the United States has not been damaged.


9.     *Outer Continental Shelf Lands Act.*

Abbott may recover if: (a) he has been injured, (b) his injury was caused by the defendant, and (c) his remedy will redress his injury.[17] At law, an injury must be something practical. One must sue for a concrete or imminent damage, rather than an unquantifiable, speculative prospect of harm.[18]

For seven years, BP has used the Atlantis platform to drill and produce. It has had no incidents. This alone shows that Abbott has suffered no injury. Having reviewed Abbott's theories about stamps, Interior has concluded that BP's operations are safe.

Abbott may sue for threatened injuries if they are "certainly impending."[19] He says that he is being injured because the platform may fail. He has no facts to connect his anxieties to this platform. Almost everything in modernity that surrounds us may be dangerous. Nonmodern times were even more dangerous. In four years, Abbott and his advisors have not identified a single component of the platform that has a reasonable and safer alternative.

---

[17] U.S. Const. art. III; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

[18] Whitmore v. Ark, 495 U.S. 149, 158 (1990).

[19] *Id.* at 158.

Abbott concedes that he has no facts. He blames the deficiency on BP. According to him, he cannot know whether BP's operation is safe because it does not consistently use stamps. His ignorance is no basis for attacking people in court.

No one doubts that disasters are hard on people and places. Yet, his technical helpers have only talked about the horror of oil spills and the importance of stamps in the abstract. Generalizations about a hypothetical future injury do not inform a suit at law.[20] Some of his advisors even admitted that "it's basically a matter of conjecture . . . what might occur in the future of BP Atlantis."

Abbott must plead a particular harm with a significant probability that it will injure him in some fashion much more physical or financial than his not liking that it happened. A person may not sue because of damage to the environment unless he has a genuine, substantial connection to the damaged resource.[21] A Texan who loves nature may not sue to stop a Montanan who may be polluting the Yellowstone River.[22]

Abbott is like that Texan. He has the same abstract interest in nature as all Americans. He lives in Houston but has not visited the Gulf since 2010 when he was there to be photographed for *60 Minutes*. He says that he is likely to swim, boat, or fish in the Gulf eventually. He would need to decide where he plans to develop a practice of a specific recreational use. Next, he would need to describe the degree of impingement that it will have on his preferred practice and plan. Then he would need to discount all of that by the likelihood of his feared failure.

Food & Water says that its members "care about the Gulf." To sue on behalf of its constituents, it has to have members who elect the governing body, serve on its board, finance its activities, or otherwise control it.[23] Food & Water's own charter says it only has donors – not members. They do not elect its board or having voting rights.

---

[20] Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 666 (D.C. Cir. 1996); Public Citizen, Inc. v. NHTSA, 489 F.3d 1279, 193-94 (D.C. Cir. 2007).

[21] Sierra Club v. Morton, 405 U.S. 727, 740 (1972).

[22] *See* Lujan, 504 U.S. at 564.

[23] Friends of the Earth, Inc. v. Chevron Chem. Co., 129 F.3d 826, 828-29 (5th Cir. 1997).

It has identified three of its donors who will be particularly injured. One purchases shrimp caught in shallow waters of the Gulf, not the deep waters of Atlantis. Another lives in California and owns land in Texas that is not adjacent to the Gulf. The last donor says that she enjoys watching its plants and animals, but she could not identify a single species of bird that was harmed by past spills. She also had not been on a boat in years and does not join in organized bird watching. These donors would not have standing as people; they certainly do not have it for an organization with other donors and other interests.

Because the plaintiffs have no particular, substantial connection to the Gulf of Mexico, they do not have standing to bring claims under the Outer Continental Shelf Lands Act or the False Claims Act.

10.     *Conclusion.*

Kenneth W. Abbott and Food & Water Watch, Inc., have burdened BP with claims that it lied to obtain an offshore lease in the Gulf of Mexico and that its platform was otherwise unreasonably dangerous. Despite all of their activity, these plaintiffs knew nothing, discovered nothing, and distorted what the government already knew.

The plaintiffs have not identified a design error in the platform caused by irregular paperwork – missing rubber stamps. None. They have not identified another design error. None. They have not suggested alternative designs. None. They have not blown a whistle. They have blown their own horn.

Worse, they brought an unprincipled case because neither of them had a legally recognized relation to the subject of the lawsuit – the Atlantis Field. They were strangers to the claims they made.

Kenneth Abbott and Food & Water Watch, Inc., will take nothing from BP PLC, BP America, Inc., BP Exploration and Production Inc., BP Global, and BP Products North America, Inc.

Signed on August 21, 2014, at Houston, Texas.

_____

Lynn N. Hughes
United States District Judge